**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| OMNIVISION TECHNOLOGIES, INC., <br><br> Plaintiff and Counterclaim-Defendant, <br><br> v. <br><br> RE SECURED NETWORKS, LLC, <br><br> Defendant and Counterclaim-Plaintiff. | C.A. No. 24-187-JLH-CJB <br><br> **REDACTED - PUBLIC VERSION** <br> **(Filed April 9, 2026)** |

**RE SECURED NETWORKS, LLC'S LETTER BRIEF IN SUPPORT OF ITS MOTION
TO STRIKE PORTIONS OF THE OPENING AND REPLY
<u>EXPERT REPORTS OF DR. R. JACOB BAKER</u>**

Dated: April 2, 2026

*Of Counsel*:

KASOWITZ LLP
Timothy K. Gilman
Robert S. Pickens
Daniel Apgar
Amanda Sewanan
1633 Broadway
New York, NY 10019
(212) 506-1700
tgilman@kasowitz.com
rpickens@kasowitz.com
dapgar@kasowitz.com
asewanan@kasowitz.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Pilar G. Kraman (No. 5199)
Jennifer P. Siew (No. 7114)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
pkraman@ycst.com
jsiew@ycst.com

*Attorneys for Defendant and Counterclaim-
Plaintiff RE Secured Networks, LLC*

Dear Judge Burke,

Pursuant to Rules 16, 26, and 37 of the Federal Rules of Civil Procedure, Defendant respectfully requests that the Court strike portions of Dr. R. Jacob Baker's Reply ("Reply Report," Ex. 1) and Opening ("Opening Report," Ex. 2) Expert Reports regarding invalidity on behalf of OmniVision.

### 1. The Reply Report Asserts Fifteen New Prior Art References for the First Time

The addition of new and untimely prior art references in the Reply Report at the eleventh hour is an unauthorized attempt to amend OmniVision's final election of asserted prior art references in violation of the Scheduling Order (D.I. 35). As a result, "[t]his motion could be viewed through the lens of a scheduling order violation rather than as a motion to strike," which requires "good cause." *Finjan, Inc. v. Rapid7, Inc.*, No. 18-1519, 2020 WL 5798545, at *5 (D. Del. Sept. 29, 2020); *Vehicle IP, LLC v. Werner Enters., Inc.*, No. 10-503, 2013 WL 4786119, at *1-3 (D. Del. Sept. 9, 2013).

The Scheduling Order sets forth that "Omnivision shall provide final invalidity contentions" by no later than October 1, 2025. D.I. 35 ¶ 6(g) (as amended by D.I. 142 at 2). OmniVision timely served final contentions, disclosing over a hundred alleged "Prior Art" patents and publications for the Asserted Patents. Ex. 3 at 6-44. Despite this voluminous disclosure, and without leave, the Reply Report now adds *fifteen* new references. *See* Appx. 1 hereto (summarizing new references).

For example, the Reply Report alleges for the first time that *Rhodes-663* shows obviousness of the "wherein the voltage selector is controlled by a register" limitation of the '671 Patent. Ex. 1 at ¶¶ 92, 98. But *Rhodes-663* was never disclosed in OmniVision's final invalidity contentions. *See* Ex. 3. Nor was it addressed in the Opening Report. *See* Ex. 2. It is a new reference, offered for the first time in the Reply Report in violation of the scheduling order and should thus be stricken. And the same is true of the other references first raised on Reply. *See* Appx. 1 (summarizing references and report portions that Defendant seeks to strike herewith).

As to good cause, an examination of the new references and reasons for their inclusion in the Reply Report confirms there is none. For example, as to *Rhodes-663*, the Reply Report explains that this reference was added in response to Defendant's validity report pointing out, *e.g.*, that "the gate in *Lee* [the original reference opined as to] is a *reset* gate," rather than a *transfer* device as required by the '671 Patent. Ex. 1 at ¶ 92. And the ambit of adding *Rhodes-663* in the Reply Report is to remedy that issue with *Lee*. But OmniVision's attempts to now add a *transfer* device reference to correct its original theory does not excuse its failure to timely address that difference in the first instance, and should be stricken. Other new references are similarly situated. Ex. 1 at ¶ 144 ("Rhodes '607"), ¶ 153 ("Rhodes-444), ¶ 160 ("Sze Textbook").

As to other new references, OmniVision attempts to blame purported changes in Defendant's infringement theories as justifying OmniVision's additions. They do not. For example, the Reply Report includes a section entitled "RESN's Different Infringement Theories" that injects a number of new references. *Id.* at ¶¶ 109, 112-116. Even if OmniVision were correct that Defendant's theories had changed (and they did not), that would not excuse OmniVision introducing new invalidity theories in the Reply Report. OmniVision had nearly two months after opening reports (and the disclosure of Defendant's infringement report) before rebuttal reports were due, and OmniVision could have addressed these allegedly "changed" infringement theories then. D.I. 194 at 1. Instead, OmniVision waited until its Reply Report to present these new opinions. Having so delayed, Defendant is left with no opportunity to respond, and these opinions should be struck.

And a court in this district struck new invalidity opinions provided for the first time in a reply report, absent "any explanation for [the] failure to seek leave to supplement [the Parties'] opening report during the 30-day period" before the rebuttal report. Memorandum Order at 3, *Prolitec Inc. v. ScentAir Technology, LLC*, No. 20-984-WCB, D.I. 371 (D. Del. Oct. 2, 2024) (Ex. 5). The same result is warranted here. OmniVision should not be permitted to redo its invalidity contentions and rewrite its Opening Report via its Reply Report where Defendant has no opportunity to respond. Indeed, the "key factor that courts have considered is whether that party has shown diligence." *British Telecomms. PLC v. IAC/InterActiveCorp*, No. 18-366-WCB, 2020 WL 3047989, at *2 (D. Del. June 8, 2020). Notably, "[u]nlike the liberal policy for amending pleadings, the philosophy behind amending infringement and invalidity contentions is decidedly conservative." *Id.* There is no diligence here, and thus the new opinions in the Reply Report should be struck.

### 2.   The Reply Report Asserts New Anticipation and Obviousness Theories

The Reply Report also impermissibly adds new anticipation and obviousness theories that were not disclosed in OmniVision's contentions or Opening Report—impermissibly amending the bases of its invalidity positions—which should also be struck.

For example, while OmniVision's invalidity contentions and Opening Report relied only on obviousness combinations of "*Rhodes-647* in Combination with *Kimura*," the Reply Report proffers new theories of "Anticipation in View of Rhodes-647." *Compare* Ex. 1 at ¶¶ 133-39, 155 (arguing, *e.g.*, that "Rhodes-647 . . . anticipates the asserted claims of the '145 patent"), *with* Ex. 2 at ¶¶ 390, 405, 412, 415 (alleging only that "*Rhodes-647* **in view of** [or in combination with] *Kimura* discloses" limitations of the '145 Patent) (emphasis added); *compare also* Ex. 1 at ¶¶ 187-192 (anticipation by Rhodes-647 for the '274 Patent), *with* Ex. 2 at ¶¶ 504, 507 (addressing obviousness with Kimura). The Reply Report's opinions concerning anticipation by Rhodes-413 are similarly situated. *Compare* Ex. 1 at ¶ 170, *with* Ex. 2 at ¶¶ 422, 425. And, for the first time in Reply, Dr. Baker presents an obviousness theory for the '671 Patent based upon the combination of *Kochi* with *Guidash-656* (Ex. 1 at ¶ 100) that was not presented in the Opening Report. Each of these theories is new, presented without good cause, and should be struck.

### 3.   The Opening and Reply Reports Present New *Guidash-656* and Other Opinions

The Reply Report also cites heavily to U.S. Patent No. 6,218,656 ("Guidash-656"), but this reference was never included in OmniVision's final invalidity contentions, and OmniVision's attempt to inject it into the case now should be rejected. The Reply Report expressly relies on combinations with Guidash-656 for all three of the '671, '274 and '145 Patents, explaining for example that "it would be obvious to further combine with Guidash-656" for a number of limitations. Ex. 1 at ¶ 70; *see also id.* at ¶¶ 48, 73-76, 77, 79-80, 81, 100, 154, 166, 169, 177. For the same reasons as above, these untimely references to Guidash-656 should be stricken.

Moreover, while Guidash-656 was included in the Opening Report (unlike the issues addressed above), that does not render OmniVision's reliance thereon proper under the Scheduling Order, and any reliance on Guidash-656 therein should also be struck. Ex. 2 at ¶¶ 124-125, 224, 321. The Opening Report's reliance on "White" and "Pierrat" should also be struck, as these references were never disclosed in the final invalidity contentions. Ex. 2 at ¶¶ 331, 374, 418-19, 475-76, and 514.

Additionally, references to "Berezin" in ¶ 113 of the Reply Report should be struck. While listed nominally list in the contentions (Ex. 3 at 15), Berezin was never charted and not relied on in the Opening Report, and thus Defendant had no opportunity to address it in rebuttal.

2

### 4.   The Reply Report Asserts a New Motivation to Combine Opinion

The Reply Report asserts a new motivation to combine opinion, combining "*Isogai* in view of *Inuiya, Fossum, Neter,* and/or *Loinaz*," explaining that "a POSITA would be motivated to look to teachings from CCD imaging devices in determining improvements to make on CMOS imaging devices." Ex. 1 at ¶ 243, ¶¶ 236-244. Dr. Baker then incorporates this opinion in support of his analysis of his combination of "*Inuiya* in view of any of *Isogai*, *Fossum*, *Neter*, and *Loinaz*." Ex. 1 at ¶ 254. The Opening Report offered no such opinion, and Defendant requests that this new motivation to combine opinion in the Reply Report be struck.

### 5.   The Reply Report Includes a New Opinion on *Kimura* for the '274 Patent

For the first time on Reply, Dr. Baker asserted a new analysis of the "non-constant work function" limitation of the '274 Patent for *Kimura*. In the Opening Report, he opined that a POSITA "would have also understood [in *Kimura*] that the p-type **gate electrode** and **the channel** would have had different work functions (*i.e.*, electron potentials) because **the graded p-type gate electrode** and **the channel** are of different materials." Ex. 2 ¶ 496; *see also id.* (noting "a work-function difference between the gate electrode and the channel"). On Reply, he changes his opinion to instead identify "mere presence of the higher and lower doping regions **in the gate**" itself. Ex. 1 at ¶¶ 183; *see also id.* at ¶ 180 (identifying **two portions of the gate** as the claimed "first part" and "second part" of the "control terminal"). Dr. Baker originally focused on differences between the "gate" and the "channel," and now pivots to differences "in the gate" itself. Dr. Carley addressed the original opinion (Ex. 4 at ¶ 320), not the new opinion, which should be struck.

### 6.   The *Pennypack* Factors Also Weigh in Favor of Striking These Opinions

Though this Court previously held that scheduling order violations may be analyzed for "good cause" rather than under *Pennypack*, exclusion is appropriate under either standard. *Vaxcel Int'l Co. v. HealthCo LLC*, No. 20-224-LPS, D.I. 226 (D. Del. June 28, 2022) (Ex. 6).

Surprise or Prejudice: OmniVision's shifting-sands approach to invalidity is highly prejudicial. The parties advanced through discovery in reliance on OmniVision's selected invalidity grounds. OmniVision now seeks to submit numerous new grounds, and, by doing so at the eleventh hour, has precluded Defendant from formulating a responsive case. *Apotex, Inc. v. Cephalon, Inc.*, C.A. No. 2:06-cv-2768, 2015 WL 12645745, at *2 (E.D. Pa. May 26, 2015) ("Prejudice is inherent when deadlines are disregarded in complex cases with extensive discovery.").

Disruption of Case Schedule and Ability to Cure: Expert discovery is closed. Case dispositive motions are due in one day, and there is no opportunity to cure the prejudice here.

Bad Faith or Willfulness: There is no reason that OmniVision could not have identified these references sooner. In fact, many of these references are OmniVision's own patents, or were invented by past OmniVision employees. *See, e.g.*, Ex. 1 at ¶ 92 (Rhodes-663 "assigned to OmniVision"); *id.* at ¶ 112 (same for "Kindt"); *id.* at ¶¶ 115, 144-148, 153, 164, 184 (relying on other Rhodes references). *See Apotex*, 2015 WL 12645745, at *9 (finding "bad faith" where a party "could have easily sought leave of court to file additional materials and failed to do so").

Importance of Excluded Evidence: OmniVision's Opening Report already analyzed multiple grounds for each Asserted Patent, and timely addressed, for example, four other Rhodes references. *See* Order at 3, *TQ Delta v. 2Wire, Inc.*, No. 13-1835-RGA, D.I. 1522 (D. Del. Dec. 10, 2020) (Ex. 7) (granting motion to strike where "Defendant has advanced dozens of invalidity theories"). What OmniVision seeks to add at this late hour are unnecessary, cumulative, and improper.

3

Dated: April 2, 2026

*Of Counsel*:

**KASOWITZ LLP**
Timothy K. Gilman
Robert S. Pickens
Daniel Apgar
Amanda Sewanan
1633 Broadway
New York, NY 10019
(212) 506-1700
TGilman@kasowitz.com
RPickens@kasowitz.com
DApgar@kasowitz.com
ASewanan@kasowitz.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Jennifer P. Siew*
Anne Shea Gaza (No. 4093)
Pilar G. Kraman (No. 5199)
Jennifer P. Siew (No. 7114)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
pkraman@ycst.com
jsiew@ycst.com

*Attorneys for RE Secured Networks, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 2, 2026, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Steven J. Fineman
Kelly E. Farnan
Sara M. Metzler
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
fineman@rlf.com
farnan@rlf.com
metzler@rlf.com

Kristen Healey Cramer
Noelle B. Torrice
BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP
1313 North Market Street, Suite 1201
Wilmington, DE 19801
kcramer@beneschlaw.com
ntorrice@beneschlaw.com

*Attorneys for Plaintiff OmniVision
Technologies, Inc.*

David H. Bluestone
Samuel J. Ruggio
Charles M. McMahon
Thomas M. DaMario
Carlton J. Hemphill
Kathleen Lynch
Kathleen Watson Moss
BENESCH FRIEDLANDER COPLAN &
ARONOFF LLP
71 S. Wacker Drive, Suite 1600
Chicago, IL 60606
dbluestone@beneschlaw.com
sruggio@beneschlaw.com
cmcmahon@beneschlaw.com
tdamario@beneschlaw.com
chemphill@beneschlaw.com
klynch@beneschlaw.com
kwatsonmoss@beneschlaw.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Jennifer P. Siew*

Anne Shea Gaza (No. 4093)
Pilar G. Kraman (No. 5199)
Jennifer P. Siew (No. 7114)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
pkraman@ycst.com
jsiew@ycst.com

*Attorneys for Defendant RE Secured Networks,
LLC*

# Appendix 1

| New Reference or Theory | Proposed Language to be Struck (If Less Than Full Paragraph) | Report Paragraph | Basis to Strike |
|---|---|---|---|
| U.S. Patent No. 7,791,663 (Ex. 58, "Rhodes-663") | Lee is applicable to any control signal applied to a gate in an image sensor, not merely a reset gate, and it would be readily understood by a POSITA to be applicable to a 4T pixel cell. For example, U.S. Patent No. 7,791,663 filed on October 15, 2004 assigned to OmniVision discusses using intermediate voltages to address blooming for either the reset transistor for a 3T pixel or the transfer transistor for a 4T pixel (See Ex. 58, Rhodes-663, Abstract 3:1-8, 3:50-48.) | Reply Report ¶ 92 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 7,791,663 (Ex. 58, "Rhodes-663") | Starting from Lee, its teachings of modifying the pixel transfer function would similarly have been understood to be readily applicable to a 4T pixel cell because the intermediate voltage application was already known to be available for 3T or 4T pixel cells. For example, U.S. Patent No. 7,791,663 filed on October 15, 2004 assigned to OmniVision discusses using intermediate voltages to address blooming for either the reset transistor for a 3T pixel or the transfer transistor for a 4T pixel (See Ex. 58, Rhodes-663, Abstract 3:1-8, 3:50-48.) | Reply Report ¶ 98 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 7,791,663 (Ex. 58, "Rhodes-663") | A POSITA knows that gate voltages can be controlled in the same way for a reset gate as for a transfer gate. (See, e.g., Ex. 17, 8:33-51; Ex. 58 at 3:1-3, 3:59-48.) | Reply Report ¶ 104 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 7,791,663 (Ex. 58, "Rhodes-663") | [Full Paragraph] | Reply Report ¶ 114 | (1) Reference not disclosed in contentions or Opening Report |
| US 2006/0114345 and PCT equivalent WO 2006/060306 (Ex. 59, "Wu Filings") | [Full Paragraph] | Reply Report ¶ 108 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent Publication No. 2004/0252211 (Ex. 60, "Rhodes-211") | [Full Paragraphs] | Reply Report ¶¶ 109, 134 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 6,348,681 (Ex. 61, "Kindt") | [Full Paragraph] | Reply Report ¶ 112 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 6,140,630 (Ex. 63, "Rhodes-630") | [Full Paragraph] | Reply Report ¶ 115 | (1) Reference not disclosed in contentions or Opening Report |
| OV3610 Datasheet (Ex. 64) | The use of registers in CMOS image sensors was performed by OmniVision prior to RESN's alleged invention in the '671 patent. (See, e.g., Ex. 64, OV3610 Datasheet Advanced Preliminary Datasheet at 2.) | Reply Report ¶ 116, and accompanying graphic | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 7,326,607 (Ex. 65, "Rhodes-607") | In U.S. Patent No. 7,326,607 ("Rhodes '607"), original application filed on April 25, 2003 and issued on February 5, 2008, describes a 4T pixel cell and explains the use of two different masks as forming a floating diffusion node: Referring first to the n+ region 10 of the 4T pixel of FIG. 1, it is normally formed from a n− type LDD implant followed by a highly-doped n+ source and drain implant. Typically, this highly-doped n+ region is formed using a n− type dose 44of 5×1014/cm2 to about 3×1016/cm3. Further, the n− type LDD implant is normally conducted very close to the reset and transfer transistors. Then, a second mask is used and the source/drain of the reset and transfer transistors are formed. The resulting n+ floating diffusion region 10, illustrated in FIG. 1, is formed as a result of the two diffusion regions combining from the LDD implant step and the highly n+ doping source/ drain implant step. (Ex. | Reply Report ¶ 144 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 7,326,607 (Ex. 65, "Rhodes-607") | As shown and highlighted below is floating diffusion region 10 in Rhodes '607 (on the left) is the same as what is shown in the Opening Report with respect to Rhodes-647. | Reply Report ¶ 145, and accompanying graphic | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 7,326,607 (Ex. 65, "Rhodes-607") | Similarly, Dr. Carley's multiple steps therefore they are different argument would be rejected by a POSITA. As noted above, even a "floating diffusion region" was confirmed by Howard Rhodes himself as the result of a LDD implant step followed by a source/drain implant step." (Ex. 65 at 5:9-12.) | Reply Report ¶ 148 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 7,825,444 (Ex. 66, "Rhodes-444") | As shown in the Opening Report, from Eric Fossum's 1995 publication describing the "floating diffusion output node", to U.S. Patent No. 5,471,515, and U.S. Patent No. 5,625,210, and more the floating diffusion node is consistently shown as the source/drain for the transfer transistor and the reset transistor. (Opening Report at ¶¶ 96-101; Exs. 12, 13, 9.) His argument ignores that they are the same region in the semiconductor, there is nothing to conflate. (See e.g. Ex. 33 at ¶ 4; Ex. 66, U.S. Patent No. 7,825,444 ("Rhodes-444") at 1:49- 53.) | Reply Report ¶ 153 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 7,825,444 (Ex. 66, "Rhodes-444") | Moreover, less than a month after the filing of the MTTPs, on January 14, 2005, Howard Rhodes did file a patent application that explained that it was indeed well-known method in the prior art "to try to ensure full read out across a transistor is to provide a lateral doping gradient with boron that drives electrons from the photosensitive side, across the transfer gate, to the drain side of the transferred gate (called the floating diffusion)." (Ex. 66, Rhodes-444, at 1:49-53.) Indeed, it was so well-known that Mr. Rhodes patent focused on an improvement of using Indium (a p-type dopant) instead of Boron (also a p-type dopant). (Id. at 2:64-3:26.) This contemporaneous patent application refutes Dr. Carley's position that Dr. Rhodes would not consider using a doping profile such as that disclosed in Kimura and his flawed positions concerning the drain and the floating diffusion node being somehow separate items. It also shows that a POSITA would recognize that a lateral doping gradient could be used to improve full readout of the photodiode. | Reply Report ¶ 164 | (1) Reference not disclosed in contentions or Opening Report |

| New Reference or Theory | Proposed Language to be Struck (If Less Than Full Paragraph) | Report Paragraph | Basis to Strike |
|---|---|---|---|
| U.S. Patent No. 7,825,444 (Ex. 66, "Rhodes-444") | [Full Paragraph] | Reply Report ¶ 184 | (1) Reference not disclosed in contentions or Opening Report |
| S.M. Sze, Semiconductor Devices, Physics and Technology, 2nd Ed. (2002) (Ex. 67) | One could dope the region under the gate, adjust the gate oxide thickness, or change the work function of the gate material. (See, e.g., Ex. 67, Sze Textbook, at 194-199.) It is not a matter of random guessing as he suggests, but a known set of solutions with predictable results. | Reply Report ¶ 160 | (1) Reference not disclosed in contentions or Opening Report |
| S.M. Sze, Semiconductor Devices, Physics and Technology, 2nd Ed. (2002) (Ex. 67) | The longstanding use of self-aligned gates is recognized in Sze (discussed above) and in Streetman. (Exs. 67; Ex. 7 at 323.) | Reply Report ¶ 189 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 3,673,471 (Ex. 68, "Faggin") | It has long been standard MOS processing practice to form the gate first and then implant the source and drain using the gate structure as a mask, thereby producing self-aligned junctions. The self-aligned polysilicon gate, co-invented by Frederico Faggin, was patented in 1972. (Ex. 68, U.S. Patent No. 3,673,471). | Reply Report ¶ 188 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 3,475,234 (Ex. 69, "Kerwin") | The use of a metal gate as a mask to align the source and drain because of potential alignment issues in the fabrication was known before then. (Exs. 69 and 70, U.S. Patent Nos. 3,475,234 and 3,472,712). | Reply Report ¶ 188 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 3,472,712 (Ex. 70, "Bower") | The use of a metal gate as a mask to align the source and drain because of potential alignment issues in the fabrication was known before then. (Exs. 69 and 70, U.S. Patent Nos. 3,475,234 and 3,472,712). | Reply Report ¶ 188 | (1) Reference not disclosed in contentions or Opening Report |
| K. Miwada, et al., TP: 11.2: A 100MHz Data-Rate, 500-Element CCD Linear Image Sensor with Reset Pulse Level Adjustment Circuit, ISSCC 92 / Session 11 / Image Sensors and Processors / Paper 11.2 (Ex. 71) | The use of self-aligned gates for the creation of a floating diffusion region was confirmed to be known in 1992 (Ex. 71, Miwanda, IEEE) and for CMOS image sensors in 1997 (Ex. 72, Wong, IEEE). | Reply Report ¶ 189 | (1) Reference not disclosed in contentions or Opening Report |
| H. Wong, CMOS Active Pixel Image Sensors Fabricated Using a 1.8-V, 0.25-um CMOS Technology, IEEE Transactions on Electron Devices, Vol. 45, No. 4, April 1998 (Ex. 72) | The use of self-aligned gates for the creation of a floating diffusion region was confirmed to be known in 1992 (Ex. 71, Miwanda, IEEE) and for CMOS image sensors in 1997 (Ex. 72, Wong, IEEE). | Reply Report ¶ 189 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent No. 6,100,551 (Ex. 73, "Lee-551") | [Full Paragraph] | Reply Report ¶ 192 | (1) Reference not disclosed in contentions or Opening Report |
| U.S. Patent Publication No. 2005/0083421 (Ex. 62, "Berezin") | [Full Paragraph] | Reply Report ¶ 113 | (3) Undisclosed in Opening Report |
| New Anticipation Theory - Rhodes-647 alone anticipates '145 patent claims | [Full Paragraphs] | Reply Report ¶¶ 133-139 | (2) New Anticipation or Obviousness Theory on Reply |
| New Anticipation Theory - Rhodes-647 node analysis | [Full Paragraph] | Reply Report ¶ 155 | (2) New Anticipation or Obviousness Theory on Reply |
| New Anticipation Theory - Rhodes-413 alone anticipates '274 patent | [Full Paragraph] | Reply Report ¶ 170 | (2) New Anticipation or Obviousness Theory on Reply |
| New Anticipation Theory - Rhodes-647 alone anticipates '274 patent | [Full Paragraphs] | Reply Report ¶¶ 187-192 | (2) New Anticipation or Obviousness Theory on Reply |
| U.S. Patent No. 6,218,656 (Ex. 28, "Guidash-656") | [Full Paragraph] | Reply Report ¶ 48 | (3) Reference not disclosed in contentions |

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| OMNIVISION TECHNOLOGIES, INC.<br><br>Plaintiff,<br><br>v.<br><br>RE SECURED NETWORKS, LLC<br><br>Defendant. | C.A. 1:24-cv-00187-JLH-CJB |

**REPLY EXPERT REPORT OF R. JACOB BAKER, PH. D., P.E.**

(PICTOSRESN0001069.)

34.    Nor is there any discussion of how the transfer gate is doped, which would be required for the claims of the '145 and '274 patents.

35.    There is simply no support in the presentation for conception of any of the claimed inventions in this case as of November 11, 2003.

### E.    Flaws in Dr. Carley's Technical Analyses

36.    Dr. Carley repeatedly equates the "transfer gate" with the "transfer device." (Carley Rebuttal Report, ¶¶ 55, 368, 369.)  Dr. Carley's statement "a POSITA would be able to identify the 'body' of the transfer gate structure" is nonsensical and he is wrong to state that the transfer gate could be located in an epitaxial layer or in the substrate.  (*Id.* at 369.)

37.    Dr. Carley's Technical Overview is viewed from the lens of an analog circuits designer, not an image sensor designer, and makes several serious errors that would not be made by a POSITA.  (*Id.* at ¶¶ 52-57.)  His explanation about the operation of the 4T pixel cell incorrectly characterizes the transfer gate as a saturated common-gate amplifier, whereas in a 4T pinned-photodiode pixel the transfer gate operates as a barrier control device enabling charge transfer, with increased voltage swing arising from the smaller capacitance of the floating diffusion node rather than transistor gain.

38.    In a 4T pinned-photodiode pixel, the transfer gate does not function as an analog amplifier operating in saturation. Rather, the transfer gate pulse lowers the potential barrier between the pinned photodiode and the floating diffusion node, allowing stored charge to transfer between the photodiode and the floating diffusion. This mechanism is distinct from transistor gain and does not constitute common-gate amplification.

39.    In other words, in a 4T pixel cell, electrons are stored in a potential well within the photodiode and transferred to the floating diffusion node when the transfer gate lowers the potential barrier between the wells. The resulting voltage signal arises

from charge-to-voltage conversion at the floating diffusion capacitance. This mechanism is governed by potential well equilibration and capacitance ratios, not transistor gain or common-gate amplification.

40.     In discussing the operation of the 4T pixel cell, Dr. Carley states, "[t]he key thing to note here is that the Reset Gate is never turned on when the TG transistor is on." (*Id.* at ¶ 54.)  This is wrong as well.  Both are turned on to clear the photodiode of residual charge prior to exposure.

41.     Dr. Carley's assertion, "[i]f the TG transistor were acting as a switch, all it could do is to share charge between the photodiode (PD) capacitance and the floating diffusion, FD, capacitance – reaching a voltage somewhere between the starting voltage of the PD capacitance and the FD capacitance" reflects a fundamental misunderstanding of how a 4T pinned-photodiode (PPD) pixel transfers charge. (*Id.*)  Charge sharing when the TG transistor is turned on is exactly how charge moves between the PD and FD.  What Dr. Carley doesn't appear to understand is that prior to charge sharing (turning on the TG) the FD is set to a reset voltage and the PD has a voltage lower than the reset voltage, assuming light is striking the PD.  If no light strikes the PD then both the PD and FD are at the reset voltage and no charge sharing occurs when the TG is turned on. The more light striking the PD the lower the voltage across the PD. When the TG turns on the charge on the PD capacitance is shared with the charge on the FD capacitance.  This causes the voltage on the PD to go up and the voltage on the FD to go down.  The voltages on the PD and FD are the same when the TG is on. The TG behaves as a switch and not a common-gate amplifier.

42.     He is also wrong in asserting that the 4T pixel cell is designed to "improve the signal to noise ratio of the photodetector by amplifying the voltage across the PD." (*Id.*) The innovation of the 4T pixel cell is the incorporation of the transfer device to allow for correlated double sampling.  Prior to reading out the pixel cell, the FD is set to the reset

voltage and readout. Then the TG turns on and charge sharing occurs as discussed in the previous paragraph. Then this signal is readout. The values of the first and second signals are subtracted to remove the noise. The term "double" corresponds to reading out two signals while the term "correlated" corresponds to doing the readouts as close together as possible.

43.    His assertion that the transfer device (TG) operates by staying in the "saturated region" and amplifies the voltage across the photodiode is also wrong. (*Id.*) The transfer gate is a barrier-control gate (a switch), not an analog gain stage. Indeed, the floating diffusion node capacitance is smaller than the photodiode capacitance. But that is charge-to-voltage conversion gain, not transistor amplification. Ideally, the PD voltage doesn't go up while the FD voltage drops to the PD voltage when the TG turned so that maximum signal is readout. Saying that the TG transistor in a conventional 4T pinned-photodiode (PPD) pixel must be kept in the MOSFET "saturation region" to make the pixel work incorrectly applies small-signal MOSFET amplifier terminology to a device that is operating as a barrier-controlled charge-transfer element (a switch), not an analog gain device.

44.    His analysis of the 4T pixel cell as employing a "common gate amplifier circuit" is wrong as well. (*Id.* at ¶ 54.) A common gate amplifier requires continuous bias current, small-signal operation, transconductance-based gain, and an analog amplification region. A 4T pixel cell has transient charge transfer, potential-wells, has no small-signal mechanisms, and no bias point for analog gain. Again, the TG transistor is a barrier-control gate (a switch), not an analog gain stage.

45.    Dr. Carey also wrongly asserts that charge transfer stops when the voltage between the gate of the TG and the source of the TG drops below a voltage threshold. (*Id.* at ¶55.) Charge transfer stops when the charge is transferred between the PD and the

FD.  Dr. Carley again mischaracterizes pinned-photodiode operation; transfer is governed by potential-well equilibration and the photodiode's pinning potential, and the floating diffusion must be reset each readout cycle.

46.    Dr. Carley's contention that "there is no need to 'reset' the PD because the act of reading out the photo-genrated electrons, restores the reverse bias voltage across to PD back to the same initial starting point each readout cycle" is wrong as well.  (*Id.*)  He is wrongly conflating "reading out" with charge removal. And it is not true that there is no need to reset the PD as a reset of the pixel is performed by turning on TG and RG, to connect the PD to the reset voltage, prior to the integration of charge.

47.    Dr. Carley asserts, "[i]t is important to note that Lee shows a traditional 3D pixel that does not employ a TG transistor. Therefore, it will have much poorer sensitivity at low light levels than the previous pixel designs using TG transistors." (*Id.* at ¶ 56.)  This is wrong as well.  Pixel sensitivity in low light is governed by quantum efficiency and noise performance, not transistor count; although 4T pinned-photodiode pixels often improve low-light SNR, a 3T architecture is not inherently insensitive at low illumination levels.  For example, a BSI image sensor could have better low-light performance than FSI because of more direct path to photons of light incident on image sensor.

48.    Dr. Carley also states concerning the modified 4T pixel cell of Guidash in which the row select transistor is omitted (Ex. 28), "[b]ut I cannot help but notice that the circuit diagram provided cannot function as an active pixel array." (*Id.* at ¶ 56.)  Dr. Carley does not comprehend how a pixel works.  Guidash itself explains that the row circuitry is driving the reset transistor and the clocking the signal.  (Ex. 22 at 3:65-4:4.)  Dr. Carley also misunderstands the role of the source follower, which is only to buffer the signal, i.e. increase the current while ideally keeping the voltage the same to address the higher capacitance of the readout circuitry.

49.    Dr. Carley's technical analysis of "signal devices coupling" is flawed. (Carley Rebuttal, ¶ 65.) Dr. Carley is asserting that the coupled definition is met because of noise. He also fundamentally misunderstands the purpose of the source follower in a CMOS image sensor. The purpose of the source follower is to ideally eliminate the effects of gate-to-source capacitance $C_{GS}$.

### F.    Previously Undisclosed Opinions

50.    ███████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████

51.    As the Final Infringement Contentions are not the subject of Dr. Carley's report, I have not attempted to discern whether there was a discernible infringement theory. Rather, I have examined whether the positions of Dr. Carley as described above and discussed in greater detail later are present and have concluded that they are not.

### G.    Person of Ordinary Skill in the Art ("POSITA")

52.    Dr. Carley's lower standard for a POSITA is incorrect as he omits "CMOS image sensor design and fabrication" and assumes that any electrical engineering graduate with a couple years of experience in CMOS image sensors, which include merely placing a pre-built image sensor into a device with other components. (*Id.* at ¶ 47.)

53.    While Dr. Carley discusses his research in CMOS integrated design, he has not

tg#) is also a row line, which is a portion of the row circuitry.")

69.    Dr. Carley does not challenge that Koizumi sufficiently informs the presence of row and column circuitry.  As noted above, he already opined that the mere signal lines are sufficient.  Nonetheless, to the extent that Dr. Carley may assert that this is insufficient disclosure, by the same standard, then all of the MTTPs claims (all requiring "row and column circuitry") are all invalid because they would lack written description to support the claim limitation.

### 2.    a plurality of signal devices coupling the plurality of nodes to the row and column circuitry

70.    Dr. Carley addresses "a plurality of signal devices coupling the plurality of nodes to the row and column circuitry." (Carley Rebuttal, ¶¶ 101-108.)  In his analysis, he does not contest that if this clause is construed to read on a 4T pixel cell, it is present in Koizumi. (*Id.*)  To the extent that the claim limitation would be construed to apply to the modified 4T pixel with the row select transistor but not the typical 4T pixel cell, it would be obvious to further combine with Guidash-656 because both devices have a transfer device and the combination would operate in the same manner—the presence of the row select transistor is irrelevant with respect to the claimed features.

71.    Dr. Carley's analysis wrongly asserts that reading the coupling language as it is recited literally in the claim is "attempting to read out embodiments in the specification." (Carley Rebuttal, ¶ 104.)  This is incorrect as evident from the analysis in the Opening Invalidity Report. (Opening Invalidity Report, ¶¶ 217–224.)

72.    The problem is that the claim language was imprecisely written and it is a legal issue whether the claims should be read as written or can be construed to encompass the preferred 4T pixel cell embodiment.  Unless stated otherwise in this report, I will assume that this claim language encompasses a 4T pixel cell, the sole embodiment shown in the specification.

19

73. Concerning whether it would be obvious for a person of ordinary skill in the art to employ the multiple voltages for the control signal (i.e. applied to the transfer gate) application in Koizumi in the well-known modified 4T pixel cell in which the row select transmitter is removed and instead uses a clocked reset signal to drive the pixel operation (discussed in ¶¶ 124 and 125 of the Opening Invalidity Report), Dr. Carley's analysis is flawed.

74. First, Dr. Carley does not understand how this type of pixel cell works, stating "I cannot help but notice that the circuit diagram provided cannot function as an active pixel array." (Carley Rebuttal, ¶ 57.)

75. Second, Dr. Carley states that Koizumi does not criticize the use of the row select transistor in its disclosure. He appears to be asserting that Koizumi itself must express concern over using a row select transistor for there to be any reason for its elimination in an obvious combination. I understand that Dr. Carley is not following the proper framework in an obviousness analysis in that he is demanding an express teaching within Koizumi to suggest a teaching, suggestion, or motivation to combine.

76. Third, as evident from Mr. Guidash's own improvement of his own pinned photodiode 4T pixel cell to remove the row select transistor, it is not a necessary component. Neither is a row select transistor an essential component for Koizumi's invention. Both the modified 4T without a row select transistor and traditional 4T pixel cell both include the transfer gate as part of a transfer device that serves as a controllable barrier between the photodiode and the transfer gate.

77. Fourth, Dr. Carley's assertion that a "POSITA would not have been encouraged to adopt the method of driving a 3T pixel shown in Fig 2 of Guidash-656" is misguided as well. (*See* Carley Rebuttal, ¶ 107.) Any pixel cell structure employing a transfer gate would work with Koizumi. Koizumi's abstract states:

This invention provides an image pickup device comprising a plurality of pixels each including a photoelectric conversion unit, a semiconductor area to which a signal from the photoelectric conversion unit is transferred, a transfer switch for transferring the signal from the photoelectric conversion unit to the semiconductor area, and a read unit for reading out the signal from the semiconductor area, and a drive circuit for outputting a first level at which the transfer switch is set in an OFF state, a second level at which the transfer switch is set in an ON state, and a third level between the first level and the second level, wherein the drive circuit controls to hold the third level for a predetermined time while the transfer switch is changing from the ON state to the OFF state.

(Ex. 16, Abstract.)

78.    There is no particular readout circuitry type that must be used in Koizumi. The focus is on the additional drive circuitry to provide three levels for the "transfer switch": off, on, and in-between.  (*Id.* at 6:51–8:65.)

79.    Additionally, the background section of Koizumi shows an exemplary 4T pixel cell (Fig. 14), but the focus of the application of the drive circuitry is to the transfer gate 15.  Thus, Figure 15 only depicts a photodiode (304/305), transfer gate (302), floating diffusion node (303), reset gate (309), insulating layer (306) and reset electrode (307), all within semiconductor material (301).  Each of these elements are also present within Mr. Guidash's 4T pixel cell with the RS select transistor eliminated.  Neither the source follower nor row select transistor are shown because they are read out circuitry portions, immaterial to how the transfer gate is driven.

80.    Dr. Carley is essentially asserting that a POSITA would not know to use the transfer gate drive circuitry of Koizumi in other pixel cell structures.  This is incorrect. Combining the known elements of Koizumi (drive circuitry for adjustable voltage levels for the control terminal) with any pixel cell structure with a transfer gate would yield predictable results—the transfer gate in the pixel cell would have multiple voltage levels

21

that can be adjusted. The POSITA would be substituting one known element, a 4T pixel cell that includes a transfer gate, with another, a modified 4T pixel cell that also includes a transfer gate). It would be obvious to try Koizumi with either pixel cell structure because the focus is on the transfer gate, which is present in both pixel cell arrangements. The presence of a row select transistor has no effect on Koizumi's invention.

81.     Fifth, Dr. Carley's argument that a person would not use Guidash 656's pixel cell because of the clocking required is wrong. (*See* Carley Rebuttal, ¶ 107.) Removing the row select (Q4) transistor saves one transistor in the pixel and would increase light sensitivity, saturation level, and dynamic range. Moreover, the timing of the clocking is not complex and is well-documented in Guidash 656 itself. (Ex. 28, 3:31–4:39.) Dr. Carley does not cite to anything in support of his understanding of a typical process at that time, does not explain why the additional area would have been small, or consider that geometries vary among pixel cell designs. Moreover, a person of ordinary skill in the art considering a pixel cell design, which as of 2004 was known to already include megapixels, such that the pixel array would have millions of pixel cells. As such, a person of ordinary skill in the art designing a pixel cell would know to appreciate any area gain, especially in small pixel designs. The circuitry related to the timing could be in the periphery as it is responsible for driving the rows, would be shared (i.e. not duplicated for each pixel), and could even been generated off the image sensor integrated circuit.

22

of pixel cells at minimum) that did not rely on computer aided design in some manner. Dr. Carley does not assert any way that an image sensor or any modern integrated circuit design could be drawn by hand. Nor is it necessary for a POSITA who is designing an integrated circuit to know that the electronic design automation tools would be applicable for any transistor design. (*See, eg.*, Ex. 55, Chap. 15.)

### 5. Dependent Claims 3, 16: "wherein the voltage selector is controlled by a register"

92. Dr. Carley does not challenge that Lee discloses using a register to set the value and control the control signal applied to a gate. Dr. Carley instead notes that the gate in Lee is a reset gate. (Carley Rebuttal, ¶ 130.) Lee is applicable to any control signal applied to a gate in an image sensor, not merely a reset gate, and it would be readily understood by a POSITA to be applicable to a 4T pixel cell. For example, U.S. Patent No. 7,791,663 filed on October 15, 2004 (assigned to OmniVision) discusses using intermediate voltages to address blooming for either the reset transistor for a 3T pixel or the transfer transistor for a 4T pixel (*See* Ex. 58, Rhodes-663, Abstract; 3:1-8, 3:50–4:8.) Blooming is the problem that the '671 patent is purportedly solving through the "variable voltage circuitry including a voltage selector...."

93. Concerning Dr. Carley's argument that a POSITA would not combine Koizumi and Lee (Carley Rebuttal, ¶¶ 131–136), he is incorrect. First, he asserts that Koizumi's voltage levels are "fixed," but ignores that Koizumi expressly contemplates using different voltage levels as discussed above in paragraph 86. Moreover, even if they were "fixed" during operation, Lee provides the benefit of controlling those levels using a simple digital register and DAC so that they can be changed, such as during the design process asserted by Dr. Carley to infringe. Lee explains that this allows more flexibility in setting the voltage levels "because the DAC's can be programmed to produce different charge control voltages." Given that Koizumi already contemplates changing the values (not

26

permanently "fixing" them) and Lee shows an easy way to change them via programming a register, a POSITA would readily appreciate the benefit and know that it would provide predictable results to employ the register and DAC combination to allow for any of the voltage level changes discussed in Koizumi.

94.     Second, Dr. Carley notes that Lee is applying the voltage level to the reset gate, but does not explain how a POSITA could not readily appreciate that both the reset gate and transfer gate are both MOS-technology gates, and that the application of a control voltage to them occurs in the same manner. (Carley Rebuttal, ¶ 132.) As noted above, both references also discuss how the objective in both gates is to get charge out of the photodiode and both are dealing with the problem of abrupt switching and the noise that is created.

95.     Third, Dr. Carley asserts that a POSITA would not be motivated to combine Koizumi with Lee because Lee sets out to improve dynamic range and the Koizumi already discloses his own way of improving dynamic range. (Carley Rebuttal, ¶ 134.) Dr. Carley's premise is illogical—if they are both attempting to solve the same problem, a POSITA would be motivated to look at both references to see how they could be combined to provide an even better result. Dr. Carley does not identify any way in the which the two would not be able to be used together. Indeed, adding in the DAC and registers of Lee to Koizumi could readily be done to provide a more efficient way of setting the fall speeds and holding times of Koizumi and doing so without relying on capacitances as discussed in Koizumi and stated as an improvement in Lee. (*Compare* Ex. 16 at 7:33-35, 8:13-15 *with* Ex. 18 at 4:40-66, 8:56-9:15, 10:20-35, 12:9-25, 13:10-12.) Dr. Carley is also ignoring that both references discuss an improvement using gradual voltage changes, which is of course, varying the voltage levels.

27

96.    Fourth,  Dr. Carley wrongly opines as to "teaching away" by "having its own solution to the problem of varying optimal voltage levels."  This is not "teaching away." There is no portion of Koizumi where it discloses or suggests that improved control of the voltage levels via digital programming should avoided.  There is also no portion of Lee where it discloses or suggests that a 4T pixel cell should not be used.  To the contrary.  Lee discloses a 3T pixel cell and even discusses the benefits of adjusting the "pixel transfer function."  Indeed, a 4T pixel cell provides the benefit of correlated double sampling via the floating diffusion node, but that improvement does not negate the fundamental question that both are looking at how to avoid noise from charge transfer from the photodiode to which both a reset gate and a transfer gate are connected in a 4T pixel cell.

97.    In paragraph 135, Dr. Carley also notes that Lee states that adding circuitry is more complicated.  (Carley Rebuttal, ¶ 135)  But he does not explain why a POSITA reading Lee would not appreciate the very point that Lee makes in that portion of the patent: it is worth it to add these components for the flexibility. (*See* Ex. 18, at 4:40-66, 8:56-9:15, 10:20-35, 12:9-25, 13:10-12.)

98.    In paragraph 136, Dr. Carley asserts "Lee's pixel does not even have Transfer Transistors or Transfer Gates, so it would be unclear how to merge these two pixel designs." Dr. Carley is incorrectly asserting that a POSITA does not know the difference between a 3T pixel design and a 4T pixel design, or how to change from 3T to 4T.  A 4T pixel cell adds the transfer gate to a floating diffusion node.  It would be readily apparent starting from Koizumi and applying the teaching of Lee to allow for digital programming and control of gate voltage levels (for any gate type). Starting from Lee, its teachings of modifying the "pixel transfer function" would similarly have been understood to be readily applicable to a 4T pixel cell because the intermediate voltage application was already known to be available for  3T or 4T pixel cells.  For example, U.S. Patent No. 7,791,663 filed on October

28

15, 2004 (assigned to OmniVision) discusses using intermediate voltages to address blooming for either the reset transistor for a 3T pixel or the transfer transistor for a 4T pixel (*See* Ex. 58, Rhodes-663, Abstract; 3:1-8, 3:50–4:8.)

### B. Kochi-Related Arguments

99. In paragraphs 140 and 141, Dr. Carley makes legal arguments. There is no technical analysis in these paragraphs. In paragraph 141, Dr. Carley states, "[w]hile I address that certain limitations herein as absent from Koichi, this should not be taken as an admission that a limitation not addressed was actually disclosed in Koichi." To respond to Dr. Carley's positions, he must provide them in his report. I will assume that Dr. Carley's failure to identify any other areas of dispute effectively means that Dr. Carley does not challenge them.

100. In paragraphs 142–145, Dr. Carley discusses a "plurality of signal devices coupling the plurality of nodes to the row and column circuitry" but does not contest that they are present under his construction of the claim limitation. To the extent that the claim limitation would be construed to apply to the modified 4T pixel with the row select transistor but not the typical 4T pixel cell, it would be obvious to further combine with Guidash-656 because both devices have a transfer device and the combination would operate in the same manner—the presence of the row select transistor is irrelevant with respect to the claimed features.

### 1. "variable voltage circuitry including a voltage selector determining a control voltage of the control signal applied to the plurality of transfer devices."

101. In paragraphs 148 through 153, Dr. Carley asserts that Kochi does not disclose this claim limitation. Dr. Carley asserts that the Opening Invalidity Report "misconstrues the relationship and functionality of the Kochi components." (Carley Rebuttal, ¶ 151.) Below is the paragraph from Kochi discussed by Dr. Carley and the

29

annotated image from the Opening Report:



(Ex. 17, 6:9-16.)



(*Id.*, Fig. 9 (annotated).)

102.    Dr. Carley correctly quotes that the language states that the "voltage conversion circuit 114 convert[s] the voltage of the voltage supply unit [113] into a desired voltage." (Carley Rebuttal, ¶ 151.)  But then he reinterprets the language to say that "into a desired voltage" is instead making sure the voltage waveform "is set to fixed values." (*Id.*) There is no explanation or reasoning for his analysis.  A POSITA would read the plain language of the description and understand it for what is discloses, not Dr. Carley's version of it.

30

103.    In paragraph 152, Dr. Carley argues that "variable resister 116 is only adjusting the shape of the pulse voltage, and not the voltage level." (Carley Rebuttal, ¶ 152.)  His argument is that the shape of the pulse changes does not satisfy the Court's claim construction.  This is false, adjusting the shape of the voltage pulse is exactly one of the features that is disclosed in the preferred embodiment in the '671 patent. (Ex. 1, 7:26–30.)  Moreover, adjusting the shape necessarily does adjust the voltage levels.  The claim construction does not say for adjusting the peak magnitude of the voltage levels.

104.    In paragraph 153, Dr. Carley raises again the argument that a POSITA would not know from how to control a reset gate that the transfer gate could also be modified in the same way.  The methods of controlling a gate in a transistor would apply to any of the gates in an image sensor pixel involved in charge transfer from the photodiode, i.e. either the reset transistor or the transfer transistor.  As discussed above, both are operating as a barrier to hold the charge within the photodetector for the appropriate time and then to release it as appropriate in consideration of charge transfer to be measured, blooming (releasing charge before it overflows the photodiode), or dynamic range.  A POSITA knows that gate voltages can be controlled in the same way for a reset gate as for a transfer gate. (*See, e.g.,* Ex. 17, 8:33-51; Ex. 58 at 3:1-3, 3:59–4:8.)

### 2.    Claim 14 Preamble

105.    Dr. Carley provides the same analysis as in the dependent claims for Koizumi. For the reasons stated above in 91, Dr. Carley is incorrect.

### C.    RESN's Different Infringement Theories

106.    It appears that Dr. Carley's infringement theory is that any adjustment of "on" or "off" control voltage levels, even if only during product design, is accused. (Carley Infringement Report, ¶¶ 122, 125, 126.)  This does not follow the claim language as there is no "voltage selector"; Dr. Carley points to a person, not circuitry or anything else within the accused products.  Nor is there any variable voltage circuitry as construed, the operation just switches between on and off.

107.    What Dr. Carley seems to be accusing is a programmable charge pump, which is also well-known but not at issue in the '671 patent claims.  As the specification explains, the charge pump serves the purpose of "provid[ing] at least one VT above the supply voltage. Higher TG voltage is safe to use since this gate operates with strong backbias" and "[t]he TG voltage should be increased by an on-chip charge pump. The charge pump provides voltages at least a threshold voltage of the n-type MOS transistor (VT) above the supply voltage or higher. This gate operates under a strong backbias condition. Therefore, it can handle relatively high voltages. This feature provides extra margin for the charge transfer. (FIG. 8)"  (Ex. 1, 14:67–15:6) This discussion is addressing the need to apply more voltage to turn on the gate based on the use of doping implants to ensure that there is no leakage from the photodiode when the gate is turned "off" (as opposed to applying a negative voltage, which the '671 patent criticizes (*id.* at 14:16-20)). The problem that the charge pump is solving has to do with having enough voltage to form the channel (turn on the switch) the doping is adjusted the threshold to preclude it from being formed (keep it off).

108.    A programmable charge pump was also known in the prior art.  An example of this is US 2006/0114345 and PCT equivalent WO 2006/060306. (Ex. 59, Wu Filings.) I have been informed that neither of these issued as patents because ESS technologies

32

abandoned them.  Moreover, none of the same inventors as the MTTPs are listed.

109.   The use of a charge pumps in 4T pixel cell CMOS image sensors was well known, as shown in US. Patent Publication No. 2004/0252211 to Rhodes (Ex. 60, Rhodes-211.)  As Rhodes explains, the ability to raise the voltage with the charge pump solves the "manufacturing imperfections" issue that Dr. Carley incorrectly attributes to the '671 patent.  (*Id.* at ¶ 34; *see also* ¶¶ 34–48.)  The manufacturing imperfections deal with differences in voltage thresholds, not blooming, which is caused by environmental conditions and must be addressed when very high light is present.  This reference further shows that as already admitted as prior art in the '671 patent, it was known to apply positive and negative voltages to the gate to avoid leakage.   This reference also notes that voltage control can be applied to both reset and transfer gates. (*Id.* at ¶¶ 41, 48.)  Dr. Carley's new theory ignores that the blooming effect that the '671 patent is seeking to solve (Ex. 1, Figure 5) is in no way solved by the mere changing of high and low voltages.  ███████████

████████████████████████████████████████████████████████

110.   Dr. Carley's infringement theory is inconsistent as he seems to be changing his position depending whether he's asserting infringement or invalidity—his infringement opinions rely on his modification of the court's claim construction. (Carley Infringement Report, ¶ 104 to ¶ 105.)  While his invalidity responses, seemingly turn back to the original claim construction and point to the need for circuitry that does not exist in the products discussed in his report.  Thus, I have considered the following scenarios based on if Dr. Carley further elucidates new differences in RESN's infringement theories.

33

### 1. Using registers to set "on" and "off" voltage levels

111.    Lee, discussed above, in combination with any pixel cell employing a transfer gate (including a 4T pixel cell) renders such an infringement theory invalid.  Lee addresses dynamic range (high light and low light conditions) and the use of discrete variable voltage levels.  (Ex. 18 at 1:50-2:8, 2:39-41, 12:9-25.) It explicitly discloses the use of a register and DAC to set the voltage to a gate, and would be applicable to any type of image sensor as discussed above. (*Id.* at 12:9-25.)

112.    Similarly, U.S. Patent No. 6,348,681 assigned to OmniVision discusses using a DAC to set a reset gate voltage.  (Ex. 61, Kindt, at 5:25-43.) For the reasons stated in paragraphs 89, 92, 98, and 115, a POSITA would know to apply the ability to set values of a control signal to a reset gate, would also apply to setting the values of a transfer gate.  They are both gates in a MOS transistor and are controlled in the same way.

### 2. More than two control voltages and explicit discussion of magnitude, width and other changes.

113.    If Dr. Carley's theory is that the reference has to disclose changing both the magnitude and the pulse width, this is disclosed in U.S. Patent Publication No. 2005/0083421. (Ex. 62, Berezin.)  Berezin also predates Dr. Carley's previously undisclosed argument of November 2003 conception date as it was filed on October 16, 2003. (*Id.*) Berezin addresses a "variable voltage signal" applied to a transfer transistor in a 4T pixel cell. (*Id.* at Abstract, ¶¶ 25–33.)  Berezin discloses that the embodiments disclose "us[ing] the magnitude of a control pulse . . . to control the amount of charge removed from a charge accumulation region of a photodiode [as well as] varying the width of the control pulse [or its] amplitude and width." (*Id.* at ¶ 48.)  Berezin also discloses the use of a specific adjustment signal to the extent that this is part of a new RESN infringement theory.  (*Id.* at ¶ 28.)

34

### 3.    Sending two different low voltage signals to a 4T pixel cell.

114.    As discussed above, Rhodes 663 discloses sending two different low signals to a 4T pixel cell to address blooming depending on lighting conditions. (Ex. 58 at Figs. 5,6, 3:1-8, 3:36-4:8.)

### 4.    Changing the set voltage levels to the transfer gate

115.    If RESN were to attempt the theory that a third-party could figure what the undisclosed register is and the code to make a change in the configuration file,  U.S. Patent No. 6,140,630 discloses allowing the voltages supplied by the charge pump to be varied to account for manufacturing differences.  (Ex. 63 ("Rhodes-630"), at 7:43-45, 7:56-60, 8:23-30.)  Like Rhodes-211, Rhodes-630 teaches the interchangeability between the transfer gate and rest gate on how they are controlled, disclosing  the ability to program the charge pump with register values would apply to both the transfer and reset gates.  (*Id.* at 8:5-11.)

### 5.    "Representativeness" Infringement



the plain meaning of the claims following Dr. Carley's interpretation that "tending to" is not indefinite.

### B. Invalidity of the Asserted '145 Claims Based on Rhodes 647 With or Without Kimura

130.    Dr. Carley begins with what appears to be attorney directed legal, not technical arguments. (Carley Rebuttal, ¶¶ 158, 159.)  To the extent that there is a substantive response needed, Dr. Carley is wrong that there are not multiple ways to invalidate the claim both based on a single prior art reference and a combination of prior art.

131.    Next Dr. Carley notes that the Opening Report notes the possibility for multiple interpretations of the claim language "in the absence of a control voltage the control terminal creates an electric field tending to repel the electrons from a portion of the body," but offers no understanding of his own.  (*Id.* at ¶ 178.) In his infringement analysis, Dr. Carley applies an interpretation in which he is reading out the limitation altogether—he does not identity any aspect of the control terminal that creates a control voltage in the absence of the control voltage.  But for invalidity he requires it in his analysis.

132.    Dr. Carley's Rebuttal is based on two incorrect positions: (1) the claimed "node" cannot be comprised of multiple doping implantations, thus the p-type region must be in the wrong location; and (2) that a POSITA would not have combined Rhodes-647 with Kimura.

#### 1. Anticipation in View of Rhodes-647 Based On Dr. Carley's Infringement Theories.

133.    Under Dr. Carley's infringement interpretation in which "in the absence of a control voltage the control terminal creates an electric field tending to repel the electrons from a portion of the body by the control terminal, Rhodes-647 anticipates the asserted claims of the '145 patent.  Kimura is unnecessary without the need for a doping

of the polysilicon gate in a particular way to "create[] an electric field tending to repel the electrons from a portion of the body." Kimura's teachings of a p-type gate (as well as a non-constant work function) are not needed under Dr. Carley's infringement standard and all of the elements of the claims are present in Rhodes-647 because Dr. Carley does not point to any structure in the control terminal that creates an electric field when there is an absence of a control voltage.

134. Similarly, to the extent that Dr. Carley would assert that his interpretation is applying a negative voltage to the gate (despite the '145 patent expressly directing this not to be done in this claimed embodiment and conceding it to be previously known in the art) meets the claim limitation, the use of a negative voltage applied to the transfer gate is confirmed to be known to be prior art for example in U.S. Patent Publication No. 2004/0252211 (Ex. P_01, ¶ 48) and U.S. Patent No. 6,974,943 (Ex. 15 at 3: 20-45.) The '145 patent acknowledges that it would be obvious to use this approach, but advises to instead address the doping of the transfer gate itself as claimed. ('145 patent at 14:1-17.)

135. Further, under Dr. Carley's infringement interpretation for the '274 patent in which a mask leaves a portion of the transfer gate uncovered and there is a subsequent implantation step, such that the implantation will make contact with a portion of the transfer gate, Dr. Carley asserts there will be a non-constant work function in the transfer gate that will cause electrons to move in the body under the transfer gate. (CITES.) This forms a second basis for Rhodes-647 to be sufficient to invalidate the asserted claims of the '145 patent via anticipation.

136. Figures 6a and 8b and the accompanying disclosure of Rhodes-647 discloses

the scenario:



FIG. 6(a)



FIG. 8(b)

Active area extension regions 40 for the transistors 14, 15 are next formed. As shown in FIG. 6(a) (relating to the embodiments shown in FIGS. 1(a) and 1(b)), the substrate is masked with a photoresist 52, which partially overlies the transfer transistor 15 gate. Then, a dopant implant 50 (of, e.g., phosphorus, arsenic, or antimony ions) is performed adjacent the gate stacks of the transistors 14, 15 at doses of approximately $5 \times 10^{11}$ to about $1 \times 10^{14}$ ions/cm$^2$ and at an implantation energy in the range of about 10 KeV to about 4100 KeV. The preferred dosage for the implant 50 is about $1 \times 10^{12}$ to about $3 \times 10^{13}$ ions/cm$^2$. Implantation at these energy levels results in ion distribution depths of approximately 200-1000 Å. Note that the photoresist 52 prevents the active area extension region implant 50 from penetrating the substrate 22 on the side of the transfer transistor 15 gate adjacent the photodiode 12. Since the transfer transistor 15 adjacent the photodiode 12 has an asymmetrically implanted active area extension region 40, the punch-through leakage can be adjusted for by the $V_t$ adjust implant discussed above and/or increasing the length 44 of the transfer transistor 15 gate, also discussed above. This allows the periphery transistors to be high performance, with short channel lengths since they can be symmetrical active area extension region 40 devices, but also mitigates dark current leakage at the photodiode 12 while providing punch-through protection to the associated transfer transistor 15.

FIGS. 8(a) and 8(b) show a stage of processing subsequent to FIG. 7(a), and FIG. 8(c) shows a stage subsequent to FIG. 7(b). As shown in FIG. 8(a) (relating to the embodiment shown in FIG. 1(a)), a mask of photoresist 152 is provided over the wafer and patterned to fully cover the transfer transistor 15 gate and define an opening over and adjacent to the reset transistor 14 gate. An etch step is performed to remove portions of the layer of insulating material 38 and to leave the material 38 as sidewall spacers on the reset transistor 14 gate. A self-aligned implant 128 of n-type dopant is performed as is known in the art to form a floating diffusion region 28 between the transfer transistor 15 and the reset transistor 14 and a source/drain region 42 on the other side of the reset transistor 14. The photoresist 152 is removed.

As shown in FIG. 8(b) (relating to the embodiment shown in FIG. 1(b)), the photoresist mask 152 is shifted over the transfer transistor 15 gate to expose one side thereof. The etching step removes the insulating material 38 and leaves a sidewall spacer on the exposed side of the transfer transistor 15 gate and on the reset transistor 14 gate. The implant 128 forms the floating diffusion region 28 and the source/drain region 42.

(Ex. 33, Figs. 6a, 8b, 7:15-40, 8:16-39.)

137. Rhodes-647 explains related to Figure 6(a) that the mask "partially overlays the transfer transistor gate 15." (Ex. 33, 7:18-19.) Concerning Figure 8(b), Rhodes-647 states: "A self-aligned implant 128 of the n-type dopant is performed as is known in the art to form a floating diffusion region 28 between the transfer transistor 15 and the reset

transistor 14 and a source/drain region 42 on the other side of the reset transistor 14." (*Id.* at 8:25-30.) It further states, "the photoresist mask 152 is shifted over to the transfer transistor 15 gate to expose one side thereof." (*Id.* at 8:32-33.)

138. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as further discussed below with respect to the '274 patent, Rhodes-647 patent anticipates the asserted claims because there is a non-constant work function of the transfer gate which will create an electric field that repels the electrons from a portion of the body by the control terminal.

139. Thus, under either Dr. Carley's theory in which "in the absence of the control voltage" is simply not limiting or in which he is asserting that a self-aligned gate with some subsequent implantation hitting a portion of the transfer gate causes a non-constant work function to be present in the transfer gate, Rhodes-647 anticipates the asserted claims of the '145 patent—i.e. Kimura is unnecessary.

### 2.  Dr. Carley's "Node" Challenge to Rhodes-647

140.  Dr. Carley's challenge to the Rhodes-647 is based on asserting that the claimed "node" can only be element 28 because "Rhodes-647 itself defines active extension region 40 as part of the transfer transistor, and not part of the floating diffusion region 28 (i.e. the node.)" (Carley Rebuttal, ¶ 163.)  He further discusses that they are formed at different parts of the pixel fabrication process. (*Id.* at ¶ 164.)  Dr. Carley does not do any functional analysis whatsoever as to why these objects are formed in this way or even consider the teachings of Rhodes-647 itself.  Because different terms are used, neither of which are using the claimed "node," he ignores how the two operate together or the distinction between a "region" and a "node."

141.  Dr. Carley's first argument— that Rhodes 647 defines the active extension region not be part of the floating diffusion region—is wrong.  First, Claim 1 of the '647 patent is specifically written with the floating diffusion region including the active area

43

extension region. (Ex. 33 at 12:8-10)("[s]aid floating diffusion region comprising an active extension region....")

142.    Second, item 28 is never described as a node.  To the contrary, the specification makes clear that item 28 and 40 (the active area extension region) operate together to act as a floating diffusion node to avoid dark current and leakage. (*Id*. at ¶ 3:46-49.)

143.    Third, Rhodes-647 explains in the abstract that an active area extension is, for example, a lightly doped drain ("LDD") implant.  (Ex. 33, Abstract.)  A lightly doped drain would be part of the node.   In the background, Rhodes-647 explains that lightly doped drains can be included in transistors associated with photodiodes in CMOS imagers (transfer or reset transistors) for leakage and punchthrough protection, but that the LDD implant on the photodiode side can cause dark current.  (*Id*. at 1:61-64.)  The solution as stated in the summary of the invention is to form the transfer transistor with a single active area extension region "similar to a lightly doped drain (LDD) region" on only the side of the gate opposite the photodiode.  (*Id*. at 2:15-20.)   Thus, the LDD is applied as part formation of the "node" as shown for example in Figures 6b and 8a.

144.    Fourth, inventor Howard Rhodes of the '647 patent contemporaneously explained that the very same use of the LDD implant step with the source/drain implantation step was known to form a floating diffusion node. In U.S. Patent No. 7,326,607 ("Rhodes '607"), original application filed on April 25, 2003 and issued on February 5, 2008, describes a 4T pixel cell and explains the use of two different masks as forming a floating diffusion node:

> Referring first to the n+ region 10 of the 4T pixel of FIG. 1, it is normally formed from a n− type LDD implant followed by a highly-doped n+ source and drain implant. Typically, this highly-doped n+ region is formed using a n− type dose

44

> of 5×1014/cm2 to about 3×1016/cm3. Further, the n– type LDD implant is normally conducted very close to the reset and transfer transistors. Then, a second mask is used and the source/drain of the reset and transfer transistors are formed. The resulting n+ floating diffusion region 10, illustrated in FIG. 1, is formed as a result of the two diffusion regions combining from the LDD implant step and the highly n+ doping source/drain implant step.

(Ex. 65, 5:1-12.)

145.    As shown and highlighted below is floating diffusion region 10 in Rhodes '607 (on the left) is the same as what is shown in the Opening Report with respect to Rhodes-647.



Rhodes-607, Fig 1.



Rhodes-647, Fig. 1(a)

146.    Dr. Carley's position that item 28 and 40 are separate items and item 28 is the node is fundamentally flawed from the standpoint of a POSITA . A node is an equipotential region between circuit components. A floating diffusion node is an equipotential region between the transfer gate and the reset gate. Every part of that region that is electrically continuous — regardless of its doping concentration—is part of the node. The lightly doped extension region is in direct ohmic continuity with the heavier N+ body of the diffusion, so

45

there is no physical basis for excluding it from the node.

147.    As formed in Rhodes-647, there is no sharp boundary between the LDD extension and the heavily doped N+ region—the doping profile transitions between the two.  Arguing that the LDD portion is not part of the node would require ignoring basic semiconductor physics, the continuity of the doping profile, and the electrical circuit topology.  Dr. Carley equating a "floating diffusion region 28" as being the only part that can constitute the "node" (¶ 162) would be rejected by a POSITA.

148.    Similarly, Dr. Carley's multiple steps therefore they are different argument would be rejected by a POSITA.  As noted above, even a "floating diffusion region" was confirmed by Howard Rhodes himself as the result of a LDD implant step followed by a source/drain implant step."  (Ex. 65 at 5:9-12.)  Further, it is often the case that multiple implantation steps are used to form components in a semi-conductor device.  A doping implantation is applied in a gaussian distribution, so even if it were desirable to introduce a constant impurity using implantation over any significant depth, multiple implantation steps would be required. Dr. Carley's multiple steps argument is technically flawed and inconsistent with his infringement assertions.



His infringement assertions directly contradict his multiple steps argument in his rebuttal to invalidity.  Moreover, he simply points to a simple schematic as sufficient to show the node.  (Carley Infringement Report at ¶ 239.)  What Dr. Carley demands from Rhodes-647 is technically flawed and contradictory

to what he asserts would have to be present for infringement.

150.    Dr. Carley also offers unexplained criticism about how the claim as read would "also make the referenced halo implant region part of the node." (Carley Rebuttal, ¶168.) It is unclear what Dr. Carley's is using to support this opinion, but Rhodes-647 claims the floating diffusion region (not a "floating diffusion node") to include "a halo implant region below said active area extension region." (Ex. 33 at 12:8-11.) Dr. Carley improperly equating "region" with "node" causes the problem. A region is an area; the node has a functional purpose for forming a connection point, which can be made using multiple implantation steps.

151.    Applying "node" properly, there is p-type region "ha[ving] a lateral position at least partly under the corresponding node" (the halo implant 41) and the second terminal coupled to one of the plurality of nodes. The halo is clearly underneath the left portion of the node (what Dr. Carley incorrectly argues should be excluded). Dr. Carley's analysis of the p-type region is wrong. (Carley Rebuttal, ¶¶ 188-193.)

152.    Dr. Carley's *the "second terminal" must be a separate item argument* is also inconsistent with the understanding of a POSITA and his infringement assertions, and incorrect. (*Id.* at ¶ 174.) A terminal is a connection point. For example, the terminals of a battery are not separate from the battery, they are positive and negative connection points. Similarly, the second terminal coupled to the floating diffusion node is a connection point for floating diffusion node, and one of the three terminals in a transistor. The other two are the control terminal and the first terminal (coupled to the photodetector). Nothing in "terminal coupled to" supports Dr. Carley's inconsistently applied "separate" component argument.

153.    Further, Dr. Carley's position that there is improper "conflating [of] the drain of the transfer device with the node" would be nonsensical to a POSITA. (*Id.* at ¶ 174.) As

47

shown in the Opening Report, from Eric Fossum's 1995 publication describing the "floating diffusion output node", to U.S. Patent No. 5,471,515, and U.S. Patent No. 5,625,210, and more the floating diffusion node is consistently shown as the source/drain for the transfer transistor and the reset transistor. (Opening Report at ¶¶ 96-101; Exs. 12, 13, 9.) His argument ignores that they are the same region in the semiconductor, there is nothing to conflate. (*See e.g.* Ex. 33 at ¶ 4; Ex. 66, U.S. Patent No. 7,825,444 ("Rhodes-444") at 1:49-53.)

154.    For completeness, I note that Dr. Carley raises the "signal devices coupling" argument but does not contest that Rhodes-647 meets this claim limitation under his proposed construction. Each of his arguments directed to Rhodes-647 is based on a non-technical focus on labels, which do not use the word "node," instead of the function and operation of the components. To the extent that the claim limitation would be construed to apply to the modified 4T pixel with the row select transistor but not the typical 4T pixel cell, it would be obvious to further combine with Guidash-656 because both devices have a transfer device and the combination would operate in the same manner—the presence of the row select transistor is irrelevant with respect to the claimed features.

155.    Dr. Carley's arguments as to why Rhodes-647 does not meet the elements he identifies are incorrect, and based on Dr. Carley's infringement analysis, anticipates the asserted claims of the '145 patent. In the alternative, if combined with Kimura for additional support for the "in the absence of the control voltage..." limitation, all of the other elements of the claims are present in Rhodes-647.

### 3.    Rhodes-647 in Combination with Kimura

156.    Turning to invalidity based on applying "in the absence of the control voltage the control terminal creates an electric field tending to repel the electrons from a portion of the body by the control terminal" as opposed to Dr. Carley's improper infringement

analyses, Rhodes-647 in Combination with Kimura invalidates the claims as obvious.

157.    Dr. Carley does not contest that Kimura discloses the "in the absence of the control voltage the control terminal creates an electric field tending to repel the electrons from a portion of the body by the control terminal.   Kimura discloses a p-type polysilicon gate with a larger p-type doping (4a) on the left (purple) and a smaller p-type doping on the right (4b) (yellow) as shown below.





158.    Dr. Carley argues that the Opening Report analysis is that a POSITA could combine the two references rather than a POSITA would combine them. (Carley Rebuttal, ¶ 181.) This is incorrect.  (*See* Opening Invalidity Report at ¶¶ 397-404.)

159.    Dr. Carley further argues that because there are numerous different structures, one would not combine all of the elements to approximate the claimed features. (Carley Rebuttal, ¶ 181.)  Kimura itself shows multiple embodiments, some with a uniform gate implantation and the multiple p-type doping gate of Figure 8.  To that end, he is ignoring that Kimura itself shows that a POSITA knows that either option is available as a matter design choice.

160.    His position contradicts that a POSITA would know of a set of ways to adjust

49

the threshold voltage in the body under the gate (which addresses whether the electrons are being repelled (or attracted) in the absence of the "on" control signal (i.e. "the control signal of a sufficient voltage [causing] the transfer of electrons through the body between the first and second terminal"). One could dope the region under the gate, adjust the gate oxide thickness, or change the work function of the gate material. (*See, e.g.,* Ex. 67, Sze Textbook, at 194-199.) It is not a matter of random guessing as he suggests, but a known set of solutions with predictable results.

161.    Dr. Carley argues that a POSITA would not want to conduct the extra step required to provide the two p-type doping levels of the embodiment disclosed in Figure 8 of Kimura. He is correct that to apply a different doping level to different portions of a polysilicon gate, one would need at least two masks. Yet, Kimura discloses the use of two p-type regions and a single doped gate. A POSITA could simply use a single p-type implant for the entire gate. In other words, a person starting with the disclosure of Rhodes-647 who wants to adjust to voltage threshold in the body between the source and the drain could simply apply a p-type doping instead of an n-type doping to the gate in an NMOS environment to address Dr. Carley's concern.

162.    More importantly, Dr. Carley's premise is flawed as the '145 patent itself explains that the change in the poly gate doping would be implemented if one would not want to use an "additional negative bias voltage" through additional circuitry in the periphery. It is a design choice: add circuitry to use a negative voltage to ensure that channel is closed off and not leaking or instead change the doping type for a uniform p-type doing or use the two-doping p-type gate of Kimura to further influence charge flow.

163.    It is incorrect for Dr. Carley to assert that additional masks are never used. Indeed, a simple voltage threshold implant is sometimes used and sometimes it is not. His logic leads to criticism of the purported '145 invention as a whole. Instead of a simple

solution of negative voltage applied to the gate to stop leakage and a positive voltage to keep the channel open, the '145 patent wants additional and specific doping changes to both the gate and an additional p-type region that has to be located in a very specific location (at least partially under the floating diffusion node, only partially under the transfer gate, distanced from the photodiode, and distanced from the reset device). The inventors of the '145 patent were themselves willing to make the tradeoff of including an additional mask because they did not want the added circuitry. As one is already applying the lightly doped drain, halo implant, and n+ source drain implant, further voltage threshold changes would be easily accomplished by turning to the gate material work function (above the surface) instead of adding another implant next to the regions discussed.

164.    Dr. Carley also raises the argument that because Howard Rhodes was prolific in his inventions and because Rhodes-647 does not include discussion of the structures of Kimura that a POSITA would not be motivated to combine the references. (Carley Rebuttal, ¶ 183.) There is no requirement nor would one expect an inventor to include every obvious combination in his disclosure, and as such, Dr. Carley's argument is flawed. Moreover, less than a month after the filing of the MTTPs, on January 14, 2005, Howard Rhodes did file a patent application that explained that it was indeed well-known method in the prior art "to try to ensure full read out across a transistor is to provide a lateral doping gradient with boron that drives electrons from the photosensitive side, across the transfer gate, to the drain side of the transferred gate (called the floating diffusion)." (Ex. 66, Rhodes-444, at 1:49-53.) Indeed, it was so well-known that Mr. Rhodes patent focused on an improvement of using Indium (a p-type dopant) instead of Boron (also a p-type dopant). (*Id.* at 2:64-3:26.) This contemporaneous patent application refutes Dr. Carley's position that Dr. Rhodes would not consider using a doping profile such as that disclosed in Kimura and his flawed positions concerning the drain and the floating diffusion node

being somehow separate items. It also shows that a POSITA would recognize that a lateral doping gradient could be used to improve full readout of the photodiode.

### 4.  Computer Readable Medium Preamble (Claim 12)

165.    As noted above, Dr. Carley does not do any different analysis for claim 12, which only has "computer readable medium describing" added to it. He does not assert infringement over anything but image sensors. Nonetheless, for the reasons stated above with respect to claim 14 of the '671 patent, the claims directed to a computer readable medium for image sensor integrated circuit are invalid as the preamble as computer aided design tools have long since been known and practically speaking required to design a image sensor integrated circuit, as discussed above in paragraph 91.

### 5.  "a plurality of signal devices coupling the plurality of nodes to the row and column circuitry"

166.    Dr. Carley addresses "a plurality of signal devices coupling the plurality of nodes to the row and column circuitry." (Carley Rebuttal, ¶¶ 194-197.) In his analysis, he does not contest that if this clause is construed to read on a 4T pixel cell, it is present in the cited prior art art. (*Id.*) To the extent that the claim limitation would be construed to apply to the modified 4T pixel with the row select transistor but not the typical 4T pixel cell, it would be obvious to further combine with Guidash-656 because both devices have a transfer device and the combination would operate in the same manner—the presence of the row select transistor is irrelevant with respect to the claimed features.

### C.  Rhodes-413 With or Without Kimura

167.    Dr. Carley's arguments concerning Rhodes-413 and Kimura mirror his arguments for Rhodes-647 and Kimura.

168.    His analysis is based on an interpretation of node that would be rejected by a POSITA. Dr. Carley is again arguing that because the node consists of two n-type

implants, that the node can only be the portion that is not underneath the p-type halo implant. (Carley Rebuttal, ¶¶206-213.) The arguments are completely unsupported and contrary to the meaning of "node" and "terminal" as discussed above—and contradictory to his infringement read which does not call for any particular implantation layer to be the node or set forth any separate terminal (he just draws an arbitrary shape). His "body" and "p-type regions" arguments are flawed in that he is conducting no functional analysis whatsoever of what constitutes a node, he is simply picking the one portion of the node and rejecting the other portion.

169.    He does not contest that the "signal devices coupling" is met under a construction that encompasses a 4T pixel cell and also mimics the same incorrect arguments as to the combination of Rhodes-413 with Kimura. For the reasons stated above, he is wrong. To the extent that the claim limitation would be construed to apply to the modified 4T pixel with the row select transistor but not the typical 4T pixel cell, it would be obvious to further combine with Guidash-656 because both devices have a transfer device and the combination would operate in the same manner—the presence of the row select transistor is irrelevant with respect to the claimed features.

170.    Also as noted above, if Dr. Carley's infringement read is applied, Kimura is unnecessary as he is not applying any further requirement for "in the absence of the control voltage" beyond simply being able to turn on and off the device. As such, Rhodes-413 would also anticipate claims 1 and 14 of the '145 patent, as well as the previously unasserted claims addressed in his Opening Report as they are present in a 4T pixel cell.

171.    For invalidity based on applying "in the absence of the control voltage the control terminal creates an electric field tending to repel the electrons from a portion of the body by the control terminal" as opposed to Dr. Carley's improper infringement analyses, Rhodes-413 in Combination with Kimura invalidates the claims as obvious. Dr.

Carley employs the same incorrect arguments concerning Kimura that I discuss above in paragraphs 121 through 139.

172.    Regarding the preamble, Dr. Carley's argument is again the same and incorrect for the reasons stated above in paragraph 165.

## III.    274 PATENT

### A.    Kimura Alone or In View of Rhodes '647 or '413

#### 1.    "image sensor integrated circuit"

173.    Dr. Carley first argues that Kimura does not disclose an image sensor integrated circuit.  (Carley Rebuttal, ¶¶ 279-286.) It is unclear how he makes this argument as even though under his argument there is a disclosed pixel cell.  But regardless, in view of the Court's claim construction ruling, Kimura still discloses an integrated circuit as the components disclosed to be built within a "semiconductor device." (*See, e.g.,* Ex. 25 at column 10, claims.)

174.    Dr. Carley's first argument seems to more directed to a POSITA would not know to apply a pixel cell in a pixel array, although he does not go that far. (Carley Rebuttal, ¶ 285).  He simply says that one does not necessarily have to include a pixel in a pixel cell array.  (*Id.*)

175.    Kimura is focused on a "image pickup element, in which one of the source/drain regions forming the transistor is a photodiode immunity region, while the other source/drain region is a floating diffusion impurity region." (Ex. 25, ¶4.)  This is the structure that is the core component of the 4T pixel cell, i.e. the improvement over the 3T pixel cell, as discussed in the Opening Report in paragraphs 91 through 107 and 117 through 123.  It would be readily obvious for any POSITA to combine Kimura's method of making the transfer device with any 4T pixel cell, including Rhodes-647, Rhodes-413 or Rhodes '042, or any other disclosure of any image sensor with any pixel cell.  A POSITA

would know that a 4T pixel cell image sensor includes the transfer device and it would be readily apparent that Kimura's disclosure of how to make this component could be used in a 4T pixel cell.

### 2. "plurality of…" arguments and "row and column circuitry"

176.    Dr. Carley argues that "a plurality of photodetectors," "a plurality of nodes," and a plurality of signal devices," "a plurality of transfer devices," "a plurality of signal devices," and "row and column circuitry" are not present. (Carley Rebuttal, ¶¶ 287-303, 330-341.)  His position is that Kimura, as noted above, is focused on an "image pickup element, in which one of the source/drain regions forming the transistor is a photodiode immunity region, while the other source/drain region is a floating diffusion impurity region." (Ex. 25, ¶ 4.)  Dr. Carley does not contest that a POSITA would not know to use Kimura in any number of 4T pixel cell designs. (Carley Rebuttal, ¶¶ 287-300, 330-341.)  For example, Rhodes-647 discloses a 4T pixel cell in a "MxN array of pixels 10 arranged in rows and columns with the pixels 10 of the array accessed using row and column select circuitry." (Ex. 33 at 4:48-53; *see also* Opening Invalidity Report at ¶ 414.)  This is similarly true for Rhodes-413.  (*See* Opening Invalidity Report at ¶¶ 422–429.)  The reasons for combining these references is further noted in the Opening Report as for the same reasons as stated with the '145 patent analysis.  (*See id.* at ¶¶ 515-516.)  As such, my responses above to Dr. Carley's arguments as to combining Kimura with the Rhodes-413 references apply here as well.  (*See* ¶¶ 167–172.)

### 3. "a plurality of signal devices coupling the plurality of nodes to the row and column circuitry"

177.    Dr. Carley addresses "a plurality of signal devices coupling the plurality of nodes to the row and column circuitry." (Carley Rebuttal, ¶¶ 342-347.)  In his analysis, he does not contest that if this clause is construed to read on a 4T pixel cell, it is present in the

Rhodes references. (*Id.*) Rather, he repeats his arguments concerning the semiconductor device in Kimura addressed above. To the extent that the claim limitation would be construed to apply to the modified 4T pixel with the row select transistor but not the typical 4T pixel cell, it would be obvious to further combine with Guidash-656 because both devices have a transfer device and the combination would operate in the same manner—the presence of the row select transistor is irrelevant with respect to the claimed features.

### 4. "a second terminal coupled to one of the plurality of nodes"

178. Dr. Carley asserts that the Opening Report does not show the "second terminal." (Carley Rebuttal Report, ¶ 305.) This is incorrect, the second terminal is shown for example in paragraph 490.

179. Dr. Carley again argues that there is "improper conflating [of] the drain of the transfer device of the node." (*Id.* at ¶ 312.) This is the same incorrect argument as set forth and responded to in paragraph 153.

### 5. "control terminal…having a non-constant work function such that the difference between the non-constant work function of the first part of the control terminal and the non-constant work function of the second part of the control terminal create an electric field in the body tending to cause electrons in the body to move in a direction from the first terminal to the second terminal."

180. Dr. Carley largely misinterprets the Opening Report's analysis. (Carley Rebuttal Report, ¶¶ 314–329.) He concedes that Kimura discloses a transfer gate with the region in purple (4a) having a higher p-type doping concentration than the region in yellow (4b), reproduced below. (*Id.* at ¶ 318.) These are the first and second parts of the control terminal as discussed in paragraphs 395–397 and 492–495 of the Opening Invalidity Report.

181. Dr. Carley's position that the relevant parts must be the p-type gate electrode

and the channel seems to be ignoring the above analysis and instead focusing on the overall physics discussion concerning work functions that follows in paragraphs 496-497. He also seems to be ignoring the point that a person of skill in the art would know how to adjust those doping levels as needed. (Carley Rebuttal Report, ¶ 327.)

182. But he disputes that this structure would "create an electric field in the body tending to cause electrons in the body to move in a direction from the first terminal to the second terminal" as claimed (*Id.* at ¶ 319) and wrongly concludes "Kimura's electric field that repels electrons from the channel cannot disclose the directional requirement (*Id.* at ¶ 321.)

183. Dr. Carley is wrong as the mere presence of the higher and lower doping regions in the gate would make it clear to any POSITA that an electric field is generated in the direction of the second terminal to the first terminal, which means the electrons (which move in the opposite direction of the electric field) in the direction of the first terminal to the second terminal. This is basic semiconductor physics as described in the Opening Report at paragraphs 51–83. For example, the creation of the electric field is discussed in the Streetman textbook. (Ex. 7, at 140 (p-n junctions) and 183 (graded junction).) In Kimura, an electric field is created where the higher p-type doping on the left meets the lower p-type doping.

184. Dr. Carley's argument that such doping cannot move the electrons is also refuted in contemporaneously filed Rhodes '444, which acknowledges that was known in the prior art "to provide a lateral doping gradient with boron that drives electrons from the photosensitive side, across the transfer gate, to the drain side of the transferred gate (called the floating diffusion)." (Ex. 66 at 1:49-53.) Rhodes considered the application useful enough to suggest improving the method by using Indium (a p-type dopant) instead of Boron (also a p-type dopant). (*Id.* at 2:64-3:26.)

185.    His argument is also refuted by the '274 patent specification, cited by Dr. Carley. (Carley Rebuttal, ¶ 362 (quoting '274 patent at 2:9-12)("[g]rading the work function of a transfer gate guides the electrons in the vicinity of the transfer gate in a direction from the photodetector area towards the transfer gate").).)

186.    Dr. Carley's analysis misstates the conclusion entirely as focusing on the p-type in general repelling electrons. (*Id.* at ¶¶ 322-323.) Dr. Carley ignores that there are also two dopings in the lateral direction, one high and one low p-type. The purple has a higher p and the yellow has a lower p, so the electric field in the body will move the electrons from the left to right. Below the higher p-type region of the gate, there will be a higher threshold voltage, below the lower p-type region of the gate, there will be a lower threshold voltage. The electric field acts on the electrons in the direction from high voltage threshold to low voltage threshold  on the electrons, from the high p-type doping to the low p-type doping, and as shown in Kimura from the first terminal to the second terminal.

## B.    Anticipation by Rhodes-647

187.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

188.    It has long been standard MOS processing practice to form the gate first and then implant the source and drain using the gate structure as a mask, thereby producing self-aligned junctions. The self-aligned polysilicon gate, co-invented by Frederico Faggin, was patented in 1972. (Ex. 68, U.S. Patent No. 3,673,471).  The use of a metal gate as a

mask to align the source and drain because of potential alignment issues in the fabrication was known before then. (Exs. 69 and 70, U.S. Patent Nos. 3,475,234 and 3,472,712).

189. The longstanding use of self-aligned gates is recognized in Sze (discussed above) and in Streetman. (Exs. 67; Ex. 7 at 323.) The use of self-aligned gates for the creation of a floating diffusion region was confirmed to be known in 1992 (Ex. 71, Miwanda, IEEE) and for CMOS image sensors in 1997 (Ex. 72, Wong, IEEE).

190. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

191. Rhodes-647 discloses a 4T pixel cell. Assuming the "signal devices coupling language" includes a 4T pixel, the only other claim limitation present is the "control terminal having the non-constant work function…." Rhodes-647 discloses a n-type gate that has a portion with a subsequent n-type doping applied, and if this is considered to be infringing as Dr. Carley alleges, it is invalid because it predates the invention of the '274 patent. The relevant disclosure of Rhodes-647 for such overlapping is discussed above in paragraphs 130 through139.

192. Additionally, U.S. Patent No. 6,100,551 also discloses a self-aligned transfer gate in a 4T pixel cell. (Ex. 73.)

### 5.    Motivation to Combine

236.    In ¶ 257 of Dr. Carley's Rebuttal Report he states that "a POSITA would not have been motivated to combine Isogai, Inuiya, Fossum, Neter, and/or Loinaz" to arrive at the limitation 1[h], the color interpolation circuit. As part of his opinion, Dr. Carley states that "Inuiya does not perform color interpolation to interpolate missing color values in a Bayer pattern," and similarly "Fossum does not perform Bayer color interpolation." (Carley Rebuttal, ¶ 257.) In this respect, Dr. Carley is importing additional limitations into the Asserted Claims. I understand that claim 1 is directed to a "solid state imaging device comprising: a red pixel having an output, a blue pixel having an output, a first green pixel having an output, [and] a second green pixel having an output." (Ex. 4, Claim 1.) Similarly, I understand that claim 18 is directed to an "imaging method" that includes converting red, blue, and first and second green pixels into first, second, third, and fourth digital signals. (Ex. 4, Claim 18.) There is no claim limitation requiring a Bayer pattern. While a Bayer pattern includes a specific arrangement of red, blue, and first and second green pixels, the claim language is not limited solely to the Bayer pattern. The specification states that the "solid state imaging device of the present invention defines a color image *based upon* the Bayer pattern of color filters," (Ex. 4, 4:51-53 (emphasis added)) but in my opinion nothing in the specification or claims appears to limit the invention to a Bayer pattern. Thus, it is my opinion that Dr. Carley's statements regarding performing color interpolation specifically on a Bayer pattern are irrelevant and could confuse the reader by conflating the claimed color pixels with a specific Bayer pattern arrangement.

237.    Moreover, Dr. Theuwissen illustrated and described the presence of red, blue, and first and second green pixels of Inuiya at least in ¶¶ 570-574, 577, and 586-589 of his Opening Report. (Opening Invalidity Report, ¶¶ 570-574, 577, and 586-589.) Dr. Theuwissen also described the presence of red, blue, and first and second green pixels of

Fossum at least in ¶¶ 526, 529, 532, 535, and 558 of his Opening Report. (*Id.* at ¶¶ 526, 529, 532, 535, and 558.)

238.    Dr. Carley also states that it is his opinion that "Inuiya uses interpolation to increase the resolution of the video signals by interpolating the red, blue, and green colors," and that "Inuiya is thus not directed to interpolating color values for Bayer color filter array CMOS image sensor data as in the '651 Patent." (Carley Rebuttal, ¶ 257.) Dr. Carley provides no citations to support his conclusion. Dr. Carley again appears to read in a Bayer color filter requirement into the Asserted Claims to form his unsupported opinion.

239.    Additionally, I understand that limitation 1[h] requires "a color interpolation circuit for combining the first, second, third and fourth digital signals," and that there is no mention of an intended use. In other words, even if I were to accept Dr. Carley's opinion as true that "Inuiya uses interpolation to increase the resolution of the video signals," (Carley Rebuttal, ¶ 257) the requirement of limitation 1[h] is silent on the intended use. Thus, in my opinion that both Inuiya and Fossum disclose each and every element of claim limitation 1[h].

240.    Dr. Carley states that "it would not have been obvious that a POSITA would combine Inuiya, which is related to CCDs, with references that are directed to, for example, CMOS image sensors." (Carley Rebuttal, ¶ 257) For the following reasons, I disagree. First, I understand that the preamble of claim 1 is directed to a "solid state imaging device," and the preamble of claim 18 is directed to "[an] imaging method." (Ex. 4, Claims 1, 18.) The Background of the Invention section of the '651 patent acknowledges that "[e] xamples of solid-state image sensors including charge coupled devices ("CCD") . . . and complementary metal oxide semiconductor ("CMOS") imaging devices." (Ex. 4, 1:21-25.) The '651 patent describes the functions of solid-state image sensors, collectively including CCD and CMOS, as:

> Each photodetector in the imaging array receives a portion of the light reflected from the object received at the solid-state image sensor. Each portion is known as a picture element or "pixel." Each individual pixel provides an output signal corresponding to the radiation intensity falling upon its detecting area . . . . The photo-charges from each pixel are converted to a signal (charge signal) or an electrical potential representative of the energy level reflected from a respective portion of the object. *The resulting signal or potential is read and processed by video processing circuitry to create an electrical representation of the image.* This signal may be utilized, for example, to display a corresponding image on a monitor or otherwise used to provide information about the optical image.

(*Id.* at 1:40-55.)

241.    The '651 patent continues by comparing advantages between CCD and CMOS image sensors, (*Id.* at 1:56-2:63), specifically noting the competition between the devices to achieve certain benefits. (Ex. 4, 1:56-59 ("CCDs are commonly utilized as solid-state image sensors. However, CMOS technology has made significant strides in competing with CCD technology as the solid-state image sensor of choice for use in various applications.").) This makes clear that a POSITA would be motivated to look to advantages between CCD and CMOS image sensors when determining what specific functionality to implement.

242.    Other cited prior art also demonstrates that comparing similarities and advantages between CCD and CMOS was done by a POSITA. For example, Neter discusses both CCD and CMOS color interpolation in the same context:

> *Two common examples of conventional integrated circuit imaging devices are a charge coupled device (CCD) and a complementary metal oxide semiconductor (CMOS) image sensing device.* Conventional imaging devices use one or more light detecting elements and charge storage elements. In order to produce a color image, the imaging devices separate the light into various color components by filtering the light before the light strikes the light detecting elements. The array of light

> detecting elements is often deposited with a filter layer such that neighboring pixels may have different color filters and organized in a particular pattern.
>
> Because each pixel is only capable of detecting a single color, conventional imaging devices require a process by which all of the color components are reconstructed for each pixel in order to maintain the original unfiltered array resolution. *To reconstruct the color components, conventional imaging devices use a process of color interpolation that is performed after an analog signal associated with each pixel has been digitized*. The conventional process of color interpolation performed after an analog signal associated with each pixel has been digitized requires conversion from analog to digital (A/D).
>
> (Ex. 49, 1:20-42 (emphasis added).)

243.    It is therefore my opinion that a POSITA would be motivated to look to teachings from CCD imaging devices in determining improvements to make on CMOS imaging devices. CCD image sensors were widely used in consumer products decades before CMOS image sensors started to be used. The Bayer pattern was used in CCD image sensors as were color interpolation circuits to create full RGB colors for each CCD pixel. A POSITA would have been strongly motivated to look at what was done, and commercially successful, in CCD image sensors when starting to use CMOS devices for image sensing.

███████████████████████████████████████████

E.    **Inuiya Alone or in Combination with One or More of Isogai, Neter, Fossum, and Loinaz**

1.    **Limitation 1[h]**

245.    Dr. Carley discusses Inuiya in ¶¶ 260-270 of his Rebuttal Report, and concludes that in his opinion Inuiya does not disclose limitation 1[h]. I disagree.

246.    Dr. Carley states that "Inuiya is not directed to interpolating color values for Bayer color filter array CMOS image sensor data as in the '651 Patent," and that "Inuiya seems to be directed to single CCDs using color filters." (Carley Rebuttal, ¶ 264.) As stated above, Dr. Carley appears to be reading in non-existent claim terms to form this opinion. For example, claims 1 and 18 of the '651 patent does not include the term "CMOS," nor does it include the term "Bayer color filter." (Ex. 4, Claims 1 and 18.) Claim limitation 1[h] is "a color interpolation circuit for combining the first, second, third and fourth digital signals," and is agnostic to whether the "solid state imaging device" in the preamble necessarily has to be a CMOS image sensor, and whether the disclosed red, blue, and first and second green pixels are arranged in a Bayer pattern. (*Id.*) I further understand that these terms are not present in the construction agreed to by both parties.

247.    In ¶ 265 of Dr. Carley's Rebuttal Report he disagrees that "'$0.5G_{1,n}$' is a third digital signal (first green pixel) and that '$0.5G_{2,n}$' is a fourth digital signal (second green pixel)." (Carley Rebuttal, ¶ 265.) But Dr. Carley admits that "[i]n the subscript (x,y) . . . x stands for the position of the pixel in the column direction and y the position of the pixel in the row direction." (*Id.*) I understand Dr. Carley's opinions to be conflicting. Dr. Carley tacitly admits that $G_{1,n}$ would correspond to a green pixel in row one, and that $G_{2,n}$ would

83

correspond to a green pixel in row two.  But he denies that this indicates there are first and second green pixels. Dr. Carley provides no alternative explanation as to what these green pixel values could be other than first and second green pixels.

248.    Moreover, Dr. Carley includes Fig. 29 of Inuiya in his discussion at ¶ 265. (Carley Rebuttal, ¶ 265.) Inuiya, Fig. 29, clearly shows red pixel information combined with green pixel information and blue pixel information combined with green pixel information. I have reproduced an excerpt of Fig. 29 below with my annotations to illustrate this disclosure. As shown below, the red pixel information and first green pixel information are combined at $(0.5R_{1,n} + 0.5G_{1,n})$ and the blue pixel information and second green pixel information are combined at $(0.5B_{2,n} + 0.5G_{2,n})$. Based on how Dr. Carley interpreted limitation 1[h] in his Opening Infringement Report, it is my opinion that Inuiya discloses this feature. (*See, e.g.,* Opening Infringement Rep., ¶¶ 657-659, 665-667.) Thus, under both OmniVision's and RESN's proposed constructions it is my opinion that Inuiya discloses limitation 1[h].



249.    Moreover, in ¶ 266 of his Rebuttal Report Dr. Carley appears to read in additional limitations into the claim where he states that "Inuiya does not disclose any step where the first, second third [sic], and fourth digital signals are ***all combined in one step*** (*e.g.*, calculation) to generate the luminance data $Y_L$." (Carley Rebuttal, ¶ 266

(emphasis added).) My understanding is that none of the language in claim limitation 1[h], OmniVision's proposed construction, and RESN's proposed construction require the four digital signals to be "all combined in one step" as Dr. Carley now seems to read the claim to require. It is also my understanding that Dr. Carley's interpretation in ¶ 266 of his Rebuttal Report would be in conflict with his interpretation of claim limitation 1[h] in his Opening Infringement Report at ¶¶ 657-659, 665-667. (*See, e.g.,* Opening Infringement Rep., ¶¶ 657-658, 665-667; *Id.* at ¶ 659 ("[L]imitation 1[h] is satisfied because the color interpolation circuit (e.g., the ISP or DSP) combines the first, second, third, and fourth digital signals *in one or more calculations* of the interpolated green, red and blue values.") (emphasis added).)

250.    Further, and solely for the sake of completeness, I disagree with Dr. Carley's opinion for at least the reason that he fails to consider Figure 30 of Inuiya in view of the specification. Figure 30 of Inuiya "illustrates the manner in which low-frequency component data $R_L$, $G_L$, and $B_L$ of the three primary colors is generated." (Ex. 37, 8:65-67.) Dr. Carley admits that these values are used to generate the luminance data $Y_L$. (Carley Rebuttal, ¶ 266.) Inuiya explicitly discloses the following equation for $Y_L$, which I have annotated below:

$$Y_L = 0.30R_L + 0.59G_L + 0.11B_L \qquad\qquad \text{Eq. (1)}$$

(Ex. 37, 28:57.)

251.    Equation 1 of Inuiya demonstrates that the $R_L$, $G_L$, and $B_L$ components from Figure 30 are combined to generate the luminance data $Y_L$. Thus, even if one were to accept Dr. Carley's position that all four digital signals needed to be combined in a single step, it is my opinion that Inuiya discloses this.

252.    In ¶ 267 of his report, Dr. Carley states that "it is not clear from Inuiya that

all four digital signals are being necessarily combined in calculating the luminance data $Y_L$." (Carley Rebuttal, ¶ 267.) I disagree for the reasons set forth above in ¶¶ 248–251 of my report.

253.    I disagree with Dr. Carley's statements in ¶ 268 of his Rebuttal Report for the same reasons set I have forth above in ¶¶ 246–251 of my report.

254.    I disagree with Dr. Carley's statements in ¶¶ 273-274 of his Rebuttal Report for the same reasons set I have forth above in ¶¶ 219–244 of my report. In my opinion a POSITA would find claim limitation 1[h] obvious over Inuiya in view of any of Isogai, Fossum, Neter, and Loinaz. A POSITA would also be motivated to combine one or more of the prior art references for the same reasons I discussed in ¶¶ 219–244.

### 2.    Limitation 18[f]

255.    For at least the same reasons described above with respect to claim 1 of the '651 patent, it is my opinion that a POSITA would understand Inuiya to anticipate claim 18 of the '651 patent, and understand Inuiya in view of one or more of the prior art references Isogai, Neter, Fossum, and Loinaz to render obvious claim 18 of the '651 patent.

### F.    Conclusion

256.    In light of the above, it is my opinion that Isogai discloses, explicitly or inherently, each and every element of the Asserted Claims 1 and 18. It is also my opinion that Inuiya discloses, explicitly or inherently, each and every element of the Asserted Claims 1 and 18. To the extent that any limitation in either reference is determined not to be explicitly or inherently disclosed, each of the Asserted Claims of the '651 patent is rendered obvious through combination of one or more of Isogai, Inuiya, Fossum, Neter, and Loinaz.

86

## V.    ALLEGED SECONDARY CONSIDERATIONS

257.    Dr. Carley asserts that there are secondary considerations of non-obviousness. (¶¶ 371-382) But none of his analysis is tied to any elements of the claims.

258.    For the '671 patent, Dr. Carley discusses the features of a programmable charge pump, which as confirmed by the prosecution history was known in the prior art and does not include the requisite "voltage selector" or "variable voltage circuitry" as construed by the Court. (*Id.* at ¶ 375.)

259.    For all of the patents discussed, Dr. Carley does not provide any nexus to the claimed features. (*Id.* at ¶¶ 376–378.) His broad brush statements about improved sensitivity, reduced image lag, or power consumption are generic.  Nor does any of the rest of his discussion attempt to identify how the claimed inventions are present in the general press releases about cost-effectiveness and improved quality, unsubstantiated claims of copying by products that Dr. Carley never analyzed, or by the mere existence of licenses in general. (*Id.* at ¶¶ 379–382.)

I hereby attest that the foregoing is true and accurate to the best of my knowledge under penalty of perjury.

Dated:  March 6, 2026

R. Jacob Baker, Ph.D., P.E.

# Exhibit 2

**UNITED STATES DISTRICT COURT**

**DISTRICT OF DELAWARE**

| | |
|---|---|
| OMNIVISION TECHNOLOGIES, INC<br><br>Plaintiff,<br><br>v.<br><br>RE SECURED NETWORKS, LLC<br><br>Defendant. | C.A. No. 24-187-JLH-CJB |

**<u>OPENING EXPERT REPORT OF ALBERT THEUWISSEN, PH.D.</u>**

### 4.    Operation of the 4T CMOS Pixel Cell

117.    The Nakamura book provides a useful depiction a typical pinned photodiode structure in a four-transistor pixel arrangement, shown below.



(Ex. 10, at 157.)

118.    Electron hole pairs are generated in the silicon when it absorbs the incoming photons of light.  The p and n doping arrangements in the photodiode create electric fields that draw the electrons to the n region, highlighted in yellow below.  The charge stays in the n-well portion of the photodiode until a transistor operating as a switch ($M_{TX}$) turns on, allowing the collected charge to pass to a floating diffusion node (FD), highlighted in pink.  This transfer transistor is controlled by the voltage signal applied to the gate of the transistor, highlighted in green.  The control signal is shown as TX.

51



(*Id.* at 157, annotated.)  The pinning layer is the area above the n-doped region of the photodiode labelled p+.

119.    The voltage applied to the transfer gate operates as a high or low voltage value (TX). The high voltage creates an electric field, which despite the gate being separated from surface by a non-conducting material, such as silicon dioxide, will draw electrons toward the surface, thereby creating a channel that will now allow the collected charge to diffuse to a floating diffusion node (FD). A low voltage on TX will result in a barrier remaining in place. In this manner, the transistor operates as a switch.  In other words, the transfer transistor operates as a switch, keeping charge in the depletion region when the voltage is low (switch open) and allowing it to flow to the floating diffusion node when the voltage is high (switch closed).

120.    A reset transistor operates as a switch to connect the floating diffusion node to a voltage source, moving the electrons to the $V_{AAPIX}$ to prepare the floating diffusion node for the next readout. As shown above, the reset transistor ($M_{RS}$) is controlled by a signal RST, which is also a high or low value. High closes the switch to perform the reset

operation and low keeps the switch open.

121.   Another transistor labelled $M_{SEL}$ is the select transistor. Setting the SEL signal to a high voltage will allow the signal to pass through to be read at point $V_{PIXOUT}$. When it is low, there is no signal to be sampled. The select transistor is typically used as a row select transistor, such that an entire row of pixels in a row of the image sensor are selected for output, and each pixel in that row is processed during that time. Then the next row is turned on and each pixel of that row is processed, and so on, until each row in the pixel array is processed.

122.   Charge generated by the photodiode and transferred to the floating diffusion node cannot be used as a signal to be processed by other elements in the image sensor. Rather, another signal must be provided in the form of a measurable voltage. This is done by a transistor known as a source follower (designated $M_{RD}$ above).

123.   The operation of the standard 4T pixel with pinned photodiode (PPD) is summarized below:



$V_p$ : pixel output voltage (V)
RS : row select
RST : reset
SF : source follower
TX : transfer gate
$V_{DD}$ : power supply
I : bias current

124.    A modification to the 4T pixel cell in which the row select transistor was removed and instead a clocked reset signal was used to drive the pixel operation was also known as shown in U.S. Patent No. 6,218,656 ("Guidash-656"), filed on December 30, 1998, issued on April 17, 2001, with Guidash as the inventor. (*See* Ex. 28.)

125.    The operation of this modified arrangement is summarized below:



### 6.    Pixel Arrays and Row and Column Circuitry

126.    As of the early 2000's there were hundreds of thousands of pixels in a CMOS image sensor at minimum.  Now, there are typically millions of pixels.

127.    Because a typical image sensor provides a two-dimensional representation of an image, the pixels are aligned in an array. The pixel array consists of rows and columns of pixels, each of which absorbs photons and converts them into an electrical signal.  A depiction of a pixel array and accompanying circuitry that would have been

54

follower are coupled together, the claim language as recited is consistent with a 4T CMOS image sensor.

217.    Independent claim 1 and 14 of the '671 patent (as well as the asserted independent claims of the '145 and '274 patents) use different language: "a plurality of signal devices coupling the plurality of nodes to the row and column circuitry."

218.    The claim language of these independent claims do not read on the 4T CMOS image sensor pixel cell if coupling A to B and C is interpreted strictly. The plurality of signal devices should be coupling A [the floating diffusion node] to B [the row circuitry] and C [the column circuitry].

219.    At best, a 4T CMOS pixel cell image sensor would have the signal devices indirectly coupling the A [the floating diffusion node] to C [the column circuitry] because a change in the voltage at the floating diffusion node would be reflected at the column circuitry after being buffered by the source follower and passed through the row select transistor.  However, a change in the voltage at the floating diffusion node would not cause a change in the voltage at the row circuitry nor the other way around in a 4T CMOS pixel cell image sensor.

220.    To the extent that "coupled to" in claim 1 means the same thing as "coupled to" in the unasserted dependent claims, the preferred embodiments of the specification are not within the scope of the claims.

221.    This would not be the case for the modified version of the pixel cell in which the row select transistor is removed as discussed in paragraphs 124 and 125.  However, that type of pixel cell is not disclosed or contemplated in the MTTP specification.

222.    To the extent that "coupling . . .  to" in claim 1 instead means that same

95

thing as "coupling with," such that the plurality of signal devices are coupling [A] the floating diffusion node <u>with</u> [B] the row circuitry and [c] the column circuitry, i.e. the floating diffusion node, row circuitry, and column circuitry are all coupled together by the signal devices, the 4T CMOS pixel cell image sensor satisfies this requirement.

223.    I understand that the interpretation of the claims is a matter for the Court who would ultimately decide whether the literal meaning of the claims which would exclude the preferred embodiments or whether a corrected version that changes the plain meaning should be apply. For the purposes of my analysis, I will assume that an interpretation by with "coupled to" is synonymous with "coupled with" that simply requires that the signal devices are generally providing for the row circuitry, column circuitry, and floating diffusion node to be coupled together and as such includes a 4T CMOS pixel cell image sensor unless stated otherwise.

224.    To the extent that Court may interpret the claims to apply "coupling . . . to" as the literal plain meaning of the claim language states and excludes the 4T CMOS image sensor pixel cell, a person of ordinary skill in the art would know how to modify an existing 4T CMOS image sensor pixel cell and use the modified version disclosed in *Guidash-656* (Ex. 28).  The asserted claims do not require a row select transistor, only that the signal devices couple the floating diffusion node to the row circuitry.  One seeking to reduce the number of components taking up space on the image sensor would find it obvious to use this arrangement.  The modified pixel cell that removes the row select transistor separates the power source and instead provides a separate signal to source follower. If a person of ordinary skill in the art were already including additional circuitry, such as the variable voltage circuitry discussed below, the addition of such a power and

96

control signal would require little additional cost or components, providing incentive to remove the row select transistor altogether.

225. The only claim language that is not present in a common prior art 4T CMOS pixel cell is "variable voltage circuitry including a voltage selector determining a control voltage of the control signal applied to the plurality of transfer devices." I understand that the parties agreed and the Court construed "variable voltage circuitry" to mean "circuitry that provides adjustable voltage levels for the control signal wherein that circuitry does not merely switch between a singular on and a singular off level."

226. The claim language "variable voltage circuitry" recited in claim 1 was the only feature identified as new by the Examiner during prosecution of the '671 patent. (*See* Ex. 38 at RESN-OV-0001606-07 (Examiner's Statement of Allowance indicating that the prior art did not disclose or suggest "a voltage selector determining a control voltage of the control signal applied to the plurality of transfer devices"; *see also id.* at RESN-OV-0001577.) Examiner does not appear to have searched specifically for changing of a voltage to a transfer gate (or control signal).

### C.     The '145 Patent Asserted Claims and Prosecution History

227. The '145 patent specification is substantively the same as the '671 patent, but its claims are directed to doping arrangements in the control terminal above the surface and "p-type regions" located "under the control terminal" and "lateral position at least partly under the corresponding node." (*See, e.g.,* Ex. 2, claim 1.) For example, the '145 patent is purportedly directed to the problem of "dark current," which is leakage current when the gate is "off." (*See id.* at 2:6–17.) The purported improvement addresses these issues by "generating an electric field which accumulates holes to eliminate dark current and reliably keeping the transfer transistor off," and "[i]n the absence of a control

97

selection switch control line 105 (e.g., row R1 or R2 in annotated figure 1 above). Selecting a row causes each pixel in the selected row to transfer charges to a corresponding signal output line 106 (e.g., columns C1, C2, and C3 in annotated figure 1 above). The row lines and column lines along with the associated circuitry for driving those lines constitutes "row and column circuitry" as recited in claim 1.

        g.    **"a plurality of signal devices coupling the plurality of nodes to the row and column circuitry; and"**

314.    To the extent that the above claim language is interpreted to encompass the CMOS 4T pixel cell discussed above and disclosed in Figure 1 of the MTTPs, *Koizumi* discloses a 4T pixel cell as shown in Figures 1 and 13. As shown in annotated figures 1 and 13 below, each pixel of *Koizumi's* pixel array includes an input MOS transistor Q3 and a selection switch Q4 (collectively, a "signal device"). (Ex. 16, 1:26-35, 6:52-56, FIGs. 1, 13.)



(*Id.*, Figs. 1, 13 (annotated).

315.    Moreover, the input MOS transistor Q3 and the selection switch Q4 together forming a "signal device" for each pixel is consistent with unasserted claim 11 of the '671 patent, which recites, "the circuit of claim 1, wherein the plurality of signal devices includes

a plurality of row select transistors coupled to the row and column circuitry and a plurality of source follower transistors coupled to the plurality of nodes."

316.    Each pixel of *Koizumi*'s pixel array includes an input MOS transistor Q3 and a selection switch Q4 that together form a "signal device" such that the array of pixels includes a "plurality of signal devices." (Ex. 16, 1:26-35, 6:52-56, Figs. 1, 13)

317.    The gate and drain of selection switch Q4 ("row select transistor") are respectively coupled to the selection switch control line 105 that performs row selection and signal output line 106 that corresponds to the columns in the pixel array, which are part of the "row and column circuitry" for the image pickup device. Additionally, the input MOS transistor Q3 is a "source follower transistor" coupled to the floating diffusion node FD ("node") of each pixel. (Ex. 16, 1:29-32.) Therefore, each "signal device" in each pixel includes a "row select transistor" (Q4) and a "source follower transistor" (Q3) such that the plurality of pixels in the pixel array includes a "plurality of signal devices [that] includes a plurality of row select transistors coupled to the row and column circuitry and a plurality of source follower transistors coupled to the plurality of nodes" as recited in claim 11.

318.    To the extent that the "coupling . . . to" limitation in independent claim 1 can be demonstrated by the presence of the "coupled to" elements of dependent claim 11, this is additional evidence that the "coupling .  . ." elements are present in Koizumi.

319.    As *Koizumi* explains:

> An ***input MOS transistor Q3*** is included in a ***source follower for outputting the voltage*** in the floating diffusion area. A ***selection switch Q4 selects a pixel***.

(Ex. 16, 1:29-32.)

132

320. As shown in annotated figures 1 and 13 above, the input MOS transistor Q3 and the selection switch Q4 are in a source follower arrangement. (*Id.*; *see also id.*, 1:46-50.) The gate of the selection switch Q4 is coupled to the selection switch control line 105 that is used to select a row in the pixel array, while the drain of Q4 is coupled to the signal output line 106 corresponding to a column in the array. Thus, when the selection switch control line 105 is asserted and selection switch Q4 is turned on, "the voltage in the floating diffusion area [FD] is output to the signal output line 106" (*id.*, 1:29-32):

> A voltage corresponding to the **voltage in the floating diffusion area is output to the signal output line 106 by a source follower** formed from a **load connected to the input MOS transistor Q3 and signal output line 106**.

(*Id.*, 1:46-50 (emphasis added).)

321. If the "coupling . . . to" requirement of claim 1 requires that the signal devices are coupling the floating diffusion node to the row circuitry and column circuitry such that the floating diffusion node would be affected by a change in the row circuitry connected to the signal devices as well as having a change in its value being outputted to the column circuitry, then it would be obvious for one of ordinary skill in the art to modify *Koizumi* to remove the row select transistor and instead have the row circuitry drive the source follower as shown in *Guidash-656* (Ex. 28) discussed in paragraph 124.

322. Given that the Court has not yet construed the "coupling . . . to" claim limitation, I reserve the right to supplement my report when a claim construction order on this term is provided. In the meantime, I assume that "coupling . . . to" will include the 4T CMOS pixel cell image sensor that is the subject of the MTTP specification. Under that interpretation, devices Q3 and Q4 are collectively coupling the floating diffusion node with

133

lines 105 and 106 ("row and column circuitry").

> **h.  "variable voltage circuitry including a voltage selector determining a control voltage of the control signal applied to the plurality of transfer devices."**

323.    I understand that notwithstanding the Court's construction of "variable voltage circuitry" to mean "circuitry that provides adjustable voltage levels for the control signal wherein that circuitry does not merely switch between a singular on and a singular off level," RESN has asserted that merely having three-voltage level states applied to the control terminal satisfies this claim limitation.  *Koizumi* discloses such a feature.

324.    For example, *Koizumi* discloses gate drive circuits 1002 and scanning circuit 1003 (collectively, "variable voltage circuitry") that includes circuitry that determines the voltage applied to the transfer gate Q1 in each of the plurality of pixels ("a voltage selector determining a control voltage of the control signal applied to the plurality of transfer devices"):

> The arrangement shown in FIG. 1 includes a pixel 1001 which has the same structure as that shown in FIG. 13, a **gate drive circuit 1002 for operating a transfer switch Q1 in the pixel 1001**, and a **scanning circuit 1003 for controlling the transfer switches on each row basis**.

(Ex. 16, 6:54-59 (emphasis added).)

134

due to charge transfer is observed. As a result of this embodiment, the residual image is improved more than in the graph "fall speed vs. Residual image" shown in FIG. 8.

(*Id.*, 7:8-15.)

328.    *Koizumi* discloses, in connection with the gate drive circuit shown in figure 2, that the scanning circuit 1003 and gate drive circuit 1002 ("variable voltage circuitry") include a voltage selector determining a control voltage of the control signal (e.g., low (0.0V), middle (3.0V), or high (5.0V) level signal) applied to the plurality of transfer switches Q1 ("transfer devices"). If this claim language requires "adjustable" to mean that the voltage levels can be changed, *Lee* expressly discusses including programming to "produce different charge control voltages." (Ex. 18 at 12:21-25.)  As discussed below with respect to claim 3, it would be obvious to combine *Koizumi* with *Lee* to provide for the ability to adjust the voltage levels.

### 2.    *Koizumi* Discloses the Features of Claim 14

329.    Claim 14 recites "a computer readable medium containing a description of an image sensor integrated circuit comprising" the limitations of claim 1. I have been asked to assume that the preamble of claim 14 is limiting.  It is my opinion that *Koizumi* discloses or suggests the features of claim 14.

330.    *Koizumi* discloses the image sensor integrated circuit of claim 1.  A person of ordinary skill in the art would have understood that semiconductor integrated circuit design, like the design of image sensors as disclosed in *Koizumi*, is typically performed using computer aided design tools that result in designs for the integrated circuits that would be understood, in the context of the *Koizumi*, as a "computer readable description of an image sensor integrated circuit."

331.    To the extent that this claim limitation may be construed to be limiting, as of

137

the December 30, 2004 filing date for the MTTPS, the creation of such computer-readable designs has been known in the industry for decades, and a typical integrated circuit designer would be aware of such computer-readable descriptions, capable of creating such a computer-readable description, and motivated to create such a computer-readable description as using computer aided design tools greatly simplifies the integrated circuit design and fabrication process. For example. U.S. Patent No. 7,325,206 ("White") which was filed on December 17, 2004 and assigned to Cadence Design Systems, Inc. (Ex. 45.) White discloses the use of an electronic design automation (EDA) tool that saves files in the Graphical Data Stream (GDS) file format. (See *id.* at 2:8-13, Figs. 10B, 28) Additionally, U.S. Patent No. 7,155,689 ("Pierrat") states:

> FIG. 5 encapsulates the existing IC creation process. IC creation is divided into design (501) and manufacturing (502) aspects. Based on circuit element models (503) and design rules (592) provided by circuit manufacturers, circuit designers generate the layout (504) of the IC. **Such layout generation can be facilitated by the use of CAD technology (505)**. From the layout, circuit manufacturers fabricate the ICs (506). The circuit element models (503) can be derived from a variety of means including manufacturing data, empirical fitting, theoretical considerations, and computer simulation such as **technology computer-aided design (TCAD) programs**.

(Ex. 46, 4:33-44.)

332.    Accordingly, because a person of ordinary skill in the art would have been familiar with the creation of a computer-readable description of the *Koizumi's* image pickup device and motivated to use computer-aided design tools to create such a computer-readable description, it is my opinion that *Koizumi* discloses or suggests all of the features of claim 14 for the same reasons discussed above.

138

voltage for driving the resetting MOS transistor 107." (*Id.*, 6:38-46.)

370.    Thus, *Kochi* discloses a second variable resistor 115 ("second voltage selector") determining the voltage at power supply voltage input terminal 112 ("a second control voltage of a second control signal") applied to resetting MOS transistor 107 ("reset device").

### 5.    *Kochi* Discloses the Features of Claim 14.

371.    Claim 14 recites "a computer readable medium containing a description of an image sensor integrated circuit comprising" the limitations of claim 1. I understand that RESN has not asserted infringement directed to a computer medium and thus would not asserted that the preamble is limiting.

372.    As discussed above in Section XI.A.2, it was well-known to use computer software, such as electronic design automation (EDA) tools to design integrated circuits and save a computer readable representation of the components of an image sensor design.

373.    *Kochi* discloses an image sensor integrated circuit as recited in claim 1. A person of ordinary skill in the art would have understood that semiconductor integrated circuit design, like the design of image sensors as disclosed in *Kochi*, typically is performed using computer aided design tools that result in designs for the integrated circuits that would be understood, in the context of the *Kochi*, as a "computer readable description of an image sensor integrated circuit." Indeed, the creation of such computer-readable designs has been known in the industry for decades, and a typical integrated circuit designer would be aware of such computer-readable descriptions, capable of creating such a computer-readable description, and motivated to create such a computer-readable description as using computer aided design tools greatly simplifies the

integrated circuit design and fabrication process.

374.   A person of ordinary skill in the art would have been familiar with the creation of a computer-readable description of the *Kochi's* image pickup device and motivated to use computer-aided design tools to store such information in a computer-readable medium.  To the extent that the "computer readable medium" is considered to be limiting, it is my opinion that *Kochi* discloses or would be obvious in view of any of the prior art references discussed in paragraph 331.

**B.   Application of Exemplary References to the Asserted Claims of the '145 Patent**

**1.   *Rhodes-647* in Combination with *Kimura* Discloses the Features of Claim 1**

**a.   An image sensor integrated circuit, comprising:**

375.   I understand that "[a] image sensor integrated circuit, comprising" is the preamble of claim 1. I have been asked to assume that the preamble is limiting. *Rhodes-647* discloses this feature. For instance, as shown in figure 12 below, *Rhodes-647* discloses an integrated CMOS imager 800 having a pixel array 200. (Ex. 33, FIG. 12, 3:12-13 ("FIG. 12 shows **a pixel array integrated into a CMOS imager system** in accordance with the invention.") (emphasis added), 9:36-39 ("FIG. 12 illustrates a block diagram for a CMOS imager 800 having a pixel array 200 like that shown in FIG. 11, with each pixel 10 being constructed in the manner discussed above in relation to FIGS. 3-8."), 13:16-14:21 (describing an "integrated circuit" including transistors and a photodiode); *see also id.*, FIG. 11 (showing array 200 that includes 4T CMOS imager pixel 10 circuits), 9:29-35, 3:39-40 ("Other transistors of the pixel or other portions of a **chip** containing a pixel array . . . .") (emphasis added).)

column select line. (*Id.*, 9:41-60.) Given that, for each pixel, the charges in the node corresponding to regions 28/40 are read out by row and column circuitry in CMOS imager 800 via a source follower transistor 16 and a row select transistor 18 (together forming a "signal device" for each pixel), *Rhodes-647* discloses "a plurality of signal devices coupling the plurality of nodes to the row and column circuitry." (Ex. 33, 1:15-18 ("A readout circuit is connected to each pixel cell and includes at least an output transistor, which receives photogenerated charges from a doped diffusion region (an electrically active area) and produces an output signal which is periodically read-out through a pixel access transistor."), 4:48-53 ("MxN array of pixels 10 arranged in rows and columns with the pixels 10 of the array accessed using row and column select circuitry"), 8:60-67 ("connecting various elements of the pixel together and with row and column lines thereby substantially completing the imager device").)

### 2. *Rhodes-647* in Combination with *Kimura* Discloses the Features of Claim 12

*A computer readable description of an image sensor integrated circuit comprising:*

417. Claim 12 recites "a computer readable medium containing a description of an image sensor integrated circuit comprising" the limitations of claim 1. (*Compare* Ex. 2, claim 12 *with* claim 1.) I understand that RESN has not asserted that this claim limitation is limiting.

418. As I discussed above, the *Rhodes-647-Kimura* combination discloses or suggests the image sensor integrated circuit of claim 1. A person of ordinary skill in the art would have understood that the design and manufacture of semiconductor integrated circuits, like the image sensors disclosed in *Rhodes-647* and *Kimura*, is typically performed using computer aided (CAD) tools that result in a design/description of the

integrated circuits that would have been understood, in the context of the *Rhodes-647-Kimura* combination, as a "computer readable description of an image sensor integrated circuit." (Ex. 46, Abstract, 1:6-7, 4:33-44.) As discussed above in Section XI.A.2, the creation of such computer-readable designs has been known in the industry for decades, and a typical integrated circuit designer would be aware of such computer-readable descriptions, capable of creating such a computer-readable description, and motivated to create such a computer-readable description as using computer aided design tools greatly simplifies the integrated circuit design and fabrication process.

419.    For example, U.S. Patent No. 7,155,689 ("Pierrat") states:

> FIG. 5 encapsulates the existing IC creation process. IC creation is divided into design (501) and manufacturing (502) aspects. Based on circuit element models (503) and design rules (592) provided by circuit manufacturers, circuit designers generate the layout (504) of the IC. **Such layout generation can be facilitated by the use of CAD technology (505)**. From the layout, circuit manufacturers fabricate the ICs (506). The circuit element models (503) can be derived from a variety of means including manufacturing data, empirical fitting, theoretical considerations, and computer simulation such as **technology computer-aided design (TCAD) programs**.

(Ex. 46, 4:33-44.)

420.    A person of ordinary skill in the art would have been familiar with the creation of a computer-readable description of the above combination and would be motivated to use computer-aided design tools to store such information in a computer-readable medium. To the extent that the "computer readable medium" is considered to be limiting, it is my opinion that *Kochi* discloses "computer readable medium" or that this limitation would be obvious in combination with any of the prior art references discussed in paragraph 331.

190

421.    Accordingly, because a person of ordinary skill in the art would have been motivated to create a computer-readable description of the image sensor of the *Rhodes-647-Kimura* combination, the *Rhodes-647-Kimura* combination discloses or suggests all of the features of claim 12 for the same reasons discussed above.

### 3.    *Rhodes-413* in view of *Kimura* and *Rhodes-042* Discloses or Suggests the Features of Claim 1

#### a.    An image sensor integrated circuit, comprising:

422.    I understand that "[a]n image sensor integrated circuit, comprising" is the preamble of claim 1.  I have been asked to assume that the preamble is limiting. *Rhodes-413* discloses this feature.  For instance, *Rhodes-413* discloses an imager device 108 including a pixel array 100 shown in figure 1. (Ex. 34, 1:38-42 ("FIG. 1 illustrates a block diagram of a CMOS imager device 108 having a pixel array 100 with each pixel cell being constructed as described above. Pixel array 100 comprises a plurality of pixels arranged in a predetermined number of columns and rows (not shown)."), FIG. 1; *see also id.*, 1:12-16 ("A CMOS imager circuit includes a focal plane array of pixel cells, each cell includes a photosensor, for example, a photogate, photoconductor or a photodiode overlying a substrate for producing a photo-generated charge in a doped region of the substrate.").)

4.    *Rhodes-413* in view of *Kimura* and *Rhodes-042* Discloses or Suggests the Features of Claim 12

*A computer readable description of an image sensor integrated circuit comprising:*

474.    Claim 12 recites "a computer readable medium containing a description of an image sensor integrated circuit comprising" the limitations of claim 1. (*Compare* Ex. 2, claim 12 *with* claim 1.)  I understand that RESN has not asserted that this claim limitation is limiting or provide any allegations directed to computer readable mediums as infringing.

475.    Nonetheless, the *Rhodes-413-Kimura-Rhodes-042* combination discloses this feature. A person of ordinary skill in the would have understood that the design and manufacture of semiconductor integrated circuits, like the image sensors disclosed in the *Rhodes-413-Kimura-Rhodes-042* combination, is typically performed using computer aided (CAD) tools that result in a design/description of the integrated circuits that would have been understood, in the context of the *Rhodes-413-Kimura-Rhodes-042* combination, as a "computer readable description of an image sensor integrated circuit. (Ex. 46, Abstract, 1:6-7, 4:33-44.) As discussed above in Section XI.A.2, the creation of such computer-readable designs has been known in the industry for decades, and a typical integrated circuit designer would be aware of such computer-readable descriptions, capable of creating such a computer-readable description, and motivated to create such a computer-readable description as using computer aided design tools greatly simplifies the integrated circuit design and fabrication process.

476.    For example, U.S. Patent No. 7,155,689 ("Pierrat") states:

> FIG. 5 encapsulates the existing IC creation process. IC creation is divided into design (501) and manufacturing (502) aspects. Based on circuit element models (503) and design rules (592) provided by circuit manufacturers, circuit designers generate the layout (504) of the IC. **Such layout**

> **generation can be facilitated by the use of CAD technology (505).** From the layout, circuit manufacturers fabricate the ICs (506). The circuit element models (503) can be derived from a variety of means including manufacturing data, empirical fitting, theoretical considerations, and computer simulation such as **technology computer-aided design (TCAD) programs.**

(Ex. 46, 4:33-44.)

477. Accordingly, because a person of ordinary skill in the art would have been motivated to create a computer-readable description of the image sensor of the *Rhodes-413-Kimura-Rhodes-042* combination, the *Rhodes-413-Kimura-Rhodes-042* combination discloses or suggests all of the features of claim 12 for the same reasons discussed above in paragraph 331.

### C. Application of Exemplary References to the Asserted Claims of the '274 Patent

#### 1. Kimura Discloses All the Features of Claim 1

##### a. An image sensor integrated circuit, comprising

478. To the extent the preamble is limiting, Kimura discloses an image sensor integrated circuit. *See, e.g.* Ex. 25 at Fig. 13 ("structure of a conventional semiconductor device") (*see id.* at ¶ 57).



479. Kimura discloses the use of a solid state pixel image pickup element (*See*

227

### 2.    Kimura Discloses All the Features of Claim 11

*A computer readable description of an image sensor integrated circuit comprising:*

511.    Claim 11 recites "a computer readable medium containing a description of an image sensor integrated circuit comprising" the limitations of claim 1. I understand that RESN has no asserted that this claim limitation is limiting or provide any allegations directed to computer readable mediums as infringing. The rest of the claim 11 is identical to claim 1.

512.    The modified preamble of claim 11 of the '274 patent in relation to claim 1 of the '274 patent is identical to the modified preamble of claim 12 of the '145 patent in relation to claim 1 of the '145 patent.

513.    As discussed above in Section XI.A.2, the creation of such computer-readable designs has been known in the industry for decades, and a typical integrated circuit designer would be aware of such computer-readable descriptions, capable of creating such a computer-readable description, and motivated to create such a computer-readable description as using computer aided design tools greatly simplifies the integrated circuit design and fabrication process.

514.    A person of ordinary skill in the would have understood that the design and manufacture of semiconductor integrated circuits, like the image sensor disclosed in the *Kimura* is typically performed using computer aided (CAD) tools that result in a design/description of the integrated circuits that would have been understood, in the context of the *Kimura*, as a "computer readable description of an image sensor integrated circuit. (*See* Ex. 46, Abstract, 1:6-7, 4:33-44.) To the extent that the preamble is construed to be limiting, a person of ordinary skill in the art viewing *Kimura* alone or in

246

combination with any references discussed below as applied to claim 1 of the '274 patent would also consider it to be obvious to describe the image sensor structures in a computer readable medium in view of any of the prior art references discussed in paragraph 331.

### 3.    Obviousness Based on '145 Patent Combinations

515.    Each of the combinations proposed above for the '145 patent reads on asserted claims 1 and 11 of the '274 patent.  The '274 patent omits the "plurality of p-type regions" and requires that a difference due to a non-constant work function in the different regions of the control terminal creates "an electric field in the body tending to cause electrons in the body to move in a direction from the first terminal to the second terminal." The proposed combinations for the "in the absence of a control voltage … creates an electric field to repel the electrons from a portion of the body by the control terminal" will perform in the same manner to disclose "a difference between the nonconstant work function of the first part of the control terminal and the nonconstant work function of the second part of the control terminal [to] create an electric field in the body" that will move the electrons in the direction from the first to the second terminal.

516.    To the extent U.S. Patent Publication No. 2003/0228736 to Kimura (Ex. 25), discussed below, is contested as not anticipating claims 1 and 11 of the '274 patent, the same '145 combinations render the asserted claims of the '274 patent obvious for the reasons stated in my discussion with respect to the '145 patent.

and 42. As confirmed by paragraph 43, a person of skill in the art would know how to build a hardware circuit for color interpolation from a general description or block diagram.

## XII.   CONCLUSION

602.   Claims 1 and 12 of the '145 patent and claims 1 and 11 of the '274 patent fail to inform with reasonable certainty a person of ordinary skill in the art as of the of filing of these patents about the scope of the claimed invention.

603.   Claims 1, 3, 14, and 16 of the '671 patent, claims 1 and 12 of the '145 patent, claims 1 and 11 of the '274 patent, and claims 1 and 18 of the '651 patent are invalid as anticipated and/or obvious.

604.   I reserve the right to supplement and/or modify my opinions in view of claim construction by the Court, infringement and/or claim construction arguments presented by RESN, or new evidence.

I hereby attest that the foregoing is true and accurate to the best of my knowledge under penalty of perjury.

Dated: December 9, 2025

A. THELWISSEN.

296

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| OMNIVISION TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> RE SECURED NETWORKS, LLC, <br><br> Defendant. | C.A. No. 24-187-JLH <br><br><br> **JURY TRIAL DEMANDED** |

**OMNIVISION TECHNOLOGIES, INC.'S
<u>AMENDED INVALIDITY CONTENTIONS</u>**

**I.    GENERAL STATEMENTS**

**A.    Introduction**

Plaintiff OmniVision Technologies, Inc. ("Plaintiff" or "OmniVision") makes the following preliminary invalidity contentions for U.S. Patent Nos. 6,838,651 ("the '651 patent"), 7,323,671 ("the '671 patent"), 7,495,274 ("the '274 patent), and 7,800,145 ("the '145 patent") (collectively, "the Asserted Patents"). As described below and in the attached exemplary claim charts (attached as Appendices A-D), the prior art anticipates and/or renders obvious all asserted claims of the Asserted Patents. Further, one or more claims of the Asserted Patents fail to satisfy the enablement, definiteness, and/or written description requirements of 35 U.S.C. § 112.

OmniVision's Amended Invalidity Contentions are responsive to the Second Amended Infringement Contentions served by Defendant RE Secured Networks, LLC ("Defendant" or "RESN") on September 10, 2025 and are limited to only those claims that RESN has asserted against OmniVision: '651 patent, claims 1 and 18; '671 patent, claims 1, 3, 14, 16; '274 patent, claims 1, 11; and '145 patent, claims 1, 12. RESN's infringement contentions do not provide a cognizable theory of infringement, failing to identify several limitations of the claims for the products referenced in its claim charts or a representativeness theory that would provide any basis for discerning how other identified products could be accused of infringement. Accordingly, RESN has failed to identify where each and every element of the asserted claims is allegedly present in the accused products to allow for responsive evidence demonstrating that the same functionality was present in the prior art. To the extent that RESN has failed to apply language in the claims to a component of an accused product, these contentions presume that RESN asserts that the applicable language is non-limiting and/or is superfluous.

## II.    INVALIDITY PURSUANT TO 35 U.S.C. §§ 102 AND 103

### A.    Prior Art Identification and Citations

Exemplary prior art references anticipating and/or rendering obvious one or more of the Asserted Claims are listed in the tables below. OmniVision intends to rely on the listed references, either individually or in combination, to establish the invalidity and/or unenforceability of the asserted patents. OmniVision may also rely upon the following: (i) prior art contained within the prosecution histories of the asserted patents; (ii) prior art contained within the prosecution histories of patents or patent applications related to the asserted patents; and (iii) prior art identified during the remainder of discovery. Each of these prior art patents, publications, and systems qualifies as prior art under one or more of 35 U.S.C. § 102(a), (b), (e), (f), and/or (g) and anticipates and/or renders obvious one or more Asserted Claims as indicated in the corresponding claim charts in Appendices A-D.

OmniVision's prior art invalidity disclosures are responsive to RESN's application of the elements of the Asserted Claims as alleged to be present in the charted OmniVision products in RESN's Second Amended Infringement Contentions. OmniVision reserves the right to supplement, modify, or amend these prior art invalidity positions to the extent that RESN supplements, modifies, or amends its Infringement Contentions, the Court provides claim constructions, new information becomes available through discovery, or as otherwise necessary.

Reference to a granted patent by patent number also refers to the corresponding publication numbers and provisional application numbers and vice versa. Within these disclosures of prior art is any system or device that practices the invention that may independently qualify as prior art to one or more of the claims.

1.    **Identification of Prior Art for the '651 Patent**

a.    **Patents, Patent Applications, and Patent Publications**

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 3,971,065 | Mar. 5, 1975 | July 20, 1976 | Bayer |
| United States | 4,541,010 | June 17, 1983 | Sept. 10, 1985 | Alston |
| United States | 4,742,238 | Oct. 1, 1986 | May 3, 1988 | Sato |
| United States | 5,293,430 | Jan. 12, 1993 | March 8, 1994 | Shiau |
| United States | 5,327,246 | Jan. 23, 1992 | July 5, 1994 | Suzuki |
| United States | 5,446,297 | Feb. 8, 1994 | Aug. 29, 1995 | Lee |
| United States | 5,477,345 | Dec. 15, 1993 | Dec. 19, 1995 | Tse |
| United States | 5,920,654 | Dec. 14, 1995 | July 6, 1999 | Someya |
| United States | 5,982,318 | Oct. 10, 1997 | Nov. 9, 1999 | Yiannoulous |
| United States | 5,982,984 | Jan. 31, 1996 | Nov. 9, 1999 | Inuiya |
| United States | 6,002,123 | March 3, 1998 | Dec. 14, 1999 | Suzuki |
| United States | 6,115,065 | Nov. 7, 1996 | Sept. 5, 2000 | Yadid-Pecht |
| United States | 6,130,710 | May 22 1995 | Oct. 10, 2000 | Yasuda |
| United States | 6,140,630 | Oct. 14, 1998 | Oct. 31, 2000 | Rhodes |
| United States | 6,222,986 | Aug. 11, 1999 | April 24, 2001 | Inuiya |
| United States | 6,246,043 | Sept. 22, 1998 | June 12, 2001 | Merrill |
| United States | 6,380,880 | March 30, 2001 | April 30, 2002 | Bidermann |
| United States | 6,403,998 | Nov. 8, 1999 | June 11, 2002 | Inoue |
| United States | 6,453,068 | Sept. 17, 1999 | Sept. 17, 2002 | Li |
| United States | 6,466,265 | June 22, 1998 | Oct. 15, 2002 | Lee |
| United States | 6,486,911 | Nov. 29, 1996 | Nov. 26, 2002 | Denyer |
| United States | 6,504,193 | June 29, 2000 | Jan. 7, 2003 | Ishiwata |
| United States | 6,512,546 | July 17, 1998 | Jan. 28, 2003 | Decker |
| United States | 6,529,238 | Sept. 1, 1998 | March 4, 2003 | Mahant-Shetti |

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 6,529,622 | Oct. 30, 1998 | March 4, 2003 | Pourjavid |
| United States | 6,570,201 | Oct. 11, 2001 | May 27, 2003 | Shim |
| United States | 6,583,641 | Apr. 25, 2001 | June 24, 2003 | Wang |
| United States | 6,600,471 | July 27, 2001 | July 29, 2003 | Lee |
| United States | 6,630,706 | Aug. 30, 2001 | Mar. 6, 2003 | Yang |
| United States | 6,642,962 | Sept. 1, 1999 | Nov. 4, 2003 | Lin |
| United States | 6,661,457 | March 22, 1999 | Dec. 9, 2003 | Mathur |
| United States | 6,674,471 | May 28, 1999 | Jan. 6, 2004 | Masuyama |
| United States | 6,690,000 | Dec. 1, 1999 | Feb. 10, 2004 | Maramatsu |
| United States | 6,690,423 | March 19, 1999 | Feb. 10, 2004 | Nakamura |
| United States | 6,704,049 | Feb. 23, 1998 | March 9, 2004 | Fossum |
| United States | 6,720,592 | June 29, 2001 | April 13, 2004 | Kindt |
| United States | 6,724,945 | May 24, 2000 | April 20, 2004 | Yen |
| United States | 6,741,754 | Feb. 19, 2001 | May 25, 2004 | Hamilton, Jr. |
| United States | 6,768,513 | Oct. 6, 2000 | July 27, 2004 | Watanabe |
| United States | 6,781,626 | Jan. 13, 2000 | Aug. 24, 2004 | Wang |
| United States | 6,784,928 | Dec. 15, 1998 | Aug. 31, 2004 | Sakurai |
| United States | 6,806,902 | June 8, 1999 | Oct. 19, 2004 | Donovan |
| United States | 6,839,084 | June 16, 1999 | Jan. 4, 2005 | Hiyama |
| United States | 6,850,278 | Nov. 24, 1999 | Feb. 1, 2005 | Sakurai |
| United States | 6,882,364 | Dec. 2, 1998 | April 19, 2005 | Inuiya |
| United States | 6,927,089 | Jan. 16, 2003 | Aug. 9, 2005 | Rhodes |
| United States | 6,947,087 | Dec. 28, 2000 | Sept. 20, 2005 | Egawa |
| United States | 6,965,395 | Sept. 12, 2000 | Nov. 15, 2005 | Neter |
| United States | 6,965,408 | Feb. 26, 2001 | Nov. 15, 2005 | Hiyama |
| United States | 6,970,194 | Nov. 16, 1999 | Nov. 29, 2005 | Smith |
| United States | 6,985,180 | June 19, 2001 | Jan. 10, 2006 | Chang |

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 7,067,792 | Oct. 9, 2003 | June 27, 2006 | Cazaux |
| United States | 7,068,319 | Feb. 1, 2002 | June 27, 2006 | Barna |
| United States | 7,106,373 | Dec. 14, 1999 | Sept. 12, 2006 | Dierickx |
| United States | 7,110,030 | March 9, 1999 | Sept. 19, 2006 | Kochi |
| United States | 7,129,978 | July 13, 1999 | Oct. 31, 2006 | Brehmer |
| United States | 7,133,073 | Feb. 2, 2000 | Nov. 7, 2006 | Neter |
| United States | 7,420,602 | May 29, 2002 | Sept. 2, 2008 | Fraenkel |
| United States | 7,688,371 | Aug. 15, 2001 | March 30, 2010 | Koizumi |
| United States | 2001/0036305 | Dec. 29, 2000 | Nov. 1, 2001 | Jun |
| United States | 2002/0054390 | Aug. 15, 2001 | May 9, 2002 | Koizumi |
| United States | 2002/0085237 | Jan. 2, 2001 | July 4, 2002 | Bradburn |
| United States | 2002/0196354 | June 19, 2001 | Dec. 26, 2002 | Chang |
| United States | 2003/0146991 | Feb. 1, 2002 | Aug. 7, 2003 | Barna |
| Korea | 100254642 | Aug. 11, 1997 | May 1, 2000 | Murakami |
| Korea | 19990084630 | May 8, 1998 | Dec. 6, 1999 | Kim |
| Korea | 20000019972 | Sept. 16, 1998 | April 15, 2000 | Nam |
| Japan | 1992-304091 | Apr. 1, 1991 | Oct. 27, 1992 | Suzuki |
| Japan | 1999-261046 | Mar. 12, 1998 | Sept. 24, 1999 | Kochi |
| Japan | 2000-012819 | June 17, 1998 | Jan. 14, 2000 | Isogai |
| Japan | 2000-150847 | Nov. 17, 1998 | May 30, 2000 | Ihara |
| Japan | 2001-148474 | Nov. 24, 1999 | May 29, 2001 | Nakajima |
| Japan | 2001-197367 | Jan. 6, 2000 | July 19, 2001 | Fukunaga |
| Japan | 2924250 | Apr. 1, 1991 | July 26, 1997 | Suzuki |
| Japan | 3070640 | Sept. 1, 1992 | July 31, 2000 | Akiyama |
| Japan | 11284166 | March 31, 1998 | Oct. 15, 1999 | Nakamura |
| Japan | S63-252469 | April 9, 1987 | Oct. 19, 1988 | Natori |

b.    Non-Patent Publications

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| Progress in CMOS active pixel image sensors | Feb. 1994 | Sunetra K, Mendis, Sabrina Kemeny, Russell C, Gee, Bedabrata Pain, Quiesup Kim and Eric R, Fossum | Proceedings of the SPIE vol. 2172, Charge-Coupler Devices and Solid-Stale Optical Sensors IV (1994) | 1–11 |
| CMOS Active Pixel Image Sensor | March 1994 | Sunetra Mendis, Sabrina E. Kemeny, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 41, No. 3 | 452–53 |
| Interactions between color plane interpolation and other image processing functions in electronic photography | March 1995 | James E. Adams, Jr. | Proc. SPIE 2416, Cameras and Systems for Electronic Photography and Scientific Imaging | 144–51 |
| An active pixel sensor fabricated using CMOS/CCD process technology | April 1995 | Paul P.K. Lee, Russel C. Gee, Michael Guidash, T-H. Lee, Eric R. Fossum | Proc. IEEE Workshop CCDs Adv. Image Sensors | 115–19 |
| Silicon Processing for the VLSI Era, Vol. 3: The Submicron MOSFET | 1995 | Stanley Wolf | Treatise | |
| CMOS Active Pixel Image Sensor with Simple Floating Gate Pixels | Sept. 1995 | Jun-ichi Nakamura, Sabrina E. Kemeny, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 42, No. 9 | 1693–94 |
| 256 x 256 CMOS Active Pixel Sensor Camera-on-a-Chip | Dec. 1996 | R. H. Nixon, S. E. Kemeny, B. Pain, C. O. Staller, and E. R. Fossum | IEEE Journal of Solid-State Circuits Vol. 31, No. 12 | 2046–50 |
| CMOS Active Pixel Image Sensors for Highly Integrated Imaging Systems | Feb. 1997 | S. K. Mendis, S. E. Kemeny, R. C. Gee, C. O. Staller, Quiesup Kim, and E. R. Fossum | IEEE Journal of Solid-State Circuits Vol. 32, No. 2 | 187–97 |

9

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| CMOS Active Pixel Sensor Star Tracker with Regional Electronic Shutter | Feb. 1997 | Orly Yadid-Pecht, Bedabrata Pain, Craig Staller, Christopher Clark, and Eric Fossum | IEEE Journal of Solid-State Circuits Vol. 32, No. 2 | 285–88 |
| Multiresolution Image Sensor | Aug. 1997 | Sabrina E. Kemeny, Roger Panicacci, Bedabrata Pain, Larry Matthies, and Eric R. Fossum | IEEE Transactions on Circuits and Systems for Video Technology Vol. 7, No. 4 | 575–83 |
| CMOS Image Sensors: Electronic Camera-on-a-Chip | Oct. 1997 | Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1689–98 |
| Wide Intrascene Dynamic Range CMOS APS Using Dual Sampling | Oct. 1997 | Orly Yadid-Pecht and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1721–23 |
| On-Focal-Plane Signal Processing for Current-Mode Active Pixel Sensors | Oct. 1997 | Junichi Nakamura, Bedabrata Pain, Tetsuo Nomoto, Tsutomu Nakamura, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1747–58 |
| CMOS Active Pixel Sensor with On-Chip Successive Approximation Analog-to-Digital Converters | Oct. 1997 | Zhimin Zhou, Bedabrata Pain, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1759–63 |
| Frame-Transfer CMOS Active Pixel Sensor with Pixel Binning | Oct. 1997 | Zhimin Zhou, Bedabrata Pain, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1764–68 |
| Noise performance of a color CMOS photogate image sensor | Dec. 1997 | Andrew J. Blanksby, Marc J. Loinaz, David A. Inglis, and Bryan D. Ackland | International Electron Devices Meeting. IEDM Technical Digest | 205-208 |
| Digital Camera System on a Chip | May–June 1998 | Eric R. Fossum | IEEE Micro Vol. 18, No. 3 | 8–15 |

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| A Circuit for the Correction of Pixel Defects in Image Sensors | Sep. 22-24, 1998 | Guy Meynants | Presented at European Solid-State Circuits Conference, Den-Haag; Published in European Solid-State Circuits Conference 1998 | 312-315 |
| A 200-mW, 3.3-V, CMOS Color Camera IC Producing 352 x 288 24-b Video at 20 Frames/s | Dec. 1998 | Marc J. Loinaz, Kanwar Jit Singh, Andrew J. Blanksby, David A. Inglis, Kamran Azadet, and Bryan D. Ackland | IEEE Journal of Solid-State Circuits, Vol. 33, No. 12 | 2092-2103 |
| Single-Chip Video Camera With Multiple Integrated Functions | Feb. 17, 1999 | U. Ramacher, I. Koren, H. Geib, C. Heer, T. Kodytek, J. Werner, J. Dohndorf, J.-U. Schlüßler, J. Poidevin, S. Kirmser | IEEE International Solid-State Circuits Conference, Session 17, Paper WA 17.4 | 306-307, 416 |
| A Nyquist-Rate Pixel-Level ADC for CMOS Image Sensors | March 1999 | David X. D. Yang, Boyd Fowler, and Abbas El Gamal | IEEE Journal of Solid-State Circuits, Vol. 34, No. 3 | 348-356 |
| A CMOS image sensor with a simple fixed-pattern-noise-reduction technology and a hole accumulation diode | Dec. 2000 | Kazuya Yonemoto and Hirofumi Sumi | IEEE Journal Of Solid-State Circuits, Vol. 35, No. 12 | 2038-2043 |
| Silicon Processing for the VLSI Era, Vol. 1: Process Technology | 2000 | Stanley Wolf | Treatise | |

2.    **Identification of Prior Art for the '671 Patent**

a.    **Patents, Patent Applications, and Patent Publications**

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 3,971,065 | Mar. 5, 1975 | July 20, 1976 | Bayer |
| United States | 4,541,010 | June 17, 1983 | Sept. 10, 1985 | Alston |
| United States | 4,742,238 | Oct. 1, 1986 | May 3, 1988 | Sato |
| United States | 5,293,430 | Jan. 12, 1993 | March 8, 1994 | Shiau |
| United States | 5,327,246 | Jan. 23, 1992 | July 5, 1994 | Suzuki |
| United States | 5,446,297 | Feb. 8, 1994 | Aug. 29, 1995 | Lee |
| United States | 5,477,345 | Dec. 15, 1993 | Dec. 19, 1995 | Tse |
| United States | 5,920,654 | Dec. 14, 1995 | July 6, 1999 | Someya |
| United States | 5,982,318 | Oct. 10, 1997 | Nov. 9, 1999 | Yiannoulous |
| United States | 5,982,984 | Jan. 31, 1996 | Nov. 9, 1999 | Inuiya |
| United States | 6,002,123 | March 3, 1998 | Dec. 14, 1999 | Suzuki |
| United States | 6,115,065 | Nov. 7, 1996 | Sept. 5, 2000 | Yadid-Pecht |
| United States | 6,130,710 | May 22 1995 | Oct. 10, 2000 | Yasuda |
| United States | 6,140,630 | Oct. 14, 1998 | Oct. 31, 2000 | Rhodes |
| United States | 6,222,986 | Aug. 11, 1999 | April 24, 2001 | Inuiya |
| United States | 6,246,043 | Sept. 22, 1998 | June 12, 2001 | Merrill |
| United States | 6,380,880 | March 30, 2001 | April 30, 2002 | Bidermann |
| United States | 6,403,998 | Nov. 8, 1999 | June 11, 2002 | Inoue |
| United States | 6,453,068 | Sept. 17, 1999 | Sept. 17, 2002 | Li |
| United States | 6,466,265 | June 22, 1998 | Oct. 15, 2002 | Lee |
| United States | 6,486,911 | Nov. 29, 1996 | Nov. 26, 2002 | Denyer |
| United States | 6,504,193 | June 29, 2000 | Jan. 7, 2003 | Ishiwata |
| United States | 6,512,546 | July 17, 1998 | Jan. 28, 2003 | Decker |
| United States | 6,529,238 | Sept. 1, 1998 | March 4, 2003 | Mahant-Shetti |
| United States | 6,529,622 | Oct. 30, 1998 | March 4, 2003 | Pourjavid |
| United States | 6,570,201 | Oct. 11, 2001 | May 27, 2003 | Shim |
| United States | 6,583,641 | Apr. 25, 2001 | June 24, 2003 | Wang |

12

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 6,600,471 | July 27, 2001 | July 29, 2003 | Lee |
| United States | 6,630,706 | Aug. 30, 2001 | Mar. 6, 2003 | Yang |
| United States | 6,642,962 | Sept. 1, 1999 | Nov. 4, 2003 | Lin |
| United States | 6,661,457 | March 22, 1999 | Dec. 9, 2003 | Mathur |
| United States | 6,674,471 | May 28, 1999 | Jan. 6, 2004 | Masuyama |
| United States | 6,690,000 | Dec. 1, 1999 | Feb. 10, 2004 | Maramatsu |
| United States | 6,690,423 | March 19, 1999 | Feb. 10, 2004 | Nakamura |
| United States | 6,704,049 | Feb. 23, 1998 | March 9, 2004 | Fossum |
| United States | 6,720,592 | June 29, 2001 | April 13, 2004 | Kindt |
| United States | 6,724,945 | May 24, 2000 | April 20, 2004 | Yen |
| United States | 6,741,754 | Feb. 19, 2001 | May 25, 2004 | Hamilton, Jr. |
| United States | 6,768,513 | Oct. 6, 2000 | July 27, 2004 | Watanabe |
| United States | 6,781,626 | Jan. 13, 2000 | Aug. 24, 2004 | Wang |
| United States | 6,784,928 | Dec. 15, 1998 | Aug. 31, 2004 | Sakurai |
| United States | 6,806,902 | June 8, 1999 | Oct. 19, 2004 | Donovan |
| United States | 6,839,084 | June 16, 1999 | Jan. 4, 2005 | Hiyama |
| United States | 6,847,051 | May 23, 2003 | Jan. 25, 2005 | Hong |
| United States | 6,850,278 | Nov. 24, 1999 | Feb. 1, 2005 | Sakurai |
| United States | 6,882,364 | Dec. 2, 1998 | April 19, 2005 | Inuiya |
| United States | 6,885,047 | June 18, 2003 | April 26, 2005 | Shinohara |
| United States | 6,927,089 | Jan. 16, 2003 | Aug. 9, 2005 | Rhodes |
| United States | 6,933,591 | Oct. 16, 2003 | Aug. 23, 2005 | Sidhu |
| United States | 6,947,087 | Dec. 28, 2000 | Sept. 20, 2005 | Egawa |
| United States | 6,949,971 | Dec. 23, 2003 | Sept. 27, 2005 | Jang |
| United States | 6,965,395 | Sept. 12, 2000 | Nov. 15, 2005 | Neter |
| United States | 6,965,408 | Feb. 26, 2001 | Nov. 15, 2005 | Hiyama |
| United States | 6,965,531 | June 16, 2003 | Nov. 15, 2005 | Mine |

13

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 6,970,194 | Nov. 16, 1999 | Nov. 29, 2005 | Smith |
| United States | 6,985,180 | June 19, 2001 | Jan. 10, 2006 | Chang |
| United States | 7,067,792 | Oct. 9, 2003 | June 27, 2006 | Cazaux |
| United States | 7,068,319 | Feb. 1, 2002 | June 27, 2006 | Barna |
| United States | 7,106,373 | Dec. 14, 1999 | Sept. 12, 2006 | Dierickx |
| United States | 7,110,030 | March 9, 1999 | Sept. 19, 2006 | Kochi |
| United States | 7,129,978 | July 13, 1999 | Oct. 31, 2006 | Brehmer |
| United States | 7,133,073 | Feb. 2, 2000 | Nov. 7, 2006 | Neter |
| United States | 7,155,689 | Oct. 7, 2003 | Dec. 26, 2006 | Pierrat |
| United States | 7,157,754 | Dec. 19, 2003 | Jan. 2, 2007 | Nagasaki |
| United States | 7,180,322 | Sept. 30, 2004 | Feb. 20, 2007 | Koniaris |
| United States | 7,250,647 | July 3, 2003 | July 31, 2007 | Rhodes |
| United States | 7,259,413 | Sept. 28, 2004 | Aug. 21, 2007 | Rhodes |
| United States | 7,304,286 | Dec. 8, 2003 | Dec. 4, 2007 | Tanaka |
| United States | 7,335,958 | June 25, 2003 | Feb. 26, 2008 | Mouli |
| United States | 7,388,183 | Aug. 23, 2002 | June 17, 2008 | Takayanagi |
| United States | 7,420,602 | May 29, 2002 | Sept. 2, 2008 | Fraenkel |
| United States | 7,453,741 | Oct. 7, 2004 | Nov. 18, 2008 | Kim |
| United States | 7,535,042 | July 1, 2004 | May 19, 2009 | Rhodes |
| United States | 7,602,438 | Oct. 19, 2004 | Oct. 13, 2009 | McGarvey |
| United States | 7,688,371 | Aug. 15, 2001 | March 30, 2010 | Koizumi |
| United States | 7,709,777 | June 16, 2003 | Dec. 16, 2004 | Rhodes |
| United States | 2001/0036305 | Dec. 29, 2000 | Nov. 1, 2001 | Jun |
| United States | 2002/0054390 | Aug. 15, 2001 | May 9, 2002 | Koizumi |
| United States | 2002/0085237 | Jan. 2, 2001 | July 4, 2002 | Bradburn |
| United States | 2002/0196354 | June 19, 2001 | Dec. 26, 2002 | Chang |
| United States | 2003/0146991 | Feb. 1, 2002 | Aug. 7, 2003 | Barna |

14

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 2003/0228736 | Jan. 3, 2003 | Dec. 11, 2003 | Kimura |
| United States | 2004/0000681 | June 18, 2003 | Jan. 1, 2004 | Shinohara |
| United States | 2005/0001277 | July 3, 2003 | Jan. 6, 2005 | Rhodes |
| United States | 2005/0083421 | Oct. 16, 2003 | April 21, 2005 | Berezin |
| United States | 2006/0001060 | July 1, 2004 | Jan. 5, 2006 | Rhodes |
| United States | 2006/0006915 | July 12, 2004 | Jan. 12, 2006 | Yan |
| United States | 2006/0046338 | Aug. 24, 2004 | March 2, 2006 | Patrick |
| Korea | 100254642 | Aug. 11, 1997 | May 1, 2000 | Murakami |
| Korea | 19990084630 | May 8, 1998 | Dec. 6, 1999 | Kim |
| Korea | 20000019972 | Sept. 16, 1998 | April 15, 2000 | Nam |
| Korea | 20040038225 | Oct. 31, 2002 | May 8, 2004 | Lee |
| Korea | 20040093809 | April 30, 2003 | Nov. 9, 2004 | Hong |
| Korea | 20040093816 | April 30, 2003 | Nov. 9, 2004 | Kim |
| Japan | 1992-304091 | Apr. 1, 1991 | Oct. 27, 1992 | Suzuki |
| Japan | 1999-261046 | Mar. 12, 1998 | Sept. 24, 1999 | Kochi |
| Japan | 2000-012819 | June 17, 1998 | Jan. 14, 2000 | Isogai |
| Japan | 2000-150847 | Nov. 17, 1998 | May 30, 2000 | Ihara |
| Japan | 2001-148474 | Nov. 24, 1999 | May 29, 2001 | Nakajima |
| Japan | 2001-197367 | Jan. 6, 2000 | July 19, 2001 | Fukunaga |
| Japan | 2002-231889 | Jan. 31, 2001 | Aug. 16, 2002 | Yoshimitsu |
| Japan | 2924250 | Apr. 1, 1991 | July 26, 1997 | Suzuki |
| Japan | 3070640 | Sept. 1, 1992 | July 31, 2000 | Akiyama |
| Japan | 11284166 | March 31, 1998 | Oct. 15, 1999 | Nakamura |
| Japan | S63-252469 | April 9, 1987 | Oct. 19, 1988 | Natori |
| World Intellectual Property Organization | 2004/084305 | March 19, 2003 | Sept. 30, 2004 | Ohkawa |

15

### b.    Non-Patent Publications

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| Progress in CMOS active pixel image sensors | Feb. 1994 | Sunetra K, Mendis, Sabrina Kemeny, Russell C, Gee, Bedabrata Pain, Quiesup Kim and Eric R, Fossum | Proceedings of the SPIE vol. 2172, Charge-Coupler Devices and Solid-Stale Optical Sensors IV (1994) | 1–11 |
| CMOS Active Pixel Image Sensor | March 1994 | Sunetra Mendis, Sabrina E. Kemeny, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 41, No. 3 | 452–53 |
| Interactions between color plane interpolation and other image processing functions in electronic photography | March 1995 | James E. Adams, Jr. | Proc. SPIE 2416, Cameras and Systems for Electronic Photography and Scientific Imaging | 144–51 |
| An active pixel sensor fabricated using CMOS/CCD process technology | April 1995 | Paul P.K. Lee, Russel C. Gee, Michael Guidash, T-H. Lee, Eric R. Fossum | Proc. IEEE Workshop CCDs Adv. Image Sensors | 115–19 |
| Silicon Processing for the VLSI Era, Vol. 3: The Submicron MOSFET | 1995 | Stanley Wolf | Treatise | |
| CMOS Active Pixel Image Sensor with Simple Floating Gate Pixels | Sept. 1995 | Jun-ichi Nakamura, Sabrina E. Kemeny, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 42, No. 9 | 1693–94 |
| 256 x 256 CMOS Active Pixel Sensor Camera-on-a-Chip | Dec. 1996 | R. H. Nixon, S. E. Kemeny, B. Pain, C. O. Staller, and E. R. Fossum | IEEE Journal of Solid-State Circuits Vol. 31, No. 12 | 2046–50 |
| CMOS Active Pixel Image Sensors for Highly Integrated Imaging Systems | Feb. 1997 | S. K. Mendis, S. E. Kemeny, R. C. Gee, C. O. Staller, Quiesup Kim, and E. R. Fossum | IEEE Journal of Solid-State Circuits Vol. 32, No. 2 | 187–97 |

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| CMOS Active Pixel Sensor Star Tracker with Regional Electronic Shutter | Feb. 1997 | Orly Yadid-Pecht, Bedabrata Pain, Craig Staller, Christopher Clark, and Eric Fossum | IEEE Journal of Solid-State Circuits Vol. 32, No. 2 | 285–88 |
| Multiresolution Image Sensor | Aug. 1997 | Sabrina E. Kemeny, Roger Panicacci, Bedabrata Pain, Larry Matthies, and Eric R. Fossum | IEEE Transactions on Circuits and Systems for Video Technology Vol. 7, No. 4 | 575–83 |
| CMOS Image Sensors: Electronic Camera-on-a-Chip | Oct. 1997 | Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1689–98 |
| Wide Intrascene Dynamic Range CMOS APS Using Dual Sampling | Oct. 1997 | Orly Yadid-Pecht and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1721–23 |
| On-Focal-Plane Signal Processing for Current-Mode Active Pixel Sensors | Oct. 1997 | Junichi Nakamura, Bedabrata Pain, Tetsuo Nomoto, Tsutomu Nakamura, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1747–58 |
| CMOS Active Pixel Sensor with On-Chip Successive Approximation Analog-to-Digital Converters | Oct. 1997 | Zhimin Zhou, Bedabrata Pain, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1759–63 |
| Frame-Transfer CMOS Active Pixel Sensor with Pixel Binning | Oct. 1997 | Zhimin Zhou, Bedabrata Pain, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1764–68 |
| Noise performance of a color CMOS photogate image sensor | Dec. 1997 | Andrew J. Blanksby, Marc J. Loinaz, David A. Inglis, and Bryan D. Ackland | International Electron Devices Meeting. IEDM Technical Digest | 205-208 |
| Digital Camera System on a Chip | May–June 1998 | Eric R. Fossum | IEEE Micro Vol. 18, No. 3 | 8–15 |

17

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| A Circuit for the Correction of Pixel Defects in Image Sensors | Sep. 22-24, 1998 | Guy Meynants | Presented at European Solid-State Circuits Conference, Den-Haag; Published in European Solid-State Circuits Conference 1998 | 312-315 |
| A 200-mW, 3.3-V, CMOS Color Camera IC Producing 352 x 288 24-b Video at 20 Frames/s | Dec. 1998 | Marc J. Loinaz, Kanwar Jit Singh, Andrew J. Blanksby, David A. Inglis, Kamran Azadet, and Bryan D. Ackland | IEEE Journal of Solid-State Circuits, Vol. 33, No. 12 | 2092-2103 |
| Single-Chip Video Camera With Multiple Integrated Functions | Feb. 17, 1999 | U. Ramacher, I. Koren, H. Geib, C. Heer, T. Kodytek, J. Werner, J. Dohndorf, J.-U. Schlüßler, J. Poidevin, S. Kirmser | IEEE International Solid-State Circuits Conference, Session 17, Paper WA 17.4 | 306-307, 416 |
| A Nyquist-Rate Pixel-Level ADC for CMOS Image Sensors | March 1999 | David X. D. Yang, Boyd Fowler, and Abbas El Gamal | IEEE Journal of Solid-State Circuits, Vol. 34, No. 3 | 348-356 |
| A CMOS image sensor with a simple fixed-pattern-noise-reduction technology and a hole accumulation diode | Dec. 2000 | Kazuya Yonemoto and Hirofumi Sumi | IEEE Journal Of Solid-State Circuits, Vol. 35, No. 12 | 2038-2043 |
| Silicon Processing for the VLSI Era, Vol. 1: Process Technology | 2000 | Stanley Wolf | Treatise | |
| Dark Current Reduction in Stacked-Type CMOS-APS for Charged Particle Imaging | Jan. 2003 | Isao Takayanagi, Junichi Nakamura, Eric R. Fossum, Kazuhide Nagashima, Takuya Kunihoro, and Hisayoshi Yurimoto | IEEE Transactions on Electron Devices Vol. 50, No. 1 | 70–76 |

18

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| A 1.5-V 550-uW 176 x 144 Autonomous CMOS Active Pixel Image Sensor | Jan. 2003 | Kwang-Bo Cho, Alexander I. Krymski, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 50, No. 1 | 96–105 |
| A High-Speed, 240-Frames/s 4.1-Mpixel CMOS Sensor | Jan. 2003 | Alexander I. Krymski, Nikolai E. Bock, Nianrong Tu, Daniel Van Blerkom, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 50, No. 1 | 130–35 |
| Implementation and Testing of Fault-Tolerant Photodiode-based Active Pixel Sensor (APS) | Nov. 2003 | Sunjaya Djaja, Glenn H. Chapman, Desmond Y.H. Cheung, Yves Audet | 18th IEEE International Symposium on Defect and Fault Tolerance in VLSI Systems, 2003 | 53-60 |
| Gate Oxide Breakdown | Dec. 2003 | Navid Azizi, Peter Yiannacouras | | |
| Semiconductor Physics and Devices: Basic Principles, 3rd Ed. | 2003 | Donald A. Neamen | Textbook | |
| Characteristics of Fault-Tolerant Photodiode and Photogate Active Pixel Sensor (APS) | Oct. 2004 | Michelle L. La Haye, Glenn H. Chapman, Cory Jung, Desmond Y.H. Cheung, Sunjaya Djaja, Benjamin Wang, Gary Liaw, Yves Audet | 19th IEEE International Symposium on Defect and Fault Tolerance in VLSI Systems, 2004 | 58-66 |

**B.      Identification of Prior Art for the '671 Patent**

**1.      Patents, Patent Applications, and Patent Publications**

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 3,971,065 | Mar. 5, 1975 | July 20, 1976 | Bayer |
| United States | 4,541,010 | June 17, 1983 | Sept. 10, 1985 | Alston |
| United States | 4,742,238 | Oct. 1, 1986 | May 3, 1988 | Sato |
| United States | 5,293,430 | Jan. 12, 1993 | March 8, 1994 | Shiau |

19

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 5,327,246 | Jan. 23, 1992 | July 5, 1994 | Suzuki |
| United States | 5,446,297 | Feb. 8, 1994 | Aug. 29, 1995 | Lee |
| United States | 5,477,345 | Dec. 15, 1993 | Dec. 19, 1995 | Tse |
| United States | 5,920,654 | Dec. 14, 1995 | July 6, 1999 | Someya |
| United States | 5,982,318 | Oct. 10, 1997 | Nov. 9, 1999 | Yiannoulous |
| United States | 5,982,984 | Jan. 31, 1996 | Nov. 9, 1999 | Inuiya |
| United States | 6,002,123 | March 3, 1998 | Dec. 14, 1999 | Suzuki |
| United States | 6,115,065 | Nov. 7, 1996 | Sept. 5, 2000 | Yadid-Pecht |
| United States | 6,130,710 | May 22 1995 | Oct. 10, 2000 | Yasuda |
| United States | 6,140,630 | Oct. 14, 1998 | Oct. 31, 2000 | Rhodes |
| United States | 6,222,986 | Aug. 11, 1999 | April 24, 2001 | Inuiya |
| United States | 6,246,043 | Sept. 22, 1998 | June 12, 2001 | Merrill |
| United States | 6,380,880 | March 30, 2001 | April 30, 2002 | Bidermann |
| United States | 6,403,998 | Nov. 8, 1999 | June 11, 2002 | Inoue |
| United States | 6,453,068 | Sept. 17, 1999 | Sept. 17, 2002 | Li |
| United States | 6,466,265 | June 22, 1998 | Oct. 15, 2002 | Lee |
| United States | 6,486,911 | Nov. 29, 1996 | Nov. 26, 2002 | Denyer |
| United States | 6,504,193 | June 29, 2000 | Jan. 7, 2003 | Ishiwata |
| United States | 6,512,546 | July 17, 1998 | Jan. 28, 2003 | Decker |
| United States | 6,529,238 | Sept. 1, 1998 | March 4, 2003 | Mahant-Shetti |
| United States | 6,529,622 | Oct. 30, 1998 | March 4, 2003 | Pourjavid |
| United States | 6,570,201 | Oct. 11, 2001 | May 27, 2003 | Shim |
| United States | 6,583,641 | Apr. 25, 2001 | June 24, 2003 | Wang |
| United States | 6,600,471 | July 27, 2001 | July 29, 2003 | Lee |
| United States | 6,630,706 | Aug. 30, 2001 | Mar. 6, 2003 | Yang |
| United States | 6,642,962 | Sept. 1, 1999 | Nov. 4, 2003 | Lin |
| United States | 6,661,457 | March 22, 1999 | Dec. 9, 2003 | Mathur |

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 6,674,471 | May 28, 1999 | Jan. 6, 2004 | Masuyama |
| United States | 6,690,000 | Dec. 1, 1999 | Feb. 10, 2004 | Maramatsu |
| United States | 6,690,423 | March 19, 1999 | Feb. 10, 2004 | Nakamura |
| United States | 6,704,049 | Feb. 23, 1998 | March 9, 2004 | Fossum |
| United States | 6,720,592 | June 29, 2001 | April 13, 2004 | Kindt |
| United States | 6,724,945 | May 24, 2000 | April 20, 2004 | Yen |
| United States | 6,741,754 | Feb. 19, 2001 | May 25, 2004 | Hamilton, Jr. |
| United States | 6,768,513 | Oct. 6, 2000 | July 27, 2004 | Watanabe |
| United States | 6,781,626 | Jan. 13, 2000 | Aug. 24, 2004 | Wang |
| United States | 6,784,928 | Dec. 15, 1998 | Aug. 31, 2004 | Sakurai |
| United States | 6,806,902 | June 8, 1999 | Oct. 19, 2004 | Donovan |
| United States | 6,839,084 | June 16, 1999 | Jan. 4, 2005 | Hiyama |
| United States | 6,847,051 | May 23, 2003 | Jan. 25, 2005 | Hong |
| United States | 6,850,278 | Nov. 24, 1999 | Feb. 1, 2005 | Sakurai |
| United States | 6,882,364 | Dec. 2, 1998 | April 19, 2005 | Inuiya |
| United States | 6,885,047 | June 18, 2003 | April 26, 2005 | Shinohara |
| United States | 6,927,089 | Jan. 16, 2003 | Aug. 9, 2005 | Rhodes |
| United States | 6,933,591 | Oct. 16, 2003 | Aug. 23, 2005 | Sidhu |
| United States | 6,947,087 | Dec. 28, 2000 | Sept. 20, 2005 | Egawa |
| United States | 6,949,971 | Dec. 23, 2003 | Sept. 27, 2005 | Jang |
| United States | 6,965,395 | Sept. 12, 2000 | Nov. 15, 2005 | Neter |
| United States | 6,965,408 | Feb. 26, 2001 | Nov. 15, 2005 | Hiyama |
| United States | 6,965,531 | June 16, 2003 | Nov. 15, 2005 | Mine |
| United States | 6,970,194 | Nov. 16, 1999 | Nov. 29, 2005 | Smith |
| United States | 6,985,180 | June 19, 2001 | Jan. 10, 2006 | Chang |
| United States | 7,067,792 | Oct. 9, 2003 | June 27, 2006 | Cazaux |
| United States | 7,068,319 | Feb. 1, 2002 | June 27, 2006 | Barna |

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 7,106,373 | Dec. 14, 1999 | Sept. 12, 2006 | Dierickx |
| United States | 7,110,030 | March 9, 1999 | Sept. 19, 2006 | Kochi |
| United States | 7,129,978 | July 13, 1999 | Oct. 31, 2006 | Brehmer |
| United States | 7,133,073 | Feb. 2, 2000 | Nov. 7, 2006 | Neter |
| United States | 7,155,689 | Oct. 7, 2003 | Dec. 26, 2006 | Pierrat |
| United States | 7,157,754 | Dec. 19, 2003 | Jan. 2, 2007 | Nagasaki |
| United States | 7,180,322 | Sept. 30, 2004 | Feb. 20, 2007 | Koniaris |
| United States | 7,250,647 | July 3, 2003 | July 31, 2007 | Rhodes |
| United States | 7,259,413 | Sept. 28, 2004 | Aug. 21, 2007 | Rhodes |
| United States | 7,304,286 | Dec. 8, 2003 | Dec. 4, 2007 | Tanaka |
| United States | 7,335,958 | June 25, 2003 | Feb. 26, 2008 | Mouli |
| United States | 7,388,183 | Aug. 23, 2002 | June 17, 2008 | Takayanagi |
| United States | 7,420,602 | May 29, 2002 | Sept. 2, 2008 | Fraenkel |
| United States | 7,453,741 | Oct. 7, 2004 | Nov. 18, 2008 | Kim |
| United States | 7,535,042 | July 1, 2004 | May 19, 2009 | Rhodes |
| United States | 7,602,438 | Oct. 19, 2004 | Oct. 13, 2009 | McGarvey |
| United States | 7,688,371 | Aug. 15, 2001 | March 30, 2010 | Koizumi |
| United States | 7,709,777 | June 16, 2003 | Dec. 16, 2004 | Rhodes |
| United States | 2001/0036305 | Dec. 29, 2000 | Nov. 1, 2001 | Jun |
| United States | 2002/0054390 | Aug. 15, 2001 | May 9, 2002 | Koizumi |
| United States | 2002/0085237 | Jan. 2, 2001 | July 4, 2002 | Bradburn |
| United States | 2002/0196354 | June 19, 2001 | Dec. 26, 2002 | Chang |
| United States | 2003/0146991 | Feb. 1, 2002 | Aug. 7, 2003 | Barna |
| United States | 2003/0228736 | Jan. 3, 2003 | Dec. 11, 2003 | Kimura |
| United States | 2004/0000681 | June 18, 2003 | Jan. 1, 2004 | Shinohara |
| United States | 2005/0001277 | July 3, 2003 | Jan. 6, 2005 | Rhodes |
| United States | 2005/0083421 | Oct. 16, 2003 | April 21, 2005 | Berezin |

22

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 2006/0001060 | July 1, 2004 | Jan. 5, 2006 | Rhodes |
| United States | 2006/0006915 | July 12, 2004 | Jan. 12, 2006 | Yan |
| United States | 2006/0046338 | Aug. 24, 2004 | March 2, 2006 | Patrick |
| Korea | 100254642 | Aug. 11, 1997 | May 1, 2000 | Murakami |
| Korea | 19990084630 | May 8, 1998 | Dec. 6, 1999 | Kim |
| Korea | 20000019972 | Sept. 16, 1998 | April 15, 2000 | Nam |
| Korea | 20040038225 | Oct. 31, 2002 | May 8, 2004 | Lee |
| Korea | 20040093809 | April 30, 2003 | Nov. 9, 2004 | Hong |
| Korea | 20040093816 | April 30, 2003 | Nov. 9, 2004 | Kim |
| Japan | 1992-304091 | Apr. 1, 1991 | Oct. 27, 1992 | Suzuki |
| Japan | 1999-261046 | Mar. 12, 1998 | Sept. 24, 1999 | Kochi |
| Japan | 2000-012819 | June 17, 1998 | Jan. 14, 2000 | Isogai |
| Japan | 2000-150847 | Nov. 17, 1998 | May 30, 2000 | Ihara |
| Japan | 2001-148474 | Nov. 24, 1999 | May 29, 2001 | Nakajima |
| Japan | 2001-197367 | Jan. 6, 2000 | July 19, 2001 | Fukunaga |
| Japan | 2002-231889 | Jan. 31, 2001 | Aug. 16, 2002 | Yoshimitsu |
| Japan | 2924250 | Apr. 1, 1991 | July 26, 1997 | Suzuki |
| Japan | 3070640 | Sept. 1, 1992 | July 31, 2000 | Akiyama |
| Japan | 11284166 | March 31, 1998 | Oct. 15, 1999 | Nakamura |
| Japan | S63-252469 | April 9, 1987 | Oct. 19, 1988 | Natori |
| EP | 0364038A1 | October 9, 1989 | April 18, 1990 | Theuwissen |
| World Intellectual Property Organization | 2004/084305 | March 19, 2003 | Sept. 30, 2004 | Ohkawa |

2.    **Non-Patent Publications**

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| Progress in CMOS active pixel image sensors | Feb. 1994 | Sunetra K, Mendis, Sabrina Kemeny, Russell C, Gee, Bedabrata Pain, Quiesup Kim and Eric R, Fossum | Proceedings of the SPIE vol. 2172, Charge-Coupler Devices and Solid-Stale Optical Sensors IV (1994) | 1–11 |
| CMOS Active Pixel Image Sensor | March 1994 | Sunetra Mendis, Sabrina E. Kemeny, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 41, No. 3 | 452–53 |
| Interactions between color plane interpolation and other image processing functions in electronic photography | March 1995 | James E. Adams, Jr. | Proc. SPIE 2416, Cameras and Systems for Electronic Photography and Scientific Imaging | 144–51 |
| An active pixel sensor fabricated using CMOS/CCD process technology | April 1995 | Paul P.K. Lee, Russel C. Gee, Michael Guidash, T-H. Lee, Eric R. Fossum | Proc. IEEE Workshop CCDs Adv. Image Sensors | 115–19 |
| Silicon Processing for the VLSI Era, Vol. 3: The Submicron MOSFET | 1995 | Stanley Wolf | Treatise | |
| CMOS Active Pixel Image Sensor with Simple Floating Gate Pixels | Sept. 1995 | Jun-ichi Nakamura, Sabrina E. Kemeny, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 42, No. 9 | 1693–94 |
| 256 x 256 CMOS Active Pixel Sensor Camera-on-a-Chip | Dec. 1996 | R. H. Nixon, S. E. Kemeny, B. Pain, C. O. Staller, and E. R. Fossum | IEEE Journal of Solid-State Circuits Vol. 31, No. 12 | 2046–50 |
| CMOS Active Pixel Image Sensors for Highly Integrated Imaging Systems | Feb. 1997 | S. K. Mendis, S. E. Kemeny, R. C. Gee, C. O. Staller, Quiesup Kim, and E. R. Fossum | IEEE Journal of Solid-State Circuits Vol. 32, No. 2 | 187–97 |

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| CMOS Active Pixel Sensor Star Tracker with Regional Electronic Shutter | Feb. 1997 | Orly Yadid-Pecht, Bedabrata Pain, Craig Staller, Christopher Clark, and Eric Fossum | IEEE Journal of Solid-State Circuits Vol. 32, No. 2 | 285–88 |
| Multiresolution Image Sensor | Aug. 1997 | Sabrina E. Kemeny, Roger Panicacci, Bedabrata Pain, Larry Matthies, and Eric R. Fossum | IEEE Transactions on Circuits and Systems for Video Technology Vol. 7, No. 4 | 575–83 |
| CMOS Image Sensors: Electronic Camera-on-a-Chip | Oct. 1997 | Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1689–98 |
| Wide Intrascene Dynamic Range CMOS APS Using Dual Sampling | Oct. 1997 | Orly Yadid-Pecht and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1721–23 |
| On-Focal-Plane Signal Processing for Current-Mode Active Pixel Sensors | Oct. 1997 | Junichi Nakamura, Bedabrata Pain, Tetsuo Nomoto, Tsutomu Nakamura, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1747–58 |
| CMOS Active Pixel Sensor with On-Chip Successive Approximation Analog-to-Digital Converters | Oct. 1997 | Zhimin Zhou, Bedabrata Pain, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1759–63 |
| Frame-Transfer CMOS Active Pixel Sensor with Pixel Binning | Oct. 1997 | Zhimin Zhou, Bedabrata Pain, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1764–68 |
| Noise performance of a color CMOS photogate image sensor | Dec. 1997 | Andrew J. Blanksby, Marc J. Loinaz, David A. Inglis, and Bryan D. Ackland | International Electron Devices Meeting. IEDM Technical Digest | 205-208 |
| Digital Camera System on a Chip | May–June 1998 | Eric R. Fossum | IEEE Micro Vol. 18, No. 3 | 8–15 |

25

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| A Circuit for the Correction of Pixel Defects in Image Sensors | Sep. 22-24, 1998 | Guy Meynants | Presented at European Solid-State Circuits Conference, Den-Haag; Published in European Solid-State Circuits Conference 1998 | 312-315 |
| A 200-mW, 3.3-V, CMOS Color Camera IC Producing 352 x 288 24-b Video at 20 Frames/s | Dec. 1998 | Marc J. Loinaz, Kanwar Jit Singh, Andrew J. Blanksby, David A. Inglis, Kamran Azadet, and Bryan D. Ackland | IEEE Journal of Solid-State Circuits, Vol. 33, No. 12 | 2092-2103 |
| Single-Chip Video Camera With Multiple Integrated Functions | Feb. 17, 1999 | U. Ramacher, I. Koren, H. Geib, C. Heer, T. Kodytek, J. Werner, J. Dohndorf, J.-U. Schlüßler, J. Poidevin, S. Kirmser | IEEE International Solid-State Circuits Conference, Session 17, Paper WA 17.4 | 306-307, 416 |
| A Nyquist-Rate Pixel-Level ADC for CMOS Image Sensors | March 1999 | David X. D. Yang, Boyd Fowler, and Abbas El Gamal | IEEE Journal of Solid-State Circuits, Vol. 34, No. 3 | 348-356 |
| A CMOS image sensor with a simple fixed-pattern-noise-reduction technology and a hole accumulation diode | Dec. 2000 | Kazuya Yonemoto and Hirofumi Sumi | IEEE Journal Of Solid-State Circuits, Vol. 35, No. 12 | 2038-2043 |
| Silicon Processing for the VLSI Era, Vol. 1: Process Technology | 2000 | Stanley Wolf | Treatise | |
| Dark Current Reduction in Stacked-Type CMOS-APS for Charged Particle Imaging | Jan. 2003 | Isao Takayanagi, Junichi Nakamura, Eric R. Fossum, Kazuhide Nagashima, Takuya Kunihoro, and Hisayoshi Yurimoto | IEEE Transactions on Electron Devices Vol. 50, No. 1 | 70–76 |

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| A 1.5-V 550-uW 176 x 144 Autonomous CMOS Active Pixel Image Sensor | Jan. 2003 | Kwang-Bo Cho, Alexander I. Krymski, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 50, No. 1 | 96–105 |
| A High-Speed, 240-Frames/s 4.1-Mpixel CMOS Sensor | Jan. 2003 | Alexander I. Krymski, Nikolai E. Bock, Nianrong Tu, Daniel Van Blerkom, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 50, No. 1 | 130–35 |
| Implementation and Testing of Fault-Tolerant Photodiode-based Active Pixel Sensor (APS) | Nov. 2003 | Sunjaya Djaja, Glenn H. Chapman, Desmond Y.H. Cheung, Yves Audet | 18th IEEE International Symposium on Defect and Fault Tolerance in VLSI Systems, 2003 | 53-60 |
| Gate Oxide Breakdown | Dec. 2003 | Navid Azizi, Peter Yiannacouras | | |
| Semiconductor Physics and Devices: Basic Principles, 3rd Ed. | 2003 | Donald A. Neamen | Textbook | |
| Characteristics of Fault-Tolerant Photodiode and Photogate Active Pixel Sensor (APS) | Oct. 2004 | Michelle L. La Haye, Glenn H. Chapman, Cory Jung, Desmond Y.H. Cheung, Sunjaya Djaja, Benjamin Wang, Gary Liaw, Yves Audet | 19th IEEE International Symposium on Defect and Fault Tolerance in VLSI Systems, 2004 | 58-66 |

3.    Identification of Prior Art for the '274 Patent

a.    Patents, Patent Applications, and Patent Publications

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 3,971,065 | Mar. 5, 1975 | July 20, 1976 | Bayer |
| United States | 4,541,010 | June 17, 1983 | Sept. 10, 1985 | Alston |
| United States | 4,742,238 | Oct. 1, 1986 | May 3, 1988 | Sato |
| United States | 5,293,430 | Jan. 12, 1993 | March 8, 1994 | Shiau |

27

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 5,327,246 | Jan. 23, 1992 | July 5, 1994 | Suzuki |
| United States | 5,446,297 | Feb. 8, 1994 | Aug. 29, 1995 | Lee |
| United States | 5,477,345 | Dec. 15, 1993 | Dec. 19, 1995 | Tse |
| United States | 5,920,654 | Dec. 14, 1995 | July 6, 1999 | Someya |
| United States | 5,982,318 | Oct. 10, 1997 | Nov. 9, 1999 | Yiannoulous |
| United States | 5,982,984 | Jan. 31, 1996 | Nov. 9, 1999 | Inuiya |
| United States | 6,002,123 | March 3, 1998 | Dec. 14, 1999 | Suzuki |
| United States | 6,115,065 | Nov. 7, 1996 | Sept. 5, 2000 | Yadid-Pecht |
| United States | 6,130,710 | May 22 1995 | Oct. 10, 2000 | Yasuda |
| United States | 6,140,630 | Oct. 14, 1998 | Oct. 31, 2000 | Rhodes |
| United States | 6,222,986 | Aug. 11, 1999 | April 24, 2001 | Inuiya |
| United States | 6,246,043 | Sept. 22, 1998 | June 12, 2001 | Merrill |
| United States | 6,306,738 | June 17, 1999 | October 23, 2001 | Selecuk |
| United States | 6,380,880 | March 30, 2001 | April 30, 2002 | Bidermann |
| United States | 6,403,998 | Nov. 8, 1999 | June 11, 2002 | Inoue |
| United States | 6,453,068 | Sept. 17, 1999 | Sept. 17, 2002 | Li |
| United States | 6,466,265 | June 22, 1998 | Oct. 15, 2002 | Lee |
| United States | 6,486,911 | Nov. 29, 1996 | Nov. 26, 2002 | Denyer |
| United States | 6,504,193 | June 29, 2000 | Jan. 7, 2003 | Ishiwata |
| United States | 6,512,546 | July 17, 1998 | Jan. 28, 2003 | Decker |
| United States | 6,529,238 | Sept. 1, 1998 | March 4, 2003 | Mahant-Shetti |
| United States | 6,529,622 | Oct. 30, 1998 | March 4, 2003 | Pourjavid |
| United States | 6,570,201 | Oct. 11, 2001 | May 27, 2003 | Shim |
| United States | 6,583,641 | Apr. 25, 2001 | June 24, 2003 | Wang |
| United States | 6,600,471 | July 27, 2001 | July 29, 2003 | Lee |
| United States | 6,630,706 | Aug. 30, 2001 | Mar. 6, 2003 | Yang |
| United States | 6,642,962 | Sept. 1, 1999 | Nov. 4, 2003 | Lin |

28

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 6,661,457 | March 22, 1999 | Dec. 9, 2003 | Mathur |
| United States | 6,674,471 | May 28, 1999 | Jan. 6, 2004 | Masuyama |
| United States | 6,690,000 | Dec. 1, 1999 | Feb. 10, 2004 | Maramatsu |
| United States | 6,690,423 | March 19, 1999 | Feb. 10, 2004 | Nakamura |
| United States | 6,704,049 | Feb. 23, 1998 | March 9, 2004 | Fossum |
| United States | 6,720,592 | June 29, 2001 | April 13, 2004 | Kindt |
| United States | 6,724,945 | May 24, 2000 | April 20, 2004 | Yen |
| United States | 6,741,754 | Feb. 19, 2001 | May 25, 2004 | Hamilton, Jr. |
| United States | 6,768,149 | Oct. 5, 2000 | July 27, 2004 | Mann |
| United States | 6,768,513 | Oct. 6, 2000 | July 27, 2004 | Watanabe |
| United States | 6,781,626 | Jan. 13, 2000 | Aug. 24, 2004 | Wang |
| United States | 6,784,928 | Dec. 15, 1998 | Aug. 31, 2004 | Sakurai |
| United States | 6,806,902 | June 8, 1999 | Oct. 19, 2004 | Donovan |
| United States | 6,839,084 | June 16, 1999 | Jan. 4, 2005 | Hiyama |
| United States | 6,847,051 | May 23, 2003 | Jan. 25, 2005 | Hong |
| United States | 6,850,278 | Nov. 24, 1999 | Feb. 1, 2005 | Sakurai |
| United States | 6,882,364 | Dec. 2, 1998 | April 19, 2005 | Inuiya |
| United States | 6,885,047 | June 18, 2003 | April 26, 2005 | Shinohara |
| United States | 6,927,089 | Jan. 16, 2003 | Aug. 9, 2005 | Rhodes |
| United States | 6,933,591 | Oct. 16, 2003 | Aug. 23, 2005 | Sidhu |
| United States | 6,947,087 | Dec. 28, 2000 | Sept. 20, 2005 | Egawa |
| United States | 6,949,971 | Dec. 23, 2003 | Sept. 27, 2005 | Jang |
| United States | 6,965,395 | Sept. 12, 2000 | Nov. 15, 2005 | Neter |
| United States | 6,965,408 | Feb. 26, 2001 | Nov. 15, 2005 | Hiyama |
| United States | 6,965,531 | June 16, 2003 | Nov. 15, 2005 | Mine |
| United States | 6,970,194 | Nov. 16, 1999 | Nov. 29, 2005 | Smith |
| United States | 6,985,180 | June 19, 2001 | Jan. 10, 2006 | Chang |

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 7,067,792 | Oct. 9, 2003 | June 27, 2006 | Cazaux |
| United States | 7,068,319 | Feb. 1, 2002 | June 27, 2006 | Barna |
| United States | 7,106,373 | Dec. 14, 1999 | Sept. 12, 2006 | Dierickx |
| United States | 7,110,030 | March 9, 1999 | Sept. 19, 2006 | Kochi |
| United States | 7,129,978 | July 13, 1999 | Oct. 31, 2006 | Brehmer |
| United States | 7,133,073 | Feb. 2, 2000 | Nov. 7, 2006 | Neter |
| United States | 7,155,689 | Oct. 7, 2003 | Dec. 26, 2006 | Pierrat |
| United States | 7,157,754 | Dec. 19, 2003 | Jan. 2, 2007 | Nagasaki |
| United States | 7,180,322 | Sept. 30, 2004 | Feb. 20, 2007 | Koniaris |
| United States | 7,250,647 | July 3, 2003 | July 31, 2007 | Rhodes |
| United States | 7,259,413 | Sept. 28, 2004 | Aug. 21, 2007 | Rhodes |
| United States | 7,288,788 | Dec. 3, 2004 | Oct. 30, 2007 | Ellis-Monaghan |
| United States | 7,304,286 | Dec. 8, 2003 | Dec. 4, 2007 | Tanaka |
| United States | 7,335,958 | June 25, 2003 | Feb. 26, 2008 | Mouli |
| United States | 7,388,183 | Aug. 23, 2002 | June 17, 2008 | Takayanagi |
| United States | 7,420,602 | May 29, 2002 | Sept. 2, 2008 | Fraenkel |
| United States | 7,453,741 | Oct. 7, 2004 | Nov. 18, 2008 | Kim |
| United States | 7,535,042 | July 1, 2004 | May 19, 2009 | Rhodes |
| United States | 7,602,438 | Oct. 19, 2004 | Oct. 13, 2009 | McGarvey |
| United States | 7,688,371 | Aug. 15, 2001 | March 30, 2010 | Koizumi |
| United States | 7,709,777 | June 16, 2003 | Dec. 16, 2004 | Rhodes |
| United States | 2001/0036305 | Dec. 29, 2000 | Nov. 1, 2001 | Jun |
| United States | 2002/0054390 | Aug. 15, 2001 | May 9, 2002 | Koizumi |
| United States | 2002/0085237 | Jan. 2, 2001 | July 4, 2002 | Bradburn |
| United States | 2002/0196354 | June 19, 2001 | Dec. 26, 2002 | Chang |
| United States | 2003/0146991 | Feb. 1, 2002 | Aug. 7, 2003 | Barna |
| United States | 2003/0228736 | Jan. 3, 2003 | Dec. 11, 2003 | Kimura |

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 2004/0000681 | June 18, 2003 | Jan. 1, 2004 | Shinohara |
| United States | 2005/0001277 | July 3, 2003 | Jan. 6, 2005 | Rhodes |
| United States | 2005/0083421 | Oct. 16, 2003 | April 21, 2005 | Berezin |
| United States | 2006/0001060 | July 1, 2004 | Jan. 5, 2006 | Rhodes |
| United States | 2006/0006915 | July 12, 2004 | Jan. 12, 2006 | Yan |
| United States | 2006/0046338 | Aug. 24, 2004 | March 2, 2006 | Patrick |
| Korea | 100254642 | Aug. 11, 1997 | May 1, 2000 | Murakami |
| Korea | 19990084630 | May 8, 1998 | Dec. 6, 1999 | Kim |
| Korea | 20000019972 | Sept. 16, 1998 | April 15, 2000 | Nam |
| Korea | 20040038225 | Oct. 31, 2002 | May 8, 2004 | Lee |
| Korea | 20040093809 | April 30, 2003 | Nov. 9, 2004 | Hong |
| Korea | 20040093816 | April 30, 2003 | Nov. 9, 2004 | Kim |
| Japan | 1992-304091 | Apr. 1, 1991 | Oct. 27, 1992 | Suzuki |
| Japan | 1999-261046 | Mar. 12, 1998 | Sept. 24, 1999 | Kochi |
| Japan | 2000-012819 | June 17, 1998 | Jan. 14, 2000 | Isogai |
| Japan | 2000-150847 | Nov. 17, 1998 | May 30, 2000 | Ihara |
| Japan | 2001-148474 | Nov. 24, 1999 | May 29, 2001 | Nakajima |
| Japan | 2001-197367 | Jan. 6, 2000 | July 19, 2001 | Fukunaga |
| Japan | 2002-231889 | Jan. 31, 2001 | Aug. 16, 2002 | Yoshimitsu |
| Japan | 2924250 | Apr. 1, 1991 | July 26, 1997 | Suzuki |
| Japan | 3070640 | Sept. 1, 1992 | July 31, 2000 | Akiyama |
| Japan | 11284166 | March 31, 1998 | Oct. 15, 1999 | Nakamura |
| Japan | S63-252469 | April 9, 1987 | Oct. 19, 1988 | Natori |
| World Intellectual Property Organization | 2004/084305 | March 19, 2003 | Sept. 30, 2004 | Ohkawa |

b.      **Non-Patent Publications**

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| Progress in CMOS active pixel image sensors | Feb. 1994 | Sunetra K, Mendis, Sabrina Kemeny, Russell C, Gee, Bedabrata Pain, Quiesup Kim and Eric R, Fossum | Proceedings of the SPIE vol. 2172, Charge-Coupler Devices and Solid-Stale Optical Sensors IV (1994) | 1–11 |
| CMOS Active Pixel Image Sensor | March 1994 | Sunetra Mendis, Sabrina E. Kemeny, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 41, No. 3 | 452–53 |
| Interactions between color plane interpolation and other image processing functions in electronic photography | March 1995 | James E. Adams, Jr. | Proc. SPIE 2416, Cameras and Systems for Electronic Photography and Scientific Imaging | 144–51 |
| An active pixel sensor fabricated using CMOS/CCD process technology | April 1995 | Paul P.K. Lee, Russel C. Gee, Michael Guidash, T-H. Lee, Eric R. Fossum | Proc. IEEE Workshop CCDs Adv. Image Sensors | 115–19 |
| Silicon Processing for the VLSI Era, Vol. 3: The Submicron MOSFET | 1995 | Stanley Wolf | Treatise | |
| CMOS Active Pixel Image Sensor with Simple Floating Gate Pixels | Sept. 1995 | Jun-ichi Nakamura, Sabrina E. Kemeny, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 42, No. 9 | 1693–94 |
| 256 x 256 CMOS Active Pixel Sensor Camera-on-a-Chip | Dec. 1996 | R. H. Nixon, S. E. Kemeny, B. Pain, C. O. Staller, and E. R. Fossum | IEEE Journal of Solid-State Circuits Vol. 31, No. 12 | 2046–50 |
| CMOS Active Pixel Image Sensors for Highly Integrated Imaging Systems | Feb. 1997 | S. K. Mendis, S. E. Kemeny, R. C. Gee, C. O. Staller, Quiesup Kim, and E. R. Fossum | IEEE Journal of Solid-State Circuits Vol. 32, No. 2 | 187–97 |

32

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| CMOS Active Pixel Sensor Star Tracker with Regional Electronic Shutter | Feb. 1997 | Orly Yadid-Pecht, Bedabrata Pain, Craig Staller, Christopher Clark, and Eric Fossum | IEEE Journal of Solid-State Circuits Vol. 32, No. 2 | 285–88 |
| Multiresolution Image Sensor | Aug. 1997 | Sabrina E. Kemeny, Roger Panicacci, Bedabrata Pain, Larry Matthies, and Eric R. Fossum | IEEE Transactions on Circuits and Systems for Video Technology Vol. 7, No. 4 | 575–83 |
| CMOS Image Sensors: Electronic Camera-on-a-Chip | Oct. 1997 | Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1689–98 |
| Wide Intrascene Dynamic Range CMOS APS Using Dual Sampling | Oct. 1997 | Orly Yadid-Pecht and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1721–23 |
| On-Focal-Plane Signal Processing for Current-Mode Active Pixel Sensors | Oct. 1997 | Junichi Nakamura, Bedabrata Pain, Tetsuo Nomoto, Tsutomu Nakamura, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1747–58 |
| CMOS Active Pixel Sensor with On-Chip Successive Approximation Analog-to-Digital Converters | Oct. 1997 | Zhimin Zhou, Bedabrata Pain, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1759–63 |
| Frame-Transfer CMOS Active Pixel Sensor with Pixel Binning | Oct. 1997 | Zhimin Zhou, Bedabrata Pain, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1764–68 |
| Noise performance of a color CMOS photogate image sensor | Dec. 1997 | Andrew J. Blanksby, Marc J. Loinaz, David A. Inglis, and Bryan D. Ackland | International Electron Devices Meeting. IEDM Technical Digest | 205-208 |
| Digital Camera System on a Chip | May–June 1998 | Eric R. Fossum | IEEE Micro Vol. 18, No. 3 | 8–15 |

33

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| A Circuit for the Correction of Pixel Defects in Image Sensors | Sep. 22-24, 1998 | Guy Meynants | Presented at European Solid-State Circuits Conference, Den-Haag; Published in European Solid-State Circuits Conference 1998 | 312-315 |
| A 200-mW, 3.3-V, CMOS Color Camera IC Producing 352 x 288 24-b Video at 20 Frames/s | Dec. 1998 | Marc J. Loinaz, Kanwar Jit Singh, Andrew J. Blanksby, David A. Inglis, Kamran Azadet, and Bryan D. Ackland | IEEE Journal of Solid-State Circuits, Vol. 33, No. 12 | 2092-2103 |
| Single-Chip Video Camera With Multiple Integrated Functions | Feb. 17, 1999 | U. Ramacher, I. Koren, H. Geib, C. Heer, T. Kodytek, J. Werner, J. Dohndorf, J.-U. Schlüßler, J. Poidevin, S. Kirmser | IEEE International Solid-State Circuits Conference, Session 17, Paper WA 17.4 | 306-307, 416 |
| A Nyquist-Rate Pixel-Level ADC for CMOS Image Sensors | March 1999 | David X. D. Yang, Boyd Fowler, and Abbas El Gamal | IEEE Journal of Solid-State Circuits, Vol. 34, No. 3 | 348-356 |
| A CMOS image sensor with a simple fixed-pattern-noise-reduction technology and a hole accumulation diode | Dec. 2000 | Kazuya Yonemoto and Hirofumi Sumi | IEEE Journal Of Solid-State Circuits, Vol. 35, No. 12 | 2038-2043 |
| Silicon Processing for the VLSI Era, Vol. 1: Process Technology | 2000 | Stanley Wolf | Treatise | |
| Dark Current Reduction in Stacked-Type CMOS-APS for Charged Particle Imaging | Jan. 2003 | Isao Takayanagi, Junichi Nakamura, Eric R. Fossum, Kazuhide Nagashima, Takuya Kunihoro, and Hisayoshi Yurimoto | IEEE Transactions on Electron Devices Vol. 50, No. 1 | 70–76 |

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| A 1.5-V 550-uW 176 x 144 Autonomous CMOS Active Pixel Image Sensor | Jan. 2003 | Kwang-Bo Cho, Alexander I. Krymski, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 50, No. 1 | 96–105 |
| A High-Speed, 240-Frames/s 4.1-Mpixel CMOS Sensor | Jan. 2003 | Alexander I. Krymski, Nikolai E. Bock, Nianrong Tu, Daniel Van Blerkom, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 50, No. 1 | 130–35 |
| Implementation and Testing of Fault-Tolerant Photodiode-based Active Pixel Sensor (APS) | Nov. 2003 | Sunjaya Djaja, Glenn H. Chapman, Desmond Y.H. Cheung, Yves Audet | 18th IEEE International Symposium on Defect and Fault Tolerance in VLSI Systems, 2003 | 53-60 |
| Gate Oxide Breakdown | Dec. 2003 | Navid Azizi, Peter Yiannacouras | | |
| Semiconductor Physics and Devices: Basic Principles, 3rd Ed. | 2003 | Donald A. Neamen | Textbook | |
| Characteristics of Fault-Tolerant Photodiode and Photogate Active Pixel Sensor (APS) | Oct. 2004 | Michelle L. La Haye, Glenn H. Chapman, Cory Jung, Desmond Y.H. Cheung, Sunjaya Djaja, Benjamin Wang, Gary Liaw, Yves Audet | 19th IEEE International Symposium on Defect and Fault Tolerance in VLSI Systems, 2004 | 58-66 |
| Transistors with Dual Work Function Metal Gates by Single Full Silicidation (FUSI) of Polysilicon Gates | 2002 | W.P. Maszara, Z. Krivokapic, P. King, J.-S. Goo and M.-R. Lin | IEEE Explore | 367-70 |

**4.    Identification of Prior Art for the '145 Patent**

35

### a.    Patents, Patent Applications, and Patent Publications

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 3,971,065 | Mar. 5, 1975 | July 20, 1976 | Bayer |
| United States | 4,541,010 | June 17, 1983 | Sept. 10, 1985 | Alston |
| United States | 4,742,238 | Oct. 1, 1986 | May 3, 1988 | Sato |
| United States | 5,293,430 | Jan. 12, 1993 | March 8, 1994 | Shiau |
| United States | 5,327,246 | Jan. 23, 1992 | July 5, 1994 | Suzuki |
| United States | 5,446,297 | Feb. 8, 1994 | Aug. 29, 1995 | Lee |
| United States | 5,477,345 | Dec. 15, 1993 | Dec. 19, 1995 | Tse |
| United States | 5,920,654 | Dec. 14, 1995 | July 6, 1999 | Someya |
| United States | 5,982,318 | Oct. 10, 1997 | Nov. 9, 1999 | Yiannoulous |
| United States | 5,982,984 | Jan. 31, 1996 | Nov. 9, 1999 | Inuiya |
| United States | 6,002,123 | March 3, 1998 | Dec. 14, 1999 | Suzuki |
| United States | 6,115,065 | Nov. 7, 1996 | Sept. 5, 2000 | Yadid-Pecht |
| United States | 6,130,710 | May 22 1995 | Oct. 10, 2000 | Yasuda |
| United States | 6,140,630 | Oct. 14, 1998 | Oct. 31, 2000 | Rhodes |
| United States | 6,222,986 | Aug. 11, 1999 | April 24, 2001 | Inuiya |
| United States | 6,246,043 | Sept. 22, 1998 | June 12, 2001 | Merrill |
| United States | 6,306,738 | June 17, 1999 | October 23, 2001 | Selecuk |
| United States | 6,380,880 | March 30, 2001 | April 30, 2002 | Bidermann |
| United States | 6,403,998 | Nov. 8, 1999 | June 11, 2002 | Inoue |
| United States | 6,453,068 | Sept. 17, 1999 | Sept. 17, 2002 | Li |
| United States | 6,466,265 | June 22, 1998 | Oct. 15, 2002 | Lee |
| United States | 6,486,911 | Nov. 29, 1996 | Nov. 26, 2002 | Denyer |
| United States | 6,504,193 | June 29, 2000 | Jan. 7, 2003 | Ishiwata |
| United States | 6,512,546 | July 17, 1998 | Jan. 28, 2003 | Decker |
| United States | 6,529,238 | Sept. 1, 1998 | March 4, 2003 | Mahant-Shetti |

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 6,529,622 | Oct. 30, 1998 | March 4, 2003 | Pourjavid |
| United States | 6,570,201 | Oct. 11, 2001 | May 27, 2003 | Shim |
| United States | 6,583,641 | Apr. 25, 2001 | June 24, 2003 | Wang |
| United States | 6,600,471 | July 27, 2001 | July 29, 2003 | Lee |
| United States | 6,630,706 | Aug. 30, 2001 | Mar. 6, 2003 | Yang |
| United States | 6,642,962 | Sept. 1, 1999 | Nov. 4, 2003 | Lin |
| United States | 6,661,457 | March 22, 1999 | Dec. 9, 2003 | Mathur |
| United States | 6,674,471 | May 28, 1999 | Jan. 6, 2004 | Masuyama |
| United States | 6,690,000 | Dec. 1, 1999 | Feb. 10, 2004 | Maramatsu |
| United States | 6,690,423 | March 19, 1999 | Feb. 10, 2004 | Nakamura |
| United States | 6,704,049 | Feb. 23, 1998 | March 9, 2004 | Fossum |
| United States | 6,720,592 | June 29, 2001 | April 13, 2004 | Kindt |
| United States | 6,724,945 | May 24, 2000 | April 20, 2004 | Yen |
| United States | 6,741,754 | Feb. 19, 2001 | May 25, 2004 | Hamilton, Jr. |
| United States | 6,768,149 | Oct. 5, 2000 | July 27, 2004 | Mann |
| United States | 6,768,513 | Oct. 6, 2000 | July 27, 2004 | Watanabe |
| United States | 6,781,626 | Jan. 13, 2000 | Aug. 24, 2004 | Wang |
| United States | 6,784,928 | Dec. 15, 1998 | Aug. 31, 2004 | Sakurai |
| United States | 6,806,902 | June 8, 1999 | Oct. 19, 2004 | Donovan |
| United States | 6,839,084 | June 16, 1999 | Jan. 4, 2005 | Hiyama |
| United States | 6,847,051 | May 23, 2003 | Jan. 25, 2005 | Hong |
| United States | 6,850,278 | Nov. 24, 1999 | Feb. 1, 2005 | Sakurai |
| United States | 6,882,364 | Dec. 2, 1998 | April 19, 2005 | Inuiya |
| United States | 6,885,047 | June 18, 2003 | April 26, 2005 | Shinohara |
| United States | 6,927,089 | Jan. 16, 2003 | Aug. 9, 2005 | Rhodes |
| United States | 6,933,591 | Oct. 16, 2003 | Aug. 23, 2005 | Sidhu |
| United States | 6,947,087 | Dec. 28, 2000 | Sept. 20, 2005 | Egawa |

37

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 6,949,971 | Dec. 23, 2003 | Sept. 27, 2005 | Jang |
| United States | 6,965,395 | Sept. 12, 2000 | Nov. 15, 2005 | Neter |
| United States | 6,965,408 | Feb. 26, 2001 | Nov. 15, 2005 | Hiyama |
| United States | 6,965,531 | June 16, 2003 | Nov. 15, 2005 | Mine |
| United States | 6,970,194 | Nov. 16, 1999 | Nov. 29, 2005 | Smith |
| United States | 6,985,180 | June 19, 2001 | Jan. 10, 2006 | Chang |
| United States | 7,067,792 | Oct. 9, 2003 | June 27, 2006 | Cazaux |
| United States | 7,068,319 | Feb. 1, 2002 | June 27, 2006 | Barna |
| United States | 7,106,373 | Dec. 14, 1999 | Sept. 12, 2006 | Dierickx |
| United States | 7,110,030 | March 9, 1999 | Sept. 19, 2006 | Kochi |
| United States | 7,129,978 | July 13, 1999 | Oct. 31, 2006 | Brehmer |
| United States | 7,133,073 | Feb. 2, 2000 | Nov. 7, 2006 | Neter |
| United States | 7,155,689 | Oct. 7, 2003 | Dec. 26, 2006 | Pierrat |
| United States | 7,157,754 | Dec. 19, 2003 | Jan. 2, 2007 | Nagasaki |
| United States | 7,180,322 | Sept. 30, 2004 | Feb. 20, 2007 | Koniaris |
| United States | 7,250,647 | July 3, 2003 | July 31, 2007 | Rhodes |
| United States | 7,259,413 | Sept. 28, 2004 | Aug. 21, 2007 | Rhodes |
| United States | 7,288,788 | Dec. 3, 2004 | Oct. 30, 2007 | Ellis-Monaghan |
| United States | 7,304,286 | Dec. 8, 2003 | Dec. 4, 2007 | Tanaka |
| United States | 7,335,958 | June 25, 2003 | Feb. 26, 2008 | Mouli |
| United States | 7,388,183 | Aug. 23, 2002 | June 17, 2008 | Takayanagi |
| United States | 7,420,602 | May 29, 2002 | Sept. 2, 2008 | Fraenkel |
| United States | 7,453,741 | Oct. 7, 2004 | Nov. 18, 2008 | Kim |
| United States | 7,535,042 | July 1, 2004 | May 19, 2009 | Rhodes |
| United States | 7,602,438 | Oct. 19, 2004 | Oct. 13, 2009 | McGarvey |
| United States | 7,688,371 | Aug. 15, 2001 | March 30, 2010 | Koizumi |
| United States | 7,709,777 | June 16, 2003 | Dec. 16, 2004 | Rhodes |

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| United States | 2001/0036305 | Dec. 29, 2000 | Nov. 1, 2001 | Jun |
| United States | 2002/0054390 | Aug. 15, 2001 | May 9, 2002 | Koizumi |
| United States | 2002/0085237 | Jan. 2, 2001 | July 4, 2002 | Bradburn |
| United States | 2002/0196354 | June 19, 2001 | Dec. 26, 2002 | Chang |
| United States | 2003/0146991 | Feb. 1, 2002 | Aug. 7, 2003 | Barna |
| United States | 2003/0228736 | Jan. 3, 2003 | Dec. 11, 2003 | Kimura |
| United States | 2004/0000681 | June 18, 2003 | Jan. 1, 2004 | Shinohara |
| United States | 2005/0001277 | July 3, 2003 | Jan. 6, 2005 | Rhodes |
| United States | 2005/0083421 | Oct. 16, 2003 | April 21, 2005 | Berezin |
| United States | 2006/0001060 | July 1, 2004 | Jan. 5, 2006 | Rhodes |
| United States | 2006/0006915 | July 12, 2004 | Jan. 12, 2006 | Yan |
| United States | 2006/0046338 | Aug. 24, 2004 | March 2, 2006 | Patrick |
| Korea | 100254642 | Aug. 11, 1997 | May 1, 2000 | Murakami |
| Korea | 19990084630 | May 8, 1998 | Dec. 6, 1999 | Kim |
| Korea | 20000019972 | Sept. 16, 1998 | April 15, 2000 | Nam |
| Korea | 20040038225 | Oct. 31, 2002 | May 8, 2004 | Lee |
| Korea | 20040093809 | April 30, 2003 | Nov. 9, 2004 | Hong |
| Korea | 20040093816 | April 30, 2003 | Nov. 9, 2004 | Kim |
| Japan | 1992-304091 | Apr. 1, 1991 | Oct. 27, 1992 | Suzuki |
| Japan | 1999-261046 | Mar. 12, 1998 | Sept. 24, 1999 | Kochi |
| Japan | 2000-012819 | June 17, 1998 | Jan. 14, 2000 | Isogai |
| Japan | 2000-150847 | Nov. 17, 1998 | May 30, 2000 | Ihara |
| Japan | 2001-148474 | Nov. 24, 1999 | May 29, 2001 | Nakajima |
| Japan | 2001-197367 | Jan. 6, 2000 | July 19, 2001 | Fukunaga |
| Japan | 2002-231889 | Jan. 31, 2001 | Aug. 16, 2002 | Yoshimitsu |
| Japan | 2924250 | Apr. 1, 1991 | July 26, 1997 | Suzuki |
| Japan | 3070640 | Sept. 1, 1992 | July 31, 2000 | Akiyama |

| Issuing Country | Number | Filing Date | Issue/Publication Date | First Named Inventor |
|---|---|---|---|---|
| Japan | 11284166 | March 31, 1998 | Oct. 15, 1999 | Nakamura |
| Japan | S63-252469 | April 9, 1987 | Oct. 19, 1988 | Natori |
| World Intellectual Property Organization | 2004/084305 | March 19, 2003 | Sept. 30, 2004 | Ohkawa |

b.     Non-Patent Publications

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| Progress in CMOS active pixel image sensors | Feb. 1994 | Sunetra K, Mendis, Sabrina Kemeny, Russell C, Gee, Bedabrata Pain, Quiesup Kim and Eric R, Fossum | Proceedings of the SPIE vol. 2172, Charge-Coupler Devices and Solid-Stale Optical Sensors IV (1994) | 1–11 |
| CMOS Active Pixel Image Sensor | March 1994 | Sunetra Mendis, Sabrina E. Kemeny, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 41, No. 3 | 452–53 |
| Interactions between color plane interpolation and other image processing functions in electronic photography | March 1995 | James E. Adams, Jr. | Proc. SPIE 2416, Cameras and Systems for Electronic Photography and Scientific Imaging | 144–51 |
| An active pixel sensor fabricated using CMOS/CCD process technology | April 1995 | Paul P.K. Lee, Russel C. Gee, Michael Guidash, T-H. Lee, Eric R. Fossum | Proc. IEEE Workshop CCDs Adv. Image Sensors | 115–19 |
| Silicon Processing for the VLSI Era, Vol. 3: The Submicron MOSFET | 1995 | Stanley Wolf | Treatise | |
| CMOS Active Pixel Image Sensor with Simple Floating Gate Pixels | Sept. 1995 | Jun-ichi Nakamura, Sabrina E. Kemeny, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 42, No. 9 | 1693–94 |

40

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| 256 x 256 CMOS Active Pixel Sensor Camera-on-a-Chip | Dec. 1996 | R. H. Nixon, S. E. Kemeny, B. Pain, C. O. Staller, and E. R. Fossum | IEEE Journal of Solid-State Circuits Vol. 31, No. 12 | 2046–50 |
| CMOS Active Pixel Image Sensors for Highly Integrated Imaging Systems | Feb. 1997 | S. K. Mendis, S. E. Kemeny, R. C. Gee, C. O. Staller, Quiesup Kim, and E. R. Fossum | IEEE Journal of Solid-State Circuits Vol. 32, No. 2 | 187–97 |
| CMOS Active Pixel Sensor Star Tracker with Regional Electronic Shutter | Feb. 1997 | Orly Yadid-Pecht, Bedabrata Pain, Craig Staller, Christopher Clark, and Eric Fossum | IEEE Journal of Solid-State Circuits Vol. 32, No. 2 | 285–88 |
| Multiresolution Image Sensor | Aug. 1997 | Sabrina E. Kemeny, Roger Panicacci, Bedabrata Pain, Larry Matthies, and Eric R. Fossum | IEEE Transactions on Circuits and Systems for Video Technology Vol. 7, No. 4 | 575–83 |
| CMOS Image Sensors: Electronic Camera-on-a-Chip | Oct. 1997 | Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1689–98 |
| Wide Intrascene Dynamic Range CMOS APS Using Dual Sampling | Oct. 1997 | Orly Yadid-Pecht and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1721–23 |
| On-Focal-Plane Signal Processing for Current-Mode Active Pixel Sensors | Oct. 1997 | Junichi Nakamura, Bedabrata Pain, Tetsuo Nomoto, Tsutomu Nakamura, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1747–58 |
| CMOS Active Pixel Sensor with On-Chip Successive Approximation Analog-to-Digital Converters | Oct. 1997 | Zhimin Zhou, Bedabrata Pain, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1759–63 |

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| Frame-Transfer CMOS Active Pixel Sensor with Pixel Binning | Oct. 1997 | Zhimin Zhou, Bedabrata Pain, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 44, No. 10 | 1764–68 |
| Noise performance of a color CMOS photogate image sensor | Dec. 1997 | Andrew J. Blanksby, Marc J. Loinaz, David A. Inglis, and Bryan D. Ackland | International Electron Devices Meeting. IEDM Technical Digest | 205-208 |
| Digital Camera System on a Chip | May–June 1998 | Eric R. Fossum | IEEE Micro Vol. 18, No. 3 | 8–15 |
| A Circuit for the Correction of Pixel Defects in Image Sensors | Sep. 22-24, 1998 | Guy Meynants | Presented at European Solid-State Circuits Conference, Den-Haag; Published in European Solid-State Circuits Conference 1998 | 312-315 |
| A 200-mW, 3.3-V, CMOS Color Camera IC Producing 352 x 288 24-b Video at 20 Frames/s | Dec. 1998 | Marc J. Loinaz, Kanwar Jit Singh, Andrew J. Blanksby, David A. Inglis, Kamran Azadet, and Bryan D. Ackland | IEEE Journal of Solid-State Circuits, Vol. 33, No. 12 | 2092-2103 |
| Single-Chip Video Camera With Multiple Integrated Functions | Feb. 17, 1999 | U. Ramacher, I. Koren, H. Geib, C. Heer, T. Kodytek, J. Werner, J. Dohndorf, J.-U. Schlüßler, J. Poidevin, S. Kirmser | IEEE International Solid-State Circuits Conference, Session 17, Paper WA 17.4 | 306-307, 416 |
| A Nyquist-Rate Pixel-Level ADC for CMOS Image Sensors | March 1999 | David X. D. Yang, Boyd Fowler, and Abbas El Gamal | IEEE Journal of Solid-State Circuits, Vol. 34, No. 3 | 348-356 |
| A CMOS image sensor with a simple fixed-pattern-noise-reduction technology and a hole accumulation diode | Dec. 2000 | Kazuya Yonemoto and Hirofumi Sumi | IEEE Journal Of Solid-State Circuits, Vol. 35, No. 12 | 2038-2043 |

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| Silicon Processing for the VLSI Era, Vol. 1: Process Technology | 2000 | Stanley Wolf | Treatise | |
| Dark Current Reduction in Stacked-Type CMOS-APS for Charged Particle Imaging | Jan. 2003 | Isao Takayanagi, Junichi Nakamura, Eric R. Fossum, Kazuhide Nagashima, Takuya Kunihoro, and Hisayoshi Yurimoto | IEEE Transactions on Electron Devices Vol. 50, No. 1 | 70–76 |
| A 1.5-V 550-uW 176 x 144 Autonomous CMOS Active Pixel Image Sensor | Jan. 2003 | Kwang-Bo Cho, Alexander I. Krymski, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 50, No. 1 | 96–105 |
| A High-Speed, 240-Frames/s 4.1-Mpixel CMOS Sensor | Jan. 2003 | Alexander I. Krymski, Nikolai E. Bock, Nianrong Tu, Daniel Van Blerkom, and Eric R. Fossum | IEEE Transactions on Electron Devices Vol. 50, No. 1 | 130–35 |
| Implementation and Testing of Fault-Tolerant Photodiode-based Active Pixel Sensor (APS) | Nov. 2003 | Sunjaya Djaja, Glenn H. Chapman, Desmond Y.H. Cheung, Yves Audet | 18th IEEE International Symposium on Defect and Fault Tolerance in VLSI Systems, 2003 | 53-60 |
| Gate Oxide Breakdown | Dec. 2003 | Navid Azizi, Peter Yiannacouras | | |
| Semiconductor Physics and Devices: Basic Principles, 3rd Ed. | 2003 | Donald A. Neamen | Textbook | |
| Characteristics of Fault-Tolerant Photodiode and Photogate Active Pixel Sensor (APS) | Oct. 2004 | Michelle L. La Haye, Glenn H. Chapman, Cory Jung, Desmond Y.H. Cheung, Sunjaya Djaja, Benjamin Wang, Gary Liaw, Yves Audet | 19th IEEE International Symposium on Defect and Fault Tolerance in VLSI Systems, 2004 | 58-66 |

43

| Title | Date | Author(s) | Publication | Page Number(s) |
|---|---|---|---|---|
| Transistors with Dual Work Function Metal Gates by Single Full Silicidation (FUSI) of Polysilicon Gates | 2002 | W.P. Maszara, Z. Krivokapic, P. King, J.-S. Goo and M.-R. Lin | IEEE Explore | 367-70 |

### C.    Anticipation Pursuant to 35 U.S.C. § 102

Subject to the reservation of rights above and based upon RESN's application of the claims to accused OmniVision products, Asserted Claims are invalid pursuant to 35 U.S.C. § 102 in view of the teachings of the references and the knowledge of a person of ordinary skill in the art as shown in the charts in Appendices A-D.

### D.    Obviousness Pursuant to 35 U.S.C. § 103

Subject to the reservation of rights above and based upon RESN's application of the claims to the accused products, the references charted and/or identified in these Invalidity Contentions, including the prior art identified above, at least render obvious the Asserted Claims in view of the teachings of these references and/or the knowledge of a person of ordinary skill in the art.

To the extent a finder of fact finds that a limitation of a given claim was not disclosed by one of the references charted in these Invalidity Contentions, such claim(s) are nevertheless invalid as obvious because the Asserted Claims contain nothing more than simple and obvious substitution of one known element for another or the mere obvious application of a known technique to a piece of prior art ready for the improvement. To the extent not anticipated, no asserted claim goes beyond

combining known elements to achieve predictable results or does more than choose between clear alternatives known to those of skill in the art.

Moreover, to the extent the foregoing references are found not to anticipate the Asserted Claims, the foregoing references render the Asserted Claims obvious either alone, in combination with one or more of the other references identified in Appendices A-D, or in combination with the knowledge of one of ordinary skill in the art. OmniVision is currently unaware of the extent, if any, to which RESN will contend that limitations of the Asserted Claims are not disclosed in the art identified herein. Nevertheless, OmniVision provides in Appendices A-D exemplary combinations that render the Asserted Claims obvious. Further reasons to combine the references disclosed in these contentions include the nature of the problem being solved, the express, implied, and inherent teachings of the prior art, the knowledge of persons of ordinary skill in the art, the fact that the prior art is generally directed toward the same or similar fields of endeavor, that such combinations would have yielded predictable results, and that such combinations would have represented known alternatives to a person of ordinary skill in the art.

No showing of an express teaching, suggestion, or motivation to combine prior art is required to combine the references disclosed above and in the attached charts, as each combination of art would have no unexpected results, and at most would simply represent a known alternative to one of skill in the art. *See KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 1739-40 (2007) (rejecting a "rigid" application of the teaching, suggestion, or motivation to combine test, instead espousing an "expansive and flexible" approach). Indeed, the Supreme Court held that a person of ordinary skill in the art is "a person of ordinary creativity, not an automaton" and "in many cases a person of ordinary skill in the art will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id*. at 1742. As the Supreme Court has explained: "[A]s progress beginning

from higher levels of achievement is expected in the normal course, the results of ordinary innovation are not the subject of exclusive rights under the patent laws. Were it otherwise patents might stifle, rather than promote, the progress of useful arts." *Id*.

One or more combinations of the prior art references identified above and in Appendices A-D would have been obvious because these references would have been combined using: known methods to yield predictable results; known techniques in the same way; a simple substitution of one known, equivalent element for another to obtain predictable results; and/or a teaching, suggestion, or motivation in the prior art generally. In addition, it would have been obvious to try combining the prior art references identified above and in Appendices A-D because there were only a finite number of predictable solutions and/or because known work in one field of endeavor prompted variations based on predictable design incentives and/or market forces either in the same field or a different one. In addition, the combination of the prior art references above and in Appendices A-D would have been obvious because the combination represents the known potential options with a reasonable expectation of success.

Additional evidence that there would have been a motivation to combine the prior art references identified above and in Appendices A-D includes the interrelated teachings of multiple prior art references; the effects of demands known to the design community or present in the marketplace; the existence of a known problem for which there was an obvious solution encompassed by the Asserted Claims; the existence of a known need or problem in the field of the endeavor at the time of the alleged invention(s); and the background knowledge that would have been possessed by a person having ordinary skill in the art.

For example, most of the references identified in Appendices A-D disclose systems related to image sensors. Therefore, one would look to references that disclose systems,

46

components, and algorithms to perform these functions for ways to implement them to meet desired design constraints, operate more quickly, and/or reduce costs. As such, a person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine the teachings of the prior art references cited in Appendices A-D.

In addition, OmniVision denies that any secondary consideration of non-obviousness supports a finding of non-obviousness with regard to any asserted patent. RESN has not provided any evidence or made any contention that any secondary consideration of non-obviousness supports a finding of non-obviousness with regard to any asserted patent. For example, RESN has not provided any evidence that the alleged inventions of the asserted patents resulted in commercial success or praise by others; RESN has not provided any evidence that before the asserted patents there was any long-felt need, failure of others, or unexpected results; RESN has not provided any evidence that there was copying of the asserted patents; and RESN has not provided any evidence that anyone expressed skepticism.

## III.    DOUBLE PATENTING

Based on RESN's application of the elements of the Asserted Claims of the '671, '274, and '145 claim limitations to accused products, the Asserted Claims of the '671, '145, and '274 patents are invalid for double patenting based on the claims of prior patents on the same invention issued to the same named inventors. *See Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381, 1384 (Fed. Cir. 2010) ("The doctrine of double patenting is intended to prevent a patentee from obtaining a timewise extension of [a] patent for the same invention or an obvious modification thereof."); *Application of Simmons*, 312 F.2d 821, 824 (C.C.P.A. 1963) ("Where … two applications of the same applicant for closely related subject matter are copending, a patent can

Dated:  October 1, 2025

OF COUNSEL:

David H. Bluestone (admitted *pro hac vice*)
Charles M. McMahon (admitted *pro hac vice*)
Samuel J. Ruggio (admitted *pro hac vice*)
Thomas M. DaMario (admitted *pro hac vice*)
Kathleen M. Lynch (admitted *pro hac vice*)
Carlton J Hemphill (admitted *pro hac vice*)
BENESCH FRIEDLANDER
  COPLAN & ARONOFF LLP
71 S. Wacker Drive
Chicago, IL 60606
312-212-4949
dbluestone@beneschlaw.com
cmcmahon@beneschlaw.com
sruggio@beneschlaw.com
tdamario@beneschlaw.com
klynch@beneschlaw.com
chemphill@beneschlaw.com

/s/ David H. Bluestone
Steven J. Fineman (#4025)
Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
RICHARDS, LAYTON & FINGER, PA
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
fineman@rlf.com
farnan@rlf.com
metzler@rlf.com

*Attorneys for Plaintiff and Counterclaim-Defendant OmniVision Technologies, Inc.*

54

# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OMNIVISION TECHNOLOGIES, INC., | C.A. No. 24-187-JLH-CJB |
| Plaintiff and Counterclaim Defendant, | |
| v. | **HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER** |
| RE SECURED NETWORKS, LLC, | |
| Defendant and Counterclaim Plaintiff. | |

**Rebuttal Expert Report of Dr. L. Richard Carley, Ph.D. Regarding Validity of U.S. Patent Nos. 7,323,671, 7,800,145, 7,495,274, and 6,838,651**



FIG.8

312.    Claim limitation 1[f] requires that the claimed second terminal be "coupled to one of the plurality of nodes." Thus, the second terminal and the node are separate elements coupled to one another. Here, Dr. Theuwissen identifies a single element as both the second terminal and the node. As described above with respect to limitation 1[c], Dr. Theuwissen once again appears to be improperly conflating the drain of the transfer device with the node, which is inconsistent with Kimura's disclosure at paragraph 10 (see limitation 1[c] above).

313.    Accordingly, Dr. Theuwissen has failed to show that Kimura discloses "a body between the first terminal and the second terminal" as required by limitation 1[g].

> viii.    **Limitation 1[h]: a control terminal electrically coupled to the body, wherein the transfer of the electrons occurs through the body between the first terminal and the second terminal in response to a control voltage of sufficient value applied to the control terminal, the control terminal includes a first part and a second part, the first part of the control terminal closer than the second part of the control terminal to the first terminal, the second part of the control terminal closer than the first part of the control terminal to the second terminal, the control terminal having a nonconstant work function such that a difference between the nonconstant work function of the first part of the control terminal and the nonconstant work function of the second part of the control terminal create an electric field in the body tending to cause electrons in the body to move in a direction from the first terminal to the second terminal;**

314.    Contrary to Dr. Theuwissen's opinion, Kimura does not disclose "a control terminal electrically coupled to the body, wherein the transfer of the electrons occurs through the body between the first terminal and the second terminal in response to a control voltage of sufficient

112

value applied to the control terminal, the control terminal includes a first part and a second part, the first part of the control terminal closer than the second part of the control terminal to the first terminal, the second part of the control terminal closer than the first part of the control terminal to the second terminal, the control terminal having a nonconstant work function such that a difference between the nonconstant work function of the first part of the control terminal and the nonconstant work function of the second part of the control terminal create an electric field in the body tending to cause electrons in the body to move in a direction from the first terminal to the second terminal;" as required by limitation 1[h] for at least the reasons described below.

315.     First, as described above in limitation 1[g], Kimura fails to disclose a body between the first terminal and second terminal. As such, Dr. Theuwissen fails to show how Kimura discloses wherein the transfer of the electrons occurs through "the body between the first terminal and the second terminal" in response to a control voltage of sufficient value applied to the control terminal, as is required by limitation 1[h].

316.     Even setting aside the errors in Dr. Theuwissen's analysis of the body, Kimura does not disclose the requirements of limitation 1[h]. Dr. Theuwissen's analysis relies upon

317.     In his analysis, Dr. Theuwissen relies upon the elements highlighted below as the claimed "control terminal" (which is a copy of Dr. Theuwissen's annotated Figure 8 of Kimura). *See* Theuwissen Report at ¶ 492.

113



FIG.8

318.    Dr. Theuwissen also recites Kimura's disclosure that "in FIG. 8, charge transfer gate electrode 4 forming charge transfer transistor 70 has a region 4a having a high impurity concentration and a region 4b having a low impurity concentration." Theuwissen Report at ¶ 494 (citing Kimura at ¶ 130-33).

319.    From there, Dr. Theuwissen simply concludes that "[a] person of ordinary skill in the art would have understood that the resulting graded p-type poly-silicon gate would disclose the features ascribed to the control terminal in claim 1. For example, such a gate implemented in the Kimura would 'create an electric field in the body tending to cause electrons in the body to move in a direction from the first terminal to the second terminal,' as claimed." Theuwissen Report at ¶ 495. However, Dr. Theuwissen's analysis of Kimura does not support his conclusion (see Theuwissen Report at ¶¶ 496-99), and thus Kimura does not disclose the requirements of limitation 1[h] as Dr. Theuwissen alleges.

320.    For example, in an effort to support his conclusion, Dr. Theuwissen compares the differences in work functions that a POSITA would understand existed between (1) Kimura's p-type gate electrode and (2) Kimura's channel—caused by the fact that the graded p-type gate electrode and the channel are made of different materials and are of different doping

114

concentrations. Theuwissen Report at ¶ 496. According to Dr. Theuwissen, the work function difference creates a potential drop across the gate dielectric, where the potential drop creates an electric field to exert force on charges in the body/channel of the semiconductor (even when no bias is applied to the gate electrode). Theuwissen Report at ¶ 497. According to Dr. Theuwissen, the difference in work function that he analyzes between gate electrode and channel would result in an electric field that "would attract positive charges, which are known as 'holes,' to the channel region *and repel negative charges, i.e., electrons, from the channel region*." *Id*. (emphasis added).

321.    Dr. Theuwissen supports his analysis by using Neaman as evidence of knowledge of the state of the art to underscore that the arrangement of Kimura's control terminal would result in an outcome where "the electrons are *repelled* away from the interface region." Theuwissen Report at ¶ 498.

322.    And Dr. Theuwissen ultimately concludes that the electric field created by the work function difference of the materials in Kimura's graded p-type poly gate "attracts holes, i.e., *repels electrons*." Theuwissen Report at ¶ 499.

323.    In my opinion, I disagree with Dr. Theuwissen's conclusion that Kimura's control terminal, and the work function differences associated therewith, discloses the requirements of limitation 1[h]. Ultimately, limitation 1[h] requires an "an electric field in the body tending to cause electrons in the body *to move in a direction from the first terminal to the second terminal*." '274 Patent at limitation 1[h] (emphasis added). The work function differences in Kimura analyzed by Dr. Theuwissen do not create the required electric field—in fact, as even Dr. Theuwissen appears to admit, the work function differences in Kimura create exactly the opposite of the electric field required by limitation 1[h]. In Dr. Theuwissen's own words, the work function differences

115

of Kimura create an electric field that would "*repel negative charges, i.e., electrons, from the channel region*." Theuwissen Report at ¶ 497. Kimura's electric field that repels electrons from the channel cannot disclose the claim's required "an electric field in the body tending to cause electrons in the body *to move in a direction from the first terminal to the second terminal*."

324.    Moreover, Dr. Theuwissen's analysis also fails and cannot supports that Kimura discloses the requirements of limitation 1[h] because Dr. Theuwissesn does not address many additional requirements of the claim limitation 1[h]. For example, claim limitation 1[h] requires that "the control terminal includes a first part and a second part, the first part of the control terminal closer than the second part of the control terminal to the first terminal, the second part of the control terminal closer than the first part of the control terminal to the second terminal, the control terminal having a nonconstant work function such that a difference between the nonconstant work function of the first part of the control terminal and the nonconstant work function of the second part of the control terminal create[s]" the electric field required by the claim discussed above. But Dr. Theuwissen never identifies what in Kimura he believes discloses the first part of the control terminal and the second part of the control terminal, and thus he never identifies how Kimura discloses any of the requirements related to the first and second part of the control terminals recited in limitation 1[h] (e.g., the difference between the nonconstant work function of the first part of the control terminal and the nonconstant work function of the second part of the control terminal).

325.    At best, from Dr. Theuwissen's analysis, it can be inferred that he believes the first and second parts of the control terminal are (1) Kimura's p-type gate electrode and (2) Kimura's channel, because that is the work function difference that Dr. Theuwissen analyzes. Theuwissen Report at ¶¶ 496-97. But Dr. Theuwissen never actually identifies what, if anything, in Kimura Dr. Theuwissen alleges satisfy the requirements of limitation 1[h] with respect to the first and second

116

parts of the control terminal. As such, Dr. Theuwissen does not meet his burden to prove by clear and convincing evidence that Kimura discloses limitation 1[h].

326.    Dr. Theuwissen also opines "it would be obvious in view of the teachings of Kimura to address the doping levels accordingly to move the electrons in the direction of the first terminal to the second terminal or vice versa because on the designed P or N type doping changes." Theuwissen Report at ¶ 499.

327.    I disagree that the teachings of Kimura render obvious limitation 1[h]. For example, Dr. Theuwissen never explains a theory regarding how a POSITA would need to modify Kimura to satisfy the requirements of limitation 1[h]. All Dr. Theuwissen says is that a POSITA would "address the doping levels" to move the electrons in either direction because of "designed P or N type doping changes." *Id*. As such, Dr. Theuwissen never even puts forward an obviousness theory in the first place. For example, Dr. Theuwissen never explains what modifications to which doping levels of which components of Kimura's semiconductor device a POSITA would need to make satisfy the requirements of limitation 1[h]. All Dr. Theuwissen discusses his unspecified P *or* N type doping changes that could result in the movement of electrons "in the direction of the first terminal to the second terminal *or vice versa*." As such, in addition to being unclear as to what modifications to Kimura a POSITA would make, it is also unclear whether the modifications would result in the movement of electrons as required by the claim.

328.    Moreover, in addition to not disclosing how a POSITA would need to modify Kimura to satisfy the requirements of limitation 1[h], Dr. Theuwissen also never sets forth any motivation for a POSITA to make any modifications to Kimura in the first place—let alone setting forth any expectation that any modifications to Kimura would lead to success. Moreover, a POSITA would understand that any changes required to the doping of the materials comprising

117

Kimura's semiconductor device would be cost prohibitive, and could result in worse performance. At best, Dr. Theuwissen's obviousness theory is an improper use of hindsight to try to arrive at the requirements of limitation 1[h].

329.    Accordingly, it is my opinion that Kimura neither discloses nor renders obvious the requirements of limitation 1[h] as alleged by Dr. Theuwissen.

> ix.    **Limitation 1[i]: a plurality of reset devices, wherein each of the plurality of nodes has a corresponding reset device of the plurality of reset devices, and said each of the plurality of nodes is reset when the corresponding reset device is active;**

330.    Contrary to Dr. Theuwissen's opinion, Kimura does not disclose "a plurality of reset devices, wherein each of the plurality of nodes has a corresponding reset device of the plurality of reset devices, and said each of the plurality of nodes is reset when the corresponding reset device is active" as required by limitation 1[i] for at least the reasons described below.

331.    Dr. Theuwissen relies upon item 80 in Figure 8 of Kimura (depicted below) as the reset device required by limitation 1[i]. *See* Theuwissen Report at ¶ 500.



FIG.8

If called upon to testify, my testimony would be consistent with the statements and opinions expressed above.

I, Dr. L. Richard Carley, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 6, 2026

Dr. L. Richard Carley

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PROLITEC INC., | § | |
| | § | |
| *Plaintiff/Counterclaim Defendant,* | § | |
| | § | |
| v. | § | Civil Action No. 20-984-WCB |
| | § | |
| SCENTAIR TECHNOLOGIES, LLC, | § | **FILED UNDER SEAL** |
| | § | |
| *Defendant/Counterclaim Plaintiff.* | § | |
| | § | |

**MEMORANDUM ORDER**

ScentAir Technology, LLC ("ScentAir") has moved to strike paragraphs 119 and 122–131 of the reply report filed by Prolitec Inc.'s expert, Dr. Plock. Dkt. No. 354. ScentAir seeks to strike Dr. Plock's opinions regarding the in table/out table limitation and obviousness combinations involving the Barclays Center system. *Id.* For the reasons below, the motion is granted in part and denied in part.

1. The in table/out table dispute was first substantively raised by ScentAir's expert, Mr. Dezmelyk, in his rebuttal report. ScentAir's validity contention interrogatory response did not address the omission of the in table/out table limitation from Prolitec's obviousness combinations. *See* Dkt. No. 358-1 at 44. In his reply report, Dr. Plock stated that the in table and out table functions could be performed by either a single table or two tables. That was a permissible response, especially in view of ScentAir's interrogatory response. There is therefore no reason to exclude paragraphs 119 and 120–125 of Dr. Plock's report and any testimony he may give based on those portions of his report. *See In re ChanBond, LLC Pat. Litig.*, No. 15-CV-842-RGA, 2019 WL 2098316, at *3 (D. Del. May 14, 2019) (finding that "merely list[ing] the claim limitations

1

that each reference allegedly failed to disclose, without any explanation" did not constitute adequate disclosure of a validity theory).

2. The second issue raised by ScentAir is more difficult. As an initial matter, I had asked the parties for supplemental briefing on whether Rule 16's good cause standard or the *Pennypack* factors should govern this dispute. But, because I find that the opinions should be excluded even under the more lenient *Pennypack* factors, as discussed below, I need not decide whether the good cause standard from Rule 16 applies to this dispute.

Late in fact discovery, Prolitec first learned of the sale of a scenting system to the Barclays Center in Brooklyn, New York. After fact discovery closed and five days before Dr. Plock's opening report was due for submission to ScentAir, ScentAir produced documents regarding that sale. In his opening report, Dr. Plock stated that the sale of the scenting system to the Barclays Center raised an on-sale bar to patentability and therefore rendered the asserted claims invalid.

In his reply report, Dr. Plock raised a new set of issues based on the role of the Barclays Center system in Prolitec's obviousness analysis. For the first time, Dr. Plock raised the Barclays Center system as a prior art reference and argued that the Barclays Center system, viewed in combination with various other prior art references, rendered the asserted claims invalid for obviousness.

ScentAir objects that the introduction of the Barclays Center system into a number of obviousness combinations for the first time in Dr. Plock's reply report comes too late and that the pertinent paragraphs of Dr. Plock's report (along with any testimony based on those paragraphs) should be excluded.

Prolitec responds that its obviousness theories incorporating the Barclays Center system should not be excluded, because the Barclays Center system was disclosed late in fact discovery

2

and the relevant documents were produced only a few days before Dr. Plock's opening report was due.

There is some force to that argument. However, as ScentAir points out, Prolitec had sufficient time to use the Barclays Center system as the basis for the on-sale bar issue raised in Dr. Plock's report, so it is difficult to understand why Prolitec could not have incorporated the Barclays Center system into Dr. Plock's obviousness analysis at that time as well.

Moreover, even if there was not time to include the Barclays Center system reference in Dr. Plock's initial report, Prolitec could have sought leave to supplement Dr. Plock's opening report with those paragraphs at some later time but still prior to the time that Mr. Dezmelyk's rebuttal report was due. That would have avoided the problem presented by delaying disclosure of the Barclays-based obviousness theories until Dr. Plock's reply report, when Mr. Dezmelyk would have no opportunity to respond to it.

Prolitec has not offered any explanation for its failure to seek leave to supplement Dr. Plock's opening report during the 30-day period between the time that report was submitted and the time Mr. Dezmelyk's report was due. Although there is no suggestion that Prolitec acted in bad faith in failing to seek leave to supplement Dr. Plock's opening report, I find that its failure to do so and its lack of explanation now weigh in favor of exclusion.

Further, although Prolitec asserts that "the challenged testimony is necessary for a full and fair evaluation of the parties' obviousness assertions," Prolitec offers no explanation for why these opinions, which amount to little more than a laundry list of potential combinations, are particularly important to Prolitec's invalidity case. Thus, I agree with ScentAir that Dr. Plock's omission of these opinions in his opening report suggests that they are relatively unimportant. That conclusion is further supported by the parties' agreement that Prolitec has multiple other invalidity positions

3

that will remain, including Prolitec's "on-sale bar" theory based on the Barclays Center system. Thus, the overall minimal importance of the opinions weighs in favor of exclusion. *See Allen v. Parkland Sch. Dist.*, 230 F. App'x 189, 194 (3d Cir. 2007) (finding partial exclusion of expert testimony to be "not too harsh a sanction").

Finally, Prolitec suggests that if I am inclined to provide any remedy to ScentAir, it should be, at most, an opportunity to file a sur-reply report from Mr. Dezmelyk, limited to Dr. Plock's obviousness theories based in part on the Barclays Center system.

ScentAir complains that adopting that course of action would be burdensome and time-consuming for ScentAir. Moreover, as ScentAir points out, Dr. Plock's new obviousness theories include multiple new combinations of references with the Barclays Center system reference. By my count, these theories span 24 new potential combinations, and Dr. Plock's reply report fails to suggest which of those 24 combinations Prolitec plans to pursue at trial. Responding to that number of assertions of obviousness would involve a considerable amount of new work on the part of Mr. Dezmelyk and the ScentAir attorneys. Further, it would be unfeasible to try 24 obviousness combinations, so much of the work put into preparing a sur-reply report would be rendered irrelevant by the time of trial. Because Prolitec failed to seek leave to amend Dr. Plock's opening report—an option that would have avoided this problem altogether—and instead waited until after Mr. Dezmelyk had filed his report to disclose the numerous new combinations of obviousness references, I conclude that, on balance, the burden of filing a sur-reply report should not be imposed on ScentAir. As Prolitec has proposed no other potential remedies, I find the prejudice to ScentAir and the inability to adequately cure the prejudice weigh in favor of exclusion.

In sum, I find that the *Pennypack* factors, on the whole, weigh in favor of exclusion. *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (explaining the factors). I

4

will therefore grant ScentAir's motion to strike the pertinent portions of Dr. Plock's reply report, paragraphs 126-131, and any testimony at trial based on those paragraphs.

*    *    *

In an abundance of caution, this order has been filed under seal because the parties' briefs and exhibits regarding the present motion were filed under seal.  Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal.  Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

IT IS SO ORDERED.

SIGNED this 2nd day of October, 2024.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

5

# Exhibit 6

ORAL ORDER: The Court, having reviewed the remaining unresolved portion of Plaintiff's discovery dispute motion ("motion"), (D.I. 192), in which Plaintiff requests that the Court extend the deadline for final infringement contentions to February 9, 2022, (D.I. 184 at 1), and the parties' letter briefs relating thereto, (D.I. 184; D.I. 193), and having heard argument on May 16, 2022, (D.I. 208), hereby ORDERS as follows with respect to the motion: There was a deadline in the applicable Scheduling Order for Plaintiff to file its final infringement contentions, and both sides agree that: (1) this deadline was January 6, 2022; and (2) Plaintiff did not, in fact, file its final infringement contentions by that deadline (instead, it filed those contentions a little over a month later, on February 9, 2022). (D.I. 184 at 1-2; D.I. 193 at 2-3) As a result, Plaintiff's motion here seeks an alteration to a Scheduling Order deadline. Therefore, the motion implicates the good cause standard under Fed. R. Civ. P. 16(b)(4). Lipocine Inc. v. Clarus Therapeutics, Inc., C.A. No. 19-622 (WCB), 2020 WL 4794576, at *3 (D. Del. Aug. 18, 2020). The good cause standard hinges on the diligence of the moving party; in order to show good cause, a movant must first meet the threshold requirement that it demonstrate that, despite diligence, the proposed new filing could not have reasonably been made in a timely manner. Id. Here, it is clear that Plaintiff has not demonstrated diligence. Plaintiff simply made a strategic choice not to meet the January 6, 2022 deadline for filing final infringement contentions; Plaintiff says that it did so "because [in its view] the fate of the asserted claims remained uncertain" as of that January 6 deadline. (Plaintiff argues that this uncertainty was not cleared up until February 3, 2022, when the District Court ruled on several post-Markman-hearing-related motions.). (D.I. 184 at 3) Indeed, Plaintiff's counsel acknowledged that Plaintiff could have filed final infringement contentions by January 6, 2022 and could thereafter have sought to modify such contentions in light of the District Court's February 3, 2022 ruling (if it turned out there was a need to do so); counsel candidly admitted that Plaintiff's failure to meet the January 6 deadline was a strategic "mistake." (D.I. 208 at 24, 32) (By the way, Plaintiff's counsel was right to make this admission, no matter its impact on the outcome of this motion -- since the truth of the admission was patently clear from the record, and because counsel's failure to do so would only have harmed Plaintiff's credibility in the case more broadly.). However, "[a] strategic mistake does not equate to a showing of good cause under Rule 16." iCeutica Pty Ltd v. Novitium Pharma LLC, Civil Action No. 18-599-CFC, 2019 WL 4604029, at *2 (D. Del. Sept. 23, 2019) (internal quotation marks and citation omitted). And because the good cause standard is applicable here, Plaintiff cannot turn to the Pennypack factors to try to save its belatedly-filed contentions. See Lipocine Inc., 2020 WL 4794576, at * 9 n.4 (noting that because an issue of untimeliness before the court related to a motion to file an amended answer after a related scheduling order deadline had passed, the Pennypack factors did not apply and the good cause standard controlled instead); Finjan, Inc. v. Rapid7, Inc., C.A. No. 18-1519-MN, 2020 WL 5798545, at *5-6 (D. Del. Sept. 29, 2020) (recognizing that if a motion is one that relates to a scheduling order violation, then the good cause standard would apply, and resort to the Pennypack factors would not be proper); see also Faiella v. Sunbelt Rentals, Inc., --- F. Supp. 3d ---, 2022 WL 827146, at *3 (D.N.J. Mar. 18, 2022) (same); Otsuka Pharm. Co. v. Aurobindo Pharma Ltd., Civil Action No. 14-3306 (JBS/KMW), 2017 WL 11463663, at *4 (D.N.J. Sept. 15, 2017) (same). This result might seem harsh in light of the facts here, since Plaintiff submitted the belated contentions at issue only about a month after the filing deadline called for by the Scheduling Order. But

more broadly, the United States Court of Appeals for the Third Circuit has explained why it makes sense that the good cause standard (and its threshold requirement of a showing of diligence) should control, even in such circumstances: if courts allowed scheduling orders to be "disregarded without a specific showing of good cause, their utility would be severely impaired." Compagnie des Grands Hotels dAfrique S.A. v. Starwood Cap. Grp. Global I LLC, Civil Action No. 18-654-RGA, 2019 WL 4740083, at *1 (D. Del. Sept. 27, 2019) (quoting Koplove v. Ford Motor Co., 795 F.2d 15, 18 (3d Cir. 1986)); see also Faiella, 2022 WL 827146, at *3 ("[I]f a court only considers the Pennypack factors when a party obtains discovery in contravention of a scheduling order [instead of utilizing the good cause standard], a party may strategically not seek an extension of time in order to evade the scheduling order and evade the good cause standard"). Because Plaintiff has failed to show good cause, its motion is DENIED. Ordered by Judge Christopher J. Burke on 6/28/2022. (dlb) (Entered: 06/28/2022)

As of June 29, 2022, PACER did not contain a publicly available document associated with this docket entry. The text of the docket entry is shown above.

*Vaxcel International Co. Ltd. v. HeathCo LLC*
1-20-cv-00224 (DDE), 6/28/2022, docket entry 226

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TQ DELTA LLC,                          :
                                       :
              Plaintiff,               :
                                       :
       v.                              :        Civil Action No. 13-1835-RGA
                                       :
2WIRE, INC.,                           :
                                       :
              Defendant.               :

**ORDER**

Plaintiff has filed a motion in the Family 6 portion of the case to strike the late assertion

of prior art.  (D.I. 1328).  The motion is fully briefed.  (D.I. 1329, 1337, 1349).

In particular, Plaintiff moves to strike about fifty enumerated paragraphs of Defendant's

expert's report on invalidity.  Plaintiff says two Texas Instruments prior art products, which it

calls "Virtuoso" and "TNETD2000C," were not disclosed before the opening expert report.  The

two products are used to assert invalidity in connection with two asserted claims of the '835

patent, which are the only asserted claims of Family 6.

Pursuant to the Final Scheduling Order (D.I. 513, ¶¶ 2, 8),[1] Defendant's Final Invalidity

Contentions were served August 15, 2018, before the close of fact discovery on October 1, 2018.

Trial was scheduled for January 25, 2021, but that date has recently been vacated.  (D.I. 1496).

The two pieces of prior art were first asserted in this case in an expert report served on July 10,

---

[1] The order noted, "Defendants may seek leave to supplement their final invalidity contentions for good cause."
Defendant does not assert that it took advantage of this provision.

2020.  Plaintiff argues there was no good cause for amending the scheduling order, and the

*Pennypack* factors support striking the evidence.  (D.I. 1329).

Defendant's response essentially concedes the accuracy of Plaintiff's recitation of the

timeline, but asserts it has good cause to amend because its expert earlier asserted the same art

against Plaintiff on the same patent in the ZyXel case.   And, in any event, Defendant states that

the *Pennypack* factors do not favor striking the evidence.  (D.I. 1337).

Defendant's "good cause" argument is essentially that its expert witness did not develop

the theory based on the Texas Instruments prior art until recently.  Yet the same expert cited the

same prior art against the same two claims of the same patent on September 3, 2019, in a related

case.  (*TQ Delta v. ZyXel,* No. 13-2013 (D.Del.) (D.I. 661 at 3)).  And TQ Delta moved to strike

the prior art in November 2019 in that case too.  (*Id.*).  Good cause requires diligence.  *See*

*Premier Comp Solutions, LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020).  Defendant has not

begun to show diligence. There is no good cause to amend the schedule.

That leaves the *Pennypack* factors for the exclusion of witnesses and evidence:

> Decisions of this and other courts suggest the factors to be considered in resolving this question: bad faith on the part of the party seeking to call witnesses not listed in his pretrial memorandum; ability of the party to have discovered the witnesses earlier, validity of the excuse offered by the party, willfulness of the party's failure to comply with the court's order; the parties' intent to mislead or confuse his adversary; and finally, the importance of the excluded testimony. Underlying the cases to which we have adverted are these basic considerations: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order.

*Meyers v. Pennypack Woods Home Ownership Assn.*, 559 F.2d 894, 904–05 (3d Cir. 1977)

(citations omitted).

It is hard to conclude Defendant has operated in bad faith. On the other hand, there is no explanation why Defendant did nothing to alert Plaintiff of its new theories in the nine months or more before the expert report was issued. Clearly, Defendant knew (if nothing else, Defendant's expert's knowledge is attributable to Defendant) of the evidence nine months or more before it disclosed the evidence. Defendant offers no compelling excuse for the delay. Thus, I conclude that the failure to disclose earlier was a conscious decision, and intentional, not just negligent. The parties argue about the importance of the evidence, but I am persuaded by Plaintiff's argument that Defendant has advanced dozens of invalidity theories[2] and it is hard to believe that two additional pieces of prior art have anything more than marginal value. I note in the subsequent summary judgment briefing (D.I. 1420, 1421), Defendant advances three theories of invalidity, including one of anticipation and one of obviousness. None of the three mentions the Texas Instruments prior art; the anticipation and obviousness arguments are primarily based on the G.992.1 standard.

The asserted prior art are products, not publications or patents. Plaintiff states it is prejudiced because it has not been able to investigate the products through discovery such as testing, source code review, or documentary production in support of public use or sale beyond what Defendant's expert (who two decades ago was personally involved with the products) had in her possession. (D.I. 1329 at 11-12). Defendant responds that any prejudice is "minimal." It says it is unlikely source code still exists. (D.I. 1337 at 9). Given the age of the products, witness testimony is unlikely to be helpful. (*Id.* at 8). Defendant also states that Plaintiff should have investigated these products when ZyXel raised them, but Plaintiff persuasively points out that it

---

[2] Plaintiff asserts Defendant's expert report advanced twenty-five obviousness grounds, fourteen anticipation grounds, ten §112 grounds, and two §101 grounds. (D.I.1329 at 17-18 & n.13). Defendant does not contest this headcount. (D.I. 1337 at 11-12).

did object to them and the ZyXel case soon thereafter settled.  Defendant does not object to limited discovery including attempts to locate source code (which, if found, would then have to be analyzed) and the deposition of the designer of the relevant chipsets.  (*Id*. at 9).  Discovery could be taken now (since the trial has been indefinitely postponed), and the likely result is that such discovery would produce whatever it would have produced if it had been done in 2018.  The results, whatever they might be, would likely lead to more expert reports and more motions.  Out-of-time discovery is not without cost, some of which would have been unnecessary had Defendant advanced these theories when it first knew about them.

In sum, there is some prejudice to Plaintiff, there is no excuse for Defendant's delay, and I am completely unconvinced that Defendant needs the additional art.

Plaintiff's motion to strike (D.I. 1328) is **GRANTED**.

IT IS SO ORDERED this 10th day of December 2020.

/s/ Richard G. Andrews
United States District Judge

| New Reference or Theory | Proposed Language to be Struck (If Less Than Full Paragraph) | Report Paragraph | Basis to Strike |
|---|---|---|---|
| U.S. Patent No. 6,218,656 (Ex. 28, "Guidash-656") | [Full Paragraphs] | Reply Report ¶¶ 73-76 | (3) Reference not disclosed in contentions |
| U.S. Patent No. 6,218,656 (Ex. 28, "Guidash-656") | Fourth, Dr. Carley's assertion that a "POSITA would not have been encouraged to adopt the method of driving a 3T pixel shown in Fig 2 of Guidash-656" is misguided as well. (*See* Carley Rebuttal, ¶ 107.) | Reply Report ¶ 77 | (3) Reference not disclosed in contentions |
| U.S. Patent No. 6,218,656 (Ex. 28, "Guidash-656") | Each of these elements are also present within Mr. Guidash's 4T pixel cell with the RS select transistor eliminated. Neither the source follower nor row select transistor are shown because they are read out circuitry portions, immaterial to how the transfer gate is driven. | Reply Report ¶ 79 | (3) Reference not disclosed in contentions |
| U.S. Patent No. 6,218,656 (Ex. 28, "Guidash-656") | The POSITA would be substituting one known element, a 4T pixel cell that includes a transfer gate, with another, a modified 4T pixel cell that also includes a transfer gate). It would be obvious to try Koizumi with either pixel cell structure because the focus is on the transfer gate, which is present in both pixel cell arrangements. The presence of a row select transistor has no effect on Koizumi's invention. | Reply Report ¶ 80 | (3) Reference not disclosed in contentions |
| U.S. Patent No. 6,218,656 (Ex. 28, "Guidash-656") | [Full Paragraph] | Reply Report ¶ 81 | (3) Reference not disclosed in contentions |
| U.S. Patent No. 6,218,656 (Ex. 28, "Guidash-656") | To the extent that the claim limitation would be construed to apply to the modified 4T pixel with the row select transistor but not the typical 4T pixel cell, it would be obvious to further combine with Guidash-656 because both devices have a transfer device and the combination would operate in the same manner—the presence of the row select transistor is irrelevant with respect to the claimed features. | Reply Report ¶¶ 70, 100, 154, 166, 169, 177 | (3) Reference not disclosed in contentions |
| U.S. Patent No. 6,218,656 (Ex. 28, "Guidash-656") | [Full Paragraphs] | Opening Report ¶¶ 124-125, 224, 321 | (3) Reference not disclosed in contentions |
| U.S. Patent No. 7,325,206 (Ex. 45, "White") | To the extent that this claim limitation may be construed to be limiting, as of138 the December 30, 2004 filing date for the MTTPS, the creation of such computer-readable designs has been known in the industry for decades, and a typical integrated circuit designer would be aware of such computer-readable descriptions, capable of creating such a computer-readable description, and motivated to create such a computer-readable description as using computer aided design tools greatly simplifies the integrated circuit design and fabrication process. For example. U.S. Patent No. 7,325,206 ("White") which was filed on December 17, 2004 and assigned to Cadence Design Systems, Inc. (Ex. 45.) White discloses the use of an electronic design automation (EDA) tool that saves files in the Graphical Data Stream (GDS) file format. (*See id.* at 2:8-13, Figs. 10B, 28) | Opening Report ¶ 331 | (3) Reference not disclosed in contentions |
| U.S. Patent No. 7,325,206 (Ex. 45, "White") | To the extent that the "computer readable medium" is considered to be limiting, it is my opinion that Kochi discloses or would be obvious in view of any of the prior art references discussed in paragraph 331. | Opening Report ¶ 374 | (3) Reference not disclosed in contentions |
| U.S. Patent No. 7,155,689 (Ex. 46, "Pierrat") | Additionally, U.S. Patent No. 7,155,689 ("Pierrat") states: FIG. 5 encapsulates the existing IC creation process. IC creation is divided into design (501) and manufacturing (502) aspects. Based on circuit element models (503) and design rules (592) provided by circuit manufacturers, circuit designers generate the layout (504) of the IC. Such layout generation can be facilitated by the use of CAD technology (505). From the layout, circuit manufacturers fabricate the ICs (506). The circuit element models (503) can be derived from a variety of means including manufacturing data, empirical fitting, theoretical considerations, and computer simulation such as technology computer-aided design (TCAD) programs, | Opening Report ¶¶ 331, 419, 476 | (3) Reference not disclosed in contentions |
| U.S. Patent No. 7,155,689 (Ex. 46, "Pierrat") | To the extent that the "computer readable medium" is considered to be limiting, it is my opinion that Kochi discloses or would be obvious in view of any of the prior art references discussed in paragraph 331. | Opening Report ¶ 374 | (3) Reference not disclosed in contentions |
| U.S. Patent No. 7,155,689 (Ex. 46, "Pierrat") | A person of ordinary skill in the art would have understood that the design and manufacture of semiconductor integrated circuits, like the image sensors disclosed in Rhodes-647 and Kimura, is typically performed using computer aided (CAD) tools that result in a design/description of the190 integrated circuits that would have been understood, in the context of the Rhodes-647- Kimura combination, as a "computer readable description of an image sensor integrated circuit." (Ex. 46, Abstract, 1:6-7, 4:33-44.) | Opening Report ¶¶ 418, 475, 514 | (3) Reference not disclosed in contentions |
| Untimely Motivation to Combine | [Full Paragraphs] | Reply Report ¶¶ 236-244 | (4) Analysis not disclosed in opening report |
| Untimely Motivation to Combine | [Full Paragraph] | Reply Report ¶ 254 | (4) Analysis not disclosed in opening report |
| Untimely Obviousness Combination - Koizumi + Guidash-656 | [Full Paragraph] | Reply Report ¶ 100 | (5) Analysis not disclosed in opening report |
| Untimely Kimura Analysis | [Full Paragraphs] | Reply Report ¶¶ 180-186 | (5) Analysis not disclosed in opening report |